IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

# FILED

JUN 1 3 2006
JUN 13 2006
**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

| | |
|---|---|
| ROBERT S. GOLDBERG, M.D. and<br>JUNE BEECHAM,<br><br>    Relators,<br><br>BRING THIS ACTION ON BEHALF<br>OF THE UNITED STATES OF AMERICA<br>and the STATE OF ILLINOIS<br><br>    Plaintiffs,<br><br>        v.<br><br>RUSH UNIVERSITY MEDICAL CENTER;<br>MIDWEST ORTHOPAEDICS<br>AT RUSH, LLC;<br>RUSH SURGICENTER, LTD.<br>PARTNERSHIP; and BRIAN J. COLE, M.D.<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

All Pleadings and Motions filed
*IN CAMERA.* Sealed pursuant
to 31 U.S.C. § 3730(b)(2) and
740 ILCS 175/4(2)

No.  04 C 4584

Judge Kocoras

Jury Trial Demanded

## SECOND AMENDED AND SUPPLEMENTAL COMPLAINT
## FOR DAMAGES AND OTHER RELIEF

Relators Robert S. Goldberg, M.D. and June Beecham bring this *qui tam* action in

the name of the United States of America and the State of Illinois against the Defendants

named herein, and allege, aver and state as follows:

### JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3732 and

under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1 *et seq.*, and is

brought by the Relators on behalf of the United States of America and on behalf of the State

of Illinois, against Defendants Rush University Medical Center, Midwest Orthopaedics,

LLC, the Rush SurgiCenter, LLC and Brian Cole, M.D.

2.     Relators Dr. Goldberg and Ms. Beecham are authorized to bring these claims on behalf of the United States pursuant to 31 U.S.C. § 3730(b) and on behalf of the State of Illinois pursuant to 740 ILCS 175/4(b)

3.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a).

4.     At all times relevant to this complaint, Defendants were found and/or transacted business in the Northern District of Illinois.  Moreover, one or more of the acts proscribed by 31 U.S.C. § 3729 and 740 ILCS 175/1 *et seq.* occurred in the Northern District of Illinois.  Accordingly, venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732 (a).  This action was filed under seal on July 12, 2004 in the United States District Court of the Northern District of Illinois and a first amended and supplemental complaint was filed on November 1, 2005.

## PARTIES

5.     The causes of action alleged herein arise from false statements, false certifications of compliance with state and federal regulations and associated actions to knowingly assert improper claims for compensation from the United States and the State of Illinois regarding the administration of Rush University Medical Center as a teaching hospital receiving Medicare Parts A and B reimbursement and payments, including federal Graduate Medical Expense ("GME") payments, medical services provided by Midwest Orthopaedics to Medicare and Medicaid patients and its associated billing practices, administration and operation of the Rush SurgiCenter, and participation in compensation arrangements which amount to remuneration for referrals.  With respect to the State of Illinois, the Relators bring this action on behalf of the State of Illinois, Illinois Department

of Healthcare and Family Services (hereafter "DHFS") which administers the Grants to States for Medical Assistance Programs for the State of Illinois pursuant to Title XIX of that Act, 42 U.S.C. § 1396 *et seq.* Defendants filed false claims and falsely certified compliance with applicable laws to obtain payments from the State of Illinois under the Illinois Medicaid Program, 42 U.S.C. § 1396 *et seq.* (hereafter Medicaid).

6.     Relator Dr. Robert Goldberg is and has been a Board-certified orthopedic surgeon on the medical staff at Rush University Medical Center in Chicago since 1995 and authorized to perform surgery at the Rush SurgiCenter during all relevant times.   Dr. Goldberg is the original source of the information establishing violations of the False Claims Act and the Illinois Whistleblower Act set forth herein.

7.     Relator June Beecham was the Director of Real Estate for Rush University Medical Center from 1996 to 2003.  Ms. Beecham is the original source of the information establishing violations of the False Claims Act and the Illinois Whistleblower Act set forth herein.

8.     Defendant Rush University Medical Center, f/k/a Rush Presbyterian—St. Luke's Medical Center (hereafter "Rush"), at all times relevant to this complaint operated as a provider of medical care to Medicare and Medicaid beneficiaries and is a teaching hospital accredited by the Accreditation Council for Graduate Medical Education ("ACGME") under the rules and regulations of Medicare Part A receiving GME payments for its resident training programs.  Said defendant is a corporation formed under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.  Mr. James T. Frankenbach was the Senior Vice-President of Corporate and Hospital Affairs at Rush during times

relevant to this action, and therefore finally responsible for decisions concerning leasing agreements with physicians who leased office space from Rush.

(a) Rush participates in both the Medicare and Medicaid Programs.  Rush University Medical Center has 963 Medicare and/or Medicaid certified beds within its facility of which approximately 468 are surgical.  Rush employs 620 certified Residents and has 450 full-time equivalent Physicians.

(b) Rush is one of 19 major teaching institutions in the State of Illinois.  Currently in Illinois the average hospital revenue source by payer is comprised of 40% Medicare and 13% Medicaid payers.[1]  Illinois also administers a State Children's Health Insurance Program (SCHIP / KidCare Illinois).

(c) Rush is accredited by the Joint Commission on the Accreditation of Healthcare Organizations.  Rush is a Disproportionate Share Hospital (DSH).  The disproportionate share hospital program, as described in Illinois Administrative Code, § 148.120, allows the department to provide additional payments to qualifying hospitals for services vital to Medicaid clients.  Rush also receives Medicaid High Volume Adjustments (MHVA) to DSH Hospitals.  MHVA payments, as described in Illinois Administrative Code, § 148.120, consist of adjustments made to disproportionate share hospitals (DSH), excluding those operated by Cook County and the University of Illinois at Chicago.

9.      Defendant Midwest Orthopaedics, as successor to Midwest Orthopaedics, an Illinois general partnership, is an LLC formed under the laws of the State of Illinois, with its principal place of business at Chicago, Illinois.  Dr. Gunnar Andersson was Chairman of

---

[1] Data are derived from the 2003 AHA/Health Forum Annual Survey of Hospitals.

the Department of Orthopaedics at Rush and a principal in Midwest Orthopaedics during times relevant to this action. Defendant Midwest Orthopaedics, at all times relevant to this complaint, operated as a provider of medical care to Medicare and Medicaid beneficiaries.

10.     Defendant Rush SurgiCenter Ltd. Partnership ("Rush SurgiCenter") is a multi-specialty surgery center owned in part by Rush and physicians who are members of Midwest Orthopaedics, among others. The center performs high volumes of orthopedic surgeries, including specifically endoscopic procedures, among other procedures.

11.     Defendant Brian J. Cole is an orthopedic surgeon and member of Midwest Orthopaedics, who performs numerous endoscopic surgical procedures at Rush SurgiCenter.

## BACKGROUND FACTS

*Rush University Medical Center – Background*

12.     Rush is an acute care hospital as well as a teaching and research institution.

13.     Rush, as a recipient of Medicare and Medicaid funds and other federal funds, was and is required to abide by all Medicare Part A (42 U.S.C. § 1395 *et seq.*), and Medicare Part B (42 U.S.C. § 1395j *et seq.*) rules and regulations specifically including the prohibition on referrals at 42 U.S.C. § 1395nn. In particular, Rush is subject to sanctions if Rush receives Medicare or Medicaid payments based on false statements, or if Rush participates in compensation arrangements which amount to remuneration for referrals.

14.     Hospitals which sponsor graduate training programs incur teaching costs in addition to the costs associated with patient care. Medicare makes explicit provision for payments to teaching hospitals for a portion of the added costs. These costs are paid pursuant to Medicare Part A Graduate Medical Expense ("GME") payments. GME

payments are made pursuant to 42 U.S.C. § 1395ww(h).  Attending physicians who involve

residents in their care are reimbursed pursuant to Medicare Part B.  Under Medicare Part B

rules, reimbursement to teaching physicians performing surgery and endoscopic operations

can only be made when the teaching physician medically directed the services provided by

the resident, and the teaching physician was physically present during all "key and critical"

portions of the surgical procedure.  42 C.F.R. §415.172; & Part 3 HHS Medicare Carriers

Manual, Carrier Manual Instructions, § 15016, Supervising Physicians in Teaching Settings,

Transmittals 1780 §15016.C.4.a(2) at 31 U.S.C. §1302.

15.    Rush requires that all medical doctors who admit patients to the hospital also

be members of the faculty of Rush Medical College.  The faculty members are required to

participate in Rush's teaching programs.  As stated *supra* the State of Illinois reimburses

Rush an additional amount for treating high volumes of Medicaid patients in the form of

"disproportionate share adjustment" payments ("DSH" payments) and Medicaid High

Volume Adjustments ("MHVA").  As part of the Medicaid reimbursement criteria, Rush

expressly certifies that it complies with all state and federal laws and regulations, and

accreditation guidelines as a condition of reimbursement, and the State allows

reimbursement in reliance upon such continuing certifications.[2]  *See, e.g.,* Medicaid Provider

Agreement, attached hereto as Exhibit A.

*Midwest Orthopaedics - Background*

16.    Midwest Orthopaedics is a group of orthopedic surgeons in private practice

who are not employees of Rush, but have surgical privileges at Rush and are members of the

faculty of Rush Medical College.  Midwest Orthopaedics is the largest group of private

---

[2]  Illinois Department of Healthcare and Family Services, "Agreement for Participation in the Illinois Medical
Assistance Program,"(Form DPA 1413 (R-6-04) IL478-1930).

practice physicians practicing at Rush, and one of the, if not the largest private practice group of orthopedic physicians in the country.

17.    Midwest Orthopaedics is required to abide by 42 U.S.C. § 1395(n), payment of benefits, and 42 U.S.C. § 1395(i)(A), outpatient surgery,  as amended, and applicable regulations promulgated in connection with such provision.

18.    Many nurses employed at Midwest Orthopaedics who perform services for purposes of the private practice of Midwest Orthopaedics received their payroll checks not from Midwest Orthopaedics, which is an independent business, but instead from Rush.

19.    By virtue of its position as a teaching hospital, Rush received compensation from the United States for the use of its facilities in teaching such as when an orthopedic surgeon teaches surgery to an orthopedic resident during an actual surgical procedure.  Rush is reimbursed for expenses associated with the training of residents, including residents' salaries, under Medicare Part A under a Medicare Indirect Medical Education ("IME") payment which is an adjustment provided to teaching hospitals to account fully for factors such as severity of illness of patients requiring the specialized services and treatment programs provided by teaching institutions and the additional costs associated with the teaching of residents.  Similarly, teaching hospitals and/or their affiliated medical schools, like Rush, are reimbursed for the teaching activities of Attending Physicians under Medicare Part A.  Those payments are designed to control Medicare costs by supplanting fee-for-service charges with lower-cost teaching compensation where the direct patient care is provided by the Residents, Fellows, Nurses, and Physician Assistants and the attending physician only indirectly contributes to patient care by acting in a supervisory and teaching role.  Attending physicians are prohibited from billing under Medicare Part B for services for which they are already compensated under Part A where the attending physician has not

directly supervised the residents during key and critical portions of the procedures and/or surgeries.

20.    Each and every time Rush presented a claim for compensation from the United States by virtue of its role as a teaching institution, Rush was representing and certifying to the United States that Rush was in fact acting as a teaching institution and complying with all Medicare and/or other applicable federal healthcare program regulations.   Such certification and continuing compliance with federal laws is also an express condition of obtaining funds from the State under the Medicaid program.

21.    Each and every time Rush sought and received GME and other compensation from the United States by virtue of its role as a teaching institution Rush was required to have actually fulfilled its role as a teaching hospital.   Further, and in general, under applicable Medicare regulations, attending physicians at Rush such as those employed by Midwest Orthopaedics are precluded from billing for services provided by Residents, Fellows, Nurses or Physician Assistants unless the physicians qualify as "Attending Physicians" as defined by those regulations and participate directly and personally in the patients' care, including the "key and critical" portions of surgical procedures.

22.    Rush and Midwest Orthopaedics sought and received compensation from the United States and the State of Illinois for surgeries that were not billed consistent with the actual services performed to the extent that Residents at Rush, rather than the claimed attending physicians from Midwest Orthopaedics, performed the key and critical portions of surgeries, or entire surgeries, without the required supervision and attendance of the listed attending physician.   Such billing and claims for reimbursement are contrary to applicable Medicare regulations, contrary to applicable requirements for accreditation by the ACGME, which is necessary for obtaining GME payments from Medicare, and contrary to the

certifications of compliance with federal laws made by said Defendants under state law to obtain Medicaid reimbursement.

*Specific and Particular False Claims*

23.     The specific and particular claims below are not exhaustive and are representative of the procedures consistently followed at Rush, and the false and fraudulent claims, upcoding and other improper compensation Rush and/or Midwest Orthopaedics received from the United States and the State of Illinois, whereby physician bills based on false medical charts were submitted to the United States falsely representing that attending physicians had performed or been present while a resident performed Key and critical portions of surgical procedures even though the attending physician was not present for the "key and critical" portions of such procedures.

24.     On September 13, 1996, Midwest Orthopaedics surgeon Dr. George Holmes, Jr. billed Medicare for an orthopedic operation on Mr. H.'s leg amputation stump. However, resident physician Dr. G. Wexler performed the entire operation on Mr. H.  Dr. Holmes in fact never entered the operating room while the procedure was being performed on Mr. H.

25.     On May 6, 2003, Midwest Orthopaedics surgeon Dr. Mitchell Sheinkop had five procedures scheduled in a row in operating room 5 – from 7:20 a.m. until 5:00 p.m. Additionally, on the same day in operating room 8, Dr. Sheinkop had another operation scheduled.  The complexity of these procedures, including a left total hip replacement, a revision right total hip replacement and a right ankle fusion, and the need for extensive robing and re-robing procedures while entering and exiting operating rooms, made it physically impossible for Dr. Sheinkop to personally perform or attend these procedures as

required under the applicable Medicare regulations.  Upon information and belief formed after reasonable inquiry, Dr. Sheinkop's services were billed to Medicare based upon false charting of the procedures to indicate that he had been present during or performed all key and critical portions of the surgeries.

26.     On August 4, 2003, in operating room 5, Midwest Orthopaedics surgeon Dr. Aaron Rosenberg had scheduled a left total knee arthroplasty while scheduling simultaneously in operating room 7 a revision of left tibial component placement of tunneled epidural for long-term infusion.  These procedures could not have been performed as scheduled by the same attending surgeon.  Upon information and belief formed after reasonable inquiry, Dr. Rosenberg's services were billed to Medicare based upon false charting of the procedures to indicate that he had been present during or performed all key and critical portions of the surgeries.

27.     On November 24, 2003, Midwest Orthopaedics surgeon Dr. Aaron Rosenberg had operations in room 5 scheduled at 7:20 a.m. and 9:30 a.m. as well as operations scheduled in room 7 at 8:00 a.m. and 10:00 a.m.  These procedures could not have been performed as scheduled by the scheduled attending surgeon.  Upon information and belief formed after reasonable inquiry, Dr. Rosenberg's services were billed to Medicare based upon false charting of the procedures to indicate that he had been present during or performed all key and critical portions of the surgeries.

28.     On April 22, 2004, Midwest Orthopaedics surgeon Dr. Mitchell Sheinkop had scheduled an operation in operating room 9 while Dr. Sheinkop was scheduled at the same time for a surgical procedure in operating room 7.  Dr. Sheinkop never entered operating room 9 and allowed resident physician Dr. Wakim to perform the bilateral total knee replacement of Ms. S.  Relator Dr. Goldberg personally observed residents in this operating

room performing bone cuts and implanting a knee replacement in this patient without Dr. Sheinkop present in the operating room. Dr. Goldberg stated his observations to one of the unsupervised residents, Dr. Emile Wakim, who admitted that Dr. Sheinkop never entered the operating room to assist or observe that complicated procedure, and that his failure to attend the procedure was not disclosed in the charting of the procedures. Upon information and belief formed after reasonable inquiry, the charting of the procedure was never corrected to make clear that Dr. Sheinkop had been present during or performed all key and critical portions of the surgery, and neither ACGME nor the government were informed of the error. To the contrary, Rush continued to falsely certify compliance with all applicable GME regulations and accreditation requirements and Midwest Orthopaedics improperly billed for its physicians' procedures.

29.     At no time, upon information and belief, has Rush informed the United States or the ACGME that it has changed its role as a teaching institution and is no longer a facility utilized in the teaching of resident surgeons, and to the contrary Rush continues to seek and accept Medicare reimbursement under Part A and continues to falsely purport to meet ACGME accreditations standards.

*Attending Physician Duties Were Not Met During Surgeries*

30.     On June 15, 2000, Rush orthopedic resident surgeons wrote Dr. Gunnar Andersson, the Chairman of Orthopedic Surgery of Rush, documenting and complaining that attending physicians were not present during surgeries conducted by residents in the operating room.

31.     On October 27, 2003, former Rush resident and attending physician Dr. Hejna stated to Relator Dr. Goldberg that as a resident he was routinely involved in

11

surgeries in which the attending physician was not present for key and critical portions of the procedure or the attending physician was absent for the entire procedure.

32.    In late 2003, Dr. Buvanendram, a Rush anesthesiologist, admitted to Relator Dr. Goldberg that attending orthopedic surgeons at Rush who perform total joint replacements routinely allow residents to perform operations those surgeons are scheduled to perform with such attending physician either not present for key and critical portions of the procedure or not being in attendance at all.  Further, Dr. Buvanendram stated that no notes indicating that the attending physician was not present for key and critical portions of the procedure or not in attendance at all are generally made in the charts reflecting those surgeries, on the basis of which Rush and Midwest Orthopaedics each bill Medicare.

33.    On February 19, 2004, two operating room nurses admitted to Relator Dr. Goldberg that attending orthopedic surgeons at Rush frequently leave residents in one operating room to perform key and critical portions of a procedure in order to perform surgery in another operating room without noting such absences in charts of the procedures.

34.    On February 19, 2004, Dr. Carreira, a resident physician at Rush, admitted to Relator Dr. Goldberg that residents are frequently left in operating rooms without an attending physician present during key and critical portions of surgeries, without noting such absences in charts of the procedures.

35.    On April 17, 2004, two operating room nurses at Rush openly discussed with Relator Dr. Goldberg that attending physicians routinely leave orthopedic residents in operating rooms during critical portions of surgeries or entire surgeries, without noting such absences in charts of the procedures.  These nurses went on to state that orthopedic operating room technicians and orthopedic nurses were in fact paid extra money by Rush to keep quiet about this situation.

36.     During the July 4, 2005 holiday weekend, Relator Dr. Goldberg met a former Rush resident, Paul Nourbash, M.D.  Dr. Nourbash is an orthopedic surgeon who did his joint fellowship at Rush.  Dr. Nourbash openly stated to Dr. Goldberg, in front of a witness, that during his fellowship the Midwest Orthopaedics attending surgeons at Rush frequently allowed him to perform every step of a total joint procedure (including dissection through muscle, capsule and bone) without supervision, except the actual insertion of the metal/plastic implant.  He stated that the charts prepared during such surgeries did not reflect that the attending surgeons were not present, and did not indicate the portions of procedures attended that were "key and critical" when the attending was present for only a portion of the surgery.

***False Claims Related to Surgeries at the Rush SurgiCenter***

37.     On October 21, 2004, Relator Dr. Goldberg spoke with the nurses working in the operating rooms at the Rush SurgiCenter (an ambulatory surgery center organized and operated under state laws, also referred to hereafter as the "ASC") along with the Director of Nursing for the Rush SurgiCenter, Ms. Nancy Dutton, R.N.  Dr. Goldberg specifically asked if any were aware of orthopedic surgeons leaving Residents alone during entire endoscopic operations.  All answered yes.  The nurses also stated that the administrators do not require the nurses to record the time when surgeons enter and exit the operating rooms. In fact, Ms. Dutton, the Director of Nursing of the SurgiCenter, stated that several orthopedic surgeons, and especially Dr. Brian J. Cole, are allowing Residents to operate on patients alone during "critical" portions of the procedures.

38.     Dr. Cole is a member of Midwest Orthopaedics.  Ms. Dutton told Relator Dr. Goldberg that within the last year she and several other nurses had brought their concerns

about unsupervised surgeries to the Executive Committee of the Rush SurgiCenter. She said that Dr. Cole had been instructed by that Committee to discontinue the practice, but had only briefly modified his conduct and had started the same practice recently. She told Dr. Goldberg that on that very day, October 21, Dr. Cole was performing arthroscopy in two SurgiCenter rooms and then left for a surgery in the main hospital operating room while the other surgeries were still on-going.

39.     Based on the operating schedule for October 21, 2004, at 7:30 a.m., Dr. Cole was performing rotator cuff repair on a 75 year-old Medicare patient in the Rush SurgiCenter. Simultaneously, Dr. Cole scheduled a shoulder replacement procedure on a 72 year-old Medicare patient in the main hospital operating room, in a different building, starting at 8:00 a.m. Again simultaneously, he scheduled knee surgery on a 14 year-old to start at 7:30 a.m. in a second operating room in the Rush SurgiCenter.

40.     The operating schedule of Dr. Cole for Thursday October 21, 2004, reveals the following multiple overlapping surgeries. Additionally, Operating Room 5 is in another building separate from the building containing Operating Rooms II and III:

| SurgiCenter Operating Room II | SurgiCenter Operating Room III | Rush Main Operating Room No. 5 |
|---|---|---|
| 7:30 – 8:30 am<br><br>Male 14<br><br>Left knee open reduction | 7:30 – 9:30 am<br><br>Male 75<br><br>Left shoulder arthroscopic rotator cuff | 8:00 am<br><br>Male 72<br><br>Right total shoulder total replacement |
| 8:30 – 10:30 am<br><br>Male 36<br><br>Left knee diagnostic arthroscopy | 9:30 – 10:30 am<br><br>Male 34<br><br>Right knee diagnostic arthroscopy | |

Given that surgeries were scheduled at the same time and almost the same time (just 30 minutes apart) and because surgeries were in different rooms and in different buildings, it was physically impossible for Dr. Cole to have been present and "attending/teaching" the residents for the key and critical portions of these surgeries. Nonetheless, Dr. Cole's failure to attend these procedures as required under applicable Medicare regulations cannot be discerned based on the information stated in the medical charting and records for these procedures, on which billing is based.

41.     Ms. Dutton commented to Dr. Goldberg, after telling him the foregoing facts, that she was concerned that she could be held personally liable for Medicare violations and any patient injuries. Ms. Dutton expressed concern that she might lose her job if she were to "blow the whistle."

*Events at the Rush SurgiCenter on October 28, 2004*

42.     On October 28, 2004, starting at approximately 11:30 a.m., Relator Dr. Goldberg entered Operating Room 2 to perform surgery on a patient, Ms. M. While in the operating room before the procedure started, Dr. Goldberg asked nurses in the room whether some orthopedic surgeons leave Residents alone in the operating room while arthroscopy is performed (*i.e.* while the fiber optic camera is projecting images of the joint). The nurses all confirmed that some surgeons did so. Dr. Goldberg asked them whether some of the patients were Medicare insured, and again, they answered, yes. These nurses identified Dr. Cole, in particular, indicating that he observed arthroscopy procedures performed by Residents in another operating room through an electronic video link that projected images through the fiber optic camera onto a large monitor or television screen in another operating room. The nurses stated that Dr. Cole observes these fiber optic images

from remote operating rooms while simultaneously personally performing surgery in another room. They stated further that Dr. Cole uses a microphone to verbally instruct the Residents in another operating room from the operating room where Dr. Cole would be physically located to enable two or more simultaneous endoscopic surgical procedures to be conducted, one attended by Dr. Cole and the other "monitored" by him.

43.     After performing surgery on October 28, Relator Dr. Goldberg spoke separately to two managers of the Rush SurgiCenter, Barbara Ramsey, R.N., and Dr. Shyamala Badrinath.   Ms. Ramsey acknowledged that Dr. Cole runs two rooms of endoscopy (arthroscopy) at the same time and often leaves the SurgiCenter to perform another surgery in the main hospital operating room, all simultaneously.   Ms. Ramsey suggested, however, that none of the patients are Medicare insured.

44.     Upon learning of Dr. Goldberg's conversations with several other nurses at the SurgiCenter on October 21, Ms. Ramsey accused Dr. Goldberg of intimidating those nurses by asking them about these practices. Dr. Goldberg informed Ms. Ramsey that these nurses had volunteered the information to him and had not been pressured in any way. He then expressed concerns about patient safety under the circumstances where Residents are operating alone, without attending supervision, and Ms. Ramsey agreed to bring these concerns to the management of the Rush SurgiCenter. When Dr. Goldberg urged her to consult the Corporate Compliance Office at Rush, she refused and stated that the "Corporate Compliance office has no jurisdiction over the SurgiCenter because it is independent."

45.     Later on October 28, Relator Dr. Goldberg spoke with Dr. Badrinath, an anesthesiologist and manager at the Rush SurgiCenter. She confirmed that some surgeons perform endoscopies and otherwise operate simultaneously in two separate operating rooms

at the SurgiCenter, and that they allow Residents to operate alone during "critical" parts of the procedures. She suggested that these surgeons do not follow this practice on Medicare patients, though. She suggested further that this practice is acceptable because "all hospitals do it, including Rush in the main operating room."

46.     Before leaving the Rush SurgiCenter that day, Relator Dr. Goldberg spoke to Todd Bates, R.N., a nurse in the recovery room. Nurse Bates expressed frustration and concern about having to make excuses and "cover up" for Dr. Cole when he would be seen by families of one patient walking around the SurgiCenter meeting with a family of another patient while he was supposed to be in the operating room. According to Mr. Bates, Dr. Cole had been seen by families of patients leaving the SurgiCenter and going over to the main operating room at Rush while he was supposed to have been performing an arthroscopic procedure at the SurgiCenter.

47.     Later on October 28, 2004, Relator Dr. Goldberg personally observed Dr. Brian Cole performing endoscopic surgery in an adjacent operating room. Dr. Goldberg observed that Dr. Cole had a video monitor in the operating room on which a second arthroscopic surgery being performed in a remote room by an unaccompanied Resident was displayed.

48.     On or about June 25, 1996, Dr. Gunnar Andersson, then Chairman of the Department of Orthopedics at Rush, had informed all attending physicians of the policy of Rush regarding Residents and the requirement that the attending must be present when work is performed by a Resident. Pursuant to the policy statement and attachment it is clear that remotely viewing an entire procedure through a video monitor in a different operating room does not meet the teaching physician presence requirement. Moreover,

with respect to medical procedures, the teaching physician must be present during all "critical" portions of the procedure.

49.     In April 2005, Relator Dr. Goldberg received a copy of a memo dated April 20, 2005 from the "Operations Committee" at Rush to "Rush SurgiCenter Medical Staff." This memo directed, among other things, that "No procedure will be scheduled at the SurgiCenter if a procedure is scheduled in the main operating room at the same time. This is in accordance with the Medicare Compliance Guidelines." The memo also specified that all daily schedules will be reviewed by the Director of Nursing for policy compliance, and that the Medical Director will have final approval of the day's schedule and authority to cancel procedures that do not comply with the facility's policy. The memo also directed that any questions regarding the memo be directed to Dr. Ivankovich (Managing Partner), Dr. Bush-Joseph (Chairman of Operations), Dr. Badrinath (Medical Director) or Barbara Ramsey (Administrator).

50.     Following a medical conference in Washington, D.C. in January 2005 attended by both Relator Dr. Goldberg and Dr. Cole, the two gentlemen met by chance at the airport while returning to Chicago. Dr. Cole approached Dr. Goldberg and told him, among other things, that he (Dr. Cole) was being investigated by the hospital based on Dr. Goldberg's information concerning concurrent endoscopic procedures at the Rush SurgiCenter on Medicare patients, which "could ruin him." He stated he was willing to repay the Medicare money he had improperly billed the government to avoid further consequences.

51.     Beginning in October 2004 and continuing thereafter, Relator Dr. Goldberg reported the foregoing information concerning these activities at the Rush SurgiCenter to the Department of Justice through legal counsel, and is the original source of information to

the government regarding the false statements and certifications made by Rush, the Rush SurgiCenter, Midwest Orthopaedics and Dr. Cole in billing the government as if those parties were in compliance with Medicare regulations.

*Construction Program Referral Fees and/or Kickbacks – Stark Law Violations*

52.     By virtue of participating in federally funded medical programs Rush is prohibited from participating in programs which amount to a referral and/or kickback arrangement.

53.     By virtue of its position as a landlord to medical providers who refer patients to Rush and schedule surgical procedures in Rush operating rooms and facilities, Rush had ample opportunities to organize, orchestrate,  and control programs which amount to prohibited referral and/or kickback arrangements.

54.     Programs which Rush activated and controlled which amounted to prohibited referral and/or kickback arrangements were the collection or lack of collection of rents, provision of construction funds to some of the renters in its ASC, Rush's distribution of its Medical Service Plan "MSP" funds to some of the renters in the ASC,  and the allocation of rental space programs.

55.     The following dates and events are reflective of the prohibited referral and/or kickback arrangements activated and controlled by Rush.

56.     In April and May of 2003, Suite 774 was annexed to Suite to 776 was leased to Drs. Joseph Hennessey and David Byer, however the tenant construction costs of a fair market value of approximately $80,000 were absorbed by Rush without requiring repayment of construction costs.  When confronted, James Frankenbach and Dr. Andersson insisted that there was no corporate compliance violation.

57.    Midwest Orthopaedics was exempted from the normal build-out process in the professional building.  In fact, Midwest Orthopaedics was given preferential treatment over other potential medical tenants to obtain leases of desirable Suites 1055, 1042 and 013 in which new MRI equipment had been installed and tested by Rush.  Moreover, in Suite 1042 Rush had purchased and installed PAX bone density equipment and digital x-ray equipment.  When Midwest Orthopaedics took over Suite 1042, it demanded that the equipment remain in the suite.  This digital x-ray equipment was left in Suite 1042 when Midwest Orthopaedics commenced occupancy of such suite, without rental or other fair market value charges for such equipment.  The equipment left in these offices suites had a substantial fair market value which was not billed to Midwest Orthopaedics in any fashion.

58.    Pursuant to the MSP activated by Rush, the Department of Dermatology during the period of December 2002 to May 2003 received over $500,000.00 to renovate their office space despite the fact that MSP funds were earmarked as start up funds for physicians beginning their practices, at the time of the allocation, the Department of Dermatology had been in existence for more than 10 years at the time of the allocation.  Additionally, during this time period Mr. Frankenbach, the Senior Vice President of Corporate and Hospital Affairs, had a dispute with Dr. Michael Tharp, a physician practicing in the Department of Dermatology, concerning the use of the above-mentioned half-million dollars on a practice that did not admit patients to the hospital.

***Rent Program***

59.    By virtue of participating in federally funded medical programs Rush was prohibited from participating in programs which amount under applicable law to prohibited referral and/or kickback arrangements.

60.     The following dates and events are reflective of the referral and/or kickback scheme activated and controlled by Rush.

61.     Back rent owed by The Dental Group in Suite 717 in 2002 and Rush SurgiCenter in Suite 556 in 2003, which totaled approximately $1,000,000.00 was suddenly "zero-balanced" by Rush.  Mr. Frankenbach instructed the Collection Committee not to pursue repayment of these funds from The Dental Group and the Rush SurgiCenter as they were "exempt" from the collection process.  Moreover, Mr. Frankenbach explained that The Dental Group was only obligated to pay 50% of the square footage in its office space as the other 50% was an exchange for teaching services.  Rush does not have a dental school. Dr. Andersson and Rush have a financial relationship with the SurgiCenter and refer patients to the SurgiCenter.

62.     Rush also forgave approximately $200,000.00 in past due rent to Dr. John Hobbs when Dr. Hobbs moved his practice back to Rush from Northwestern Hospital. Again, Mr. Frankenbach specifically directed the Collections Committee not to pursue the back rent owed by Dr. Hobbs.

63.     Rush has also engaged in improper allocations or characterizations of office space for purposes of rent determination.  As a representative example, Dr. Thomas Deutsch pays only $991.32 a month for Suite 906 while Rush is allocated responsibility for the remaining $24,042.09 per month of rent.  Despite the 3.9% and 96% respective allocations, Dr. Deutsch has complete access to the entire space including the waiting rooms, laser and treatment room and the reception area for his private practice.  His rent allocation implies that he does not use any of these areas for his private patients.  Such improper allocation is not an isolated occurrence at Rush.

## COUNT I
### (False Claims Act – Rush University Medical Center)

64.    Paragraphs 1 through 63 of the Second Amended and Supplemental Complaint are incorporated herein as fully set forth herein.

65.    This is a claim for treble damages under the False Claims Act, 31 U.S.C. § 3729(a) for Rush University Medical Center knowingly making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

66.    By virtue of the acts described above, Rush University Medical Center knowingly made or used, or caused to be made or used, false records or statements, including statements regarding proper coding of medical charges, to get false or fraudulent claims paid or approved by the United States. Additionally, Rush inappropriately included orthopedic Residents in its Full Time Equivalent "FTE" counts used to compute its direct GME payments submitted to CMS.  The hours spent by Rush orthopedic residents operating without appropriate supervision by the teaching/attending physician present and teaching during entire operations and procedures and/or "key and critical" portions of operations and procedures renders the hours utilized performing these operations and procedures ineligible for inclusion in Rush's FTE counts on its Medicare cost report. Therefore Rush received excess reimbursements for its GME payments.

67.    The United States paid these false or fraudulent claims because of the acts of the Defendants not knowing the falsity of the claims and certifications.  As a result the federal government has been damaged in an amount to be determined at trial.

68.     By virtue of the acts described above, Rush University Medical Center knowingly made or used, or caused to be made or used prohibited referral and/or kickback arrangements in violation of federal rules and regulations.

69.     As a result the Rush University Medical Center is liable for civil monetary penalties.

WHEREFORE, Relators, on behalf of the United States and themselves, request:

A.     That Defendant Rush University Medical Center be cited to appear and answer and, upon final trial or hearing, judgment be awarded to Plaintiffs for:

   (i)     all actual, incidental and/or consequential damages sustained by the United States;

   (ii)     treble damages pursuant to 31 U.S.C. § 3729(a);

   (iii)     civil penalties pursuant to 31 U.S.C. § 3729(a); and

   (iv)     pre-judgment interest.

B.     That Defendant Rush University Medical Center be cited to appear and answer and, upon final trial or hearing, judgment enter that:

   (i)     Relators be awarded reasonable and necessary attorneys' fees, litigation expenses and court costs through the trial and any appeals of this case;

   (ii)     in the event the United States intervenes in and proceeds with this action, Relators be awarded an amount for originating this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement; and

   (iii)     in the event the United States does not intervene in and proceed with this action, Relators be awarded an amount for originating and prosecuting

this action and collecting civil penalties and damages of at least 25%, but not

more than 30%, of the proceeds of the action or settlement.

C.      That this Court grant such other relief and further relief, both in law and in

equity, to which Plaintiffs are justly entitled.

**COUNT II**
**(Illinois Whistleblower Act – Rush University Medical Center)**

70.     Paragraphs 1 through 69 of the Second Amended and Supplemental

Complaint are incorporated herein as fully set forth herein.

71.     Title 77, Ill. Admin. Code, (b), Hospital and Ambulatory Care Facilities,

Hospital Licensing Requirements, § 250.315 for House Staff Members states that:

(a)  In hospitals participating in professional graduate training programs, the policies
of the hospital, which shall be approved by the Board, must specify the duty hour
requirements for house staff members and the mechanisms by which house staff
members are supervised by members of the medical staff in carrying out their patient
care responsibilities.

(b)  These policies shall comply with the "Essentials of Accredited Residencies in
Graduate Medical Education" established by the Accreditation Council for Graduate
Medical Education.

72.     Rush did not comply with GME requirements as referred to above in that it

allowed Residents to perform orthopedic operations unsupervised by attending/teaching

physicians.

73.     77 Ill. Admin Code § 250.320 requires that all persons admitted to the

hospital shall be under the professional care of a member of the medical staff.  However at

Rush,  patients were left during operations to the care of Residents instead of the care of

attending/teaching physicians as required in Medicare and Medicaid reimbursement

regulations.

74.     77 Ill. Admin Code § 250.1210, Surgery requires that:

(a) Where a hospital provides surgical services, the service shall be provided in a manner sufficient to meet surgical needs of the patients. The surgical department/service shall have a defined organization and shall be integrated with other departments and services of the hospital and shall be governed by written policies and procedures.

75.     Rush did not meet the surgical needs of its patients when it allowed Residents to perform key and critical portions of surgeries without attending/teaching physicians present or participating in the surgeries. Rush intentionally acted to maximize Medicaid and Medicare reimbursements by performing as many surgeries as possible regardless of the availability of attending/teaching physicians to supervise Residents and/or be immediately available to them during key and critical portions of surgeries or in some instances during entire surgical procedures. Rush double and triple booked operating rooms, scheduling attending/teaching physicians in multiple operating rooms. Rush failed to have sufficient medical staff available to supervise Residents and attend patients during key and critical portions of surgeries.

76.     Rush violated 77 Ill. Admin Code § 250.1260, Operating Room Register and Records requirements:

a)      An operating room log or register, including those created by electronic means, shall be provided and maintained on a current basis. If the register is created by electronic means, then safeguards to protect the integrity and confidentiality of these records must be in place. The operating room log or register shall contain the date of the operation, name and number of patient, names of surgeons and surgical assistants, name of anesthetist, type of anesthesia given and pre- and post-operative diagnosis, type of surgical procedure, operating room number and the presence or absence of complications in surgery.

77.     Rush's operating room records show attending/teaching physicians in two or three operating rooms simultaneously, while in reality Residents were the only physicians present and performing surgeries. The impossibility of attending/teaching physicians being present at key and critical portions of surgeries or even at any point in many surgeries was

clearly indicated in the operating room records yet Rush did nothing to ensure that attending/teaching physicians were available and able to supervise Residents and/or perform orthopedic surgeries as required by the ACGME and by GME, IME, Medicare and Medicaid regulations.

78.    Rush regularly allowed its operating rooms to be double or triple booked by attending/teaching physicians when operations and procedures scheduled were difficult, technically complex, and highly specialized, where an attending/teaching physician should have been present throughout the surgery because the vast majority of the procedure consisted of "key and critical" procedures. The Illinois Medicaid program operated by the State of Illinois, unaware of the falsity of the claims and in reliance on the certifications of compliance with applicable, material state and federal laws and regulations as set forth herein, paid the claims submitted by attending/teaching physicians for surgeries which were in fact performed by Residents who are not eligible to bill Medicare and Medicaid but are instead paid via their GME stipends. Rush materially failed to comply with the CMS, State of Illinois, and DHFS regulations by allowing attending/teaching physicians to receive reimbursement for surgeries performed wholly or in part by Residents without the required attending/teaching physician presence. Rush regularly jeopardized patient safety by allowing inexperienced Residents to perform complex orthopedic procedures without attending/teaching physicians being present during key and critical portions of the surgery or absent throughout surgeries and procedures performed by Residents. (*See* Rush Housestaff Agreement, attached hereto as Exhibit B).

79.    Rush placed patient safety at risk and harmed patients in violation of 77 Ill. Admin Code § 250.1290, Safety, when Residents were allowed to perform key and critical

or entire surgeries without an attending/teaching physician present. Patients relied upon Rush for their orthopedic surgical services and Rush failed to provide these services in a manner sufficient to meet the orthopedic surgical needs of the patients in violation of 77 ILL Dept. Public Health § 250.1210 by overbooking and over utilization of its operating rooms where attending/teaching physicians could not be present for surgeries or key and critical portions of surgeries. Rush patients relied upon Rush's attending/teaching physician's expertise when they engaged Rush's attending/teaching physicians to perform their surgeries and procedures. Patients did not engage the services of Residents to perform all or most of their surgeries and procedures, but came to Rush because it is a highly ranked orthopedic program with nationally respected orthopedic surgeons whom they believed they were engaging to perform their surgeries and procedures.

80. Rush, as a licensed hospital, is also required to "enforce its occupancy control measures in an effort to avoid over utilization of its facilities and services and control its admission and discharge of patients so that occupancy does not at any time exceed capacity, except in the event of an unusual emergency and then only as a temporary measure." 77 Ill. Admin. Code § 250.230 (a) and (b). Rush scheduled more surgeries than its attending/teaching physicians could properly and safely perform while fulfilling their resident teaching responsibilities and allowed residents to perform key and critical portions of surgeries or entire surgeries without an attending/teaching physician's presence, supervision, and participation, endangering patient health and misleading patients into thinking that an attending/teaching physician would perform their surgeries while fulfilling their teaching duties by having Residents observe and participate under their supervision in patient surgeries. The informed consent forms signed by patients were defective or void where they did not fully inform patients that residents might be performing the entire

surgery or key and critical portions of surgeries and surgical procedures without attending/teaching physicians presence and/or participation, therefore depriving patients of the ability to make fully informed decisions regarding there care and treatment and violating physicians duty to obtain patient's informed consent before proceeding with treatment.

81.   As a condition of payment from DHFS for Medicaid-covered patients, Rush was required to certify compliance with all Medicaid and Illinois Department of Public Health "IDPH" regulations.  These regulations govern GME provisions, attending/teaching physician responsibilities, how surgeries are performed in teaching hospitals, and capacity and presence requirements for surgeries.  *See* Illinois Department of Healthcare and Family Services, "Agreement for Participation in the Illinois Medical Assistance Program," (Form DPA 1413 (R-6-04) IL478-1930).[3]  Further, under 89 Ill. Admin. Code § 148.50(a), DHFS will only pay for covered services that are in compliance with hospital licensing standards.

82.   Under Medicaid, providers may submit claims only for services that are of a quality which meets professionally recognized standards of healthcare.  42 U.S.C. § 1320c-5(a)(2).  Rush did not provide professionally recognized standards of healthcare because it failed to supervise and teach orthopedic Residents as it was required to do.  Rush concealed from Medicaid (DHFS) and Medicare that Residents were performing surgeries without a

---

[3] The Illinois Department of Healthcare and Family Services, "Agreement for Participation in the Illinois Medical Assistance Program,"(Form DPA 1413 (R-6-04) IL478-1930) which all participants in the Illinois Medicaid program must sign to participate in and receive payments from the Medicaid program it stipulates, *inter alia*:

1. The Provider agrees, on a continuing basis, to comply with all current and future program policy and billing provisions as set forth in the applicable Department of Public Aid Medical Assistance Program rules and handbooks.
2. The Provider agrees, on a continuing basis, to comply with applicable licensing standards as contained in State laws or regulations. Hospitals are further required to be certified for participation in the Medicare Program (Title XVIII) or, if not eligible for or subject to Medicare certification, must be accredited by the Joint Commission on the Accreditation of Healthcare Organizations.
3. The Provider agrees, on a continuing basis, to comply with Federal standards specified in Title XIX and XXI of the Social Security Act and with all other applicable Federal and State laws and regulations.

attending/teaching physician's being present and able to intervene during key and critical portions of surgeries.   Complex, highly technical surgeries were performed by Residents without attending/teaching physician intervention when medical necessity required it. Rush submitted claims to DHFS for payment for attending/teaching physician's services when they were not present at key and critical portions of surgeries or entire surgeries, intentionally deceiving the State of Illinois in order to receive payment from Medicaid for which it was and is not entitled.   None of the Residents were Board Certified or Board Certified-eligible orthopedic surgeons as are all of Rush's orthopedic surgeons (and hold themselves out to the public as such).   Patients at Rush were not informed that when they engaged a Board Certified or Board Certified-eligible surgeon, that surgeon might or might not be available and present during their surgeries.

83.    Rush regularly forgave rents in its medical office buildings and ASC to some physicians or physician groups; charged below fair market value on rents to some physicians or physician groups; did not charge interest on late rent to some physicians or physicians groups, including Midwest Orthopaedics; gave physicians and physicians groups renting in it's ASC inflated amounts of money's for construction to some physicians or physicians groups in excess of the amount provided in its standard lease agreements; provided free equipment to some physicians or physician groups who leased space in Rush's wholly owned ASC which must be established in accordance with 77 Ill. Admin. Code § 205, May 31, 2001, The Ambulatory Surgical Treatment Center Act.

84.    Rush and Midwest Orthopaedics certified compliance as Medicaid providers that they would be in compliance on a continuing basis with Federal standards specified in Title XIX and XXI of the Social Security Act and with all other applicable Federal and State laws and regulations.   Rush and Midwest further agreed as Medicaid providers to be fully

liable for the truth, accuracy and completeness of all claims submitted electronically or on hard copy to the DHF for payment. When Rush and Midwest Orthopaedics violated the federal Anti-Kickback Statute and the federal Ethics in Patient Referrals Act, 42 U.S.C. §1395nn, as amended (the "Stark Act"), and regulations promulgated thereunder, 42 C.F.R. § 411.350 *et seq.* (the "Stark Rules"), they were not in compliance with Title XIX and XXI of the Social Security Act and all other applicable federal and state laws and regulations.

85.     Rush knowingly and intentionally submitted false claims for payment in connection with its resident surgery practices since at least 1998.

86.     Rush knowingly violated federal anti-referral and anti-kickback laws and falsely certified compliance with applicable federal laws and regulations in order to obtain payments from DHFS/Medicaid.

WHEREFORE, Relators, on behalf of the State of Illinois and themselves, request:

A.     That Defendant Rush University Medical Center be cited to appear and answer and, upon final trial or hearing, judgment be awarded to Plaintiffs for:

(i)     all actual, incidental and/or consequential damages sustained by the State of Illinois;

(ii)     treble damages pursuant to 740 ILCS 175/3;

(iii)     civil penalties pursuant to 740 ILCS 175/3; and

(iv)     pre-judgment interest.

B.     That Defendant Rush University Medical Center be cited to appear and answer and, upon final trial or hearing, judgment enter that:

(i)      Relators be awarded reasonable and necessary attorneys' fees, litigation expenses and court costs through the trial and any appeals of this case;

(ii)      in the event the State of Illinois intervenes in and proceeds with this action, Relators be awarded an amount for originating this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement; and

(iii)      in the event the State of Illinois does not intervene in and proceed with this action, Relators be awarded an amount for originating and prosecuting this action and collecting civil penalties and damages of at least 25%, but not more than 30%, of the proceeds of the action or settlement.

C.      That this Court grant such other and further relief, both in law and in equity, to which Plaintiffs are justly entitled.

## COUNT III
### (False Claims Act – Midwest Orthopaedics)

87.      Paragraphs 1 through 86 of the Second Amended and Supplemental Complaint are herein incorporated as if fully set forth herein.

88.      This is a claim for damages and treble damages under the False Claims Act, 31 U.S.C. § 3729(a) against Midwest Orthopaedics for knowingly making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

89.      By virtue of the acts described above, Midwest Orthopaedics knowingly made or used, or caused to be made or used, false records, statements and certifications of compliance with applicable laws and regulations, including false charting, to get false or fraudulent claims paid or approved by the United States.

90.    The United States paid these false or fraudulent claims because of and in reliance upon the acts of the defendants, not knowing their falsity.  As a result the federal government has been damaged by said false claims and certifications in an amount to be determined at trial.

91.    As a result Midwest Orthopaedics is liable for civil damages and monetary penalties.

WHEREFORE, Relators, on behalf of the United States and themselves, request:

A.    That Defendant Midwest Orthopaedics be cited to appear and answer and, upon final trial or hearing, judgment be awarded to Plaintiffs for:

(i)    all actual, incidental and/or consequential damages sustained by the United States;

(ii)    treble damages pursuant to 31 U.S.C. § 3729(a);

(iii)    civil penalties pursuant to 31 U.S.C. § 3729(a); and

(iv)    pre-judgment interest.

B.    That Defendant Midwest Orthopaedics be cited to appear and answer and, upon final trial or hearing, judgment enter that:

(i)    Relators be awarded reasonable and necessary attorneys' fees, litigation expenses and court costs through the trial and any appeals of this case;

(ii)    in the event the United States intervenes in and proceeds with this action, Relators be awarded an amount for originating this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement; and

(iii)    in the event the United States does not intervene in and proceed with this action, Relators be awarded an amount for originating and prosecuting

this action and collecting civil penalties and damages of at least 25%, but not more than 30%, of the proceeds of the action or settlement.

C.      That this Court grant such other relief and further relief, both in law and in equity, to which Plaintiffs are justly entitled.

**COUNT IV**
**(Illinois Whistleblower Act – Midwest Orthopaedics and Brian J. Cole)**

92.     Paragraphs 1 through 91 of the Second Amended and Supplemental Complaint are incorporated herein as fully set forth herein.

93.     Midwest Orthopaedics' and Dr. Cole's conduct as alleged herein violates, among other provisions, 77 IDPH 1, Hospital and Ambulatory Care Facilities, § 205, including:

(a) § 205.130 (Ambulatory Surgical Treatment Center Licensing Requirements), through failure to disclose the overlapping surgical procedures performed by Rush and the SurgiCenter in the application as provided in § 205.120 and in the renewal application as provided in § 205.125 and that the facility's Consulting Committee had not reviewed and approved such overlapping procedures prior to their performance;

(b) § 205.230 (Standards of Professional Work) which requires, among other things, that management and/or the owner of the ambulatory surgical treatment center maintain proper standards of professional work in the licensed facility;

(c) § 205.320 which requires the presence of Qualified Physician to be present at the facility at all times during the operative and postoperative period for all patients;

(d) § 205.520 (regarding Preoperative Care) which requires a written statement indicating informed consent and a signed authorization by the patient for the

performance of the specific surgical procedure – Midwest Orthopedic patients in their informed consent forms consented to an attending physician to perform their surgeries in conjunction with residents as attending physicians were also teaching physicians. Patients relied upon the informed consent forms that attending/teaching physicians would at least  be present during all key and critical portions of operations, and that a Board Certified or Board Certified-eligible physician would be performing or supervising their operations and procedures and that Residents who were supervised might participate in the surgeries.  Disclosure was not made that Midwest's attending physician might not perform or observe or be available for key and critical portions of their surgeries or any portion of their  surgeries;

(e) § 250.1290 (Safety) which requires establishment and adherence to patient safety and welfare policies and procedures where Midwest Orthopedics patients welfare and safety was regularly jeopardized because of the lack of attending/teaching physician observation or participation in patients procedures and surgeries.

94.    Midwest Orthopedics' physicians, including specifically Dr. Cole, submitted false reimbursement claims for services rendered by Residents, who are only eligible to be paid stipends at GME approved rates and do not bill separately for services, but are included in Rush's GME Medicare Reimbursement.

95.    These Defendants falsely certified compliance with 89 Ill.  Admin. Code, § 140.24 (d) when its attending/teaching physicians submitted forms seeking State reimbursement although attending/teaching physicians may bill only for direct patient care rendered or supervised by them. [Provider Handbooks (DPA 2307 (R-9-03) IL478-1125)].

96.    Dr. Cole's and Midwest's conduct violates 740 ILCS 175/3(a), rendering them liable to the State of Illinois for the remedies and penalties set forth therein for (1)

knowingly presenting, or causing to be presented, to an officer or employee of the State …a false or fraudulent claim for payment or approval; and (2) knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State.

97.    The State of Illinois, by and through DHFS, paid the claims submitted by or on behalf of Midwest Orthopaedics in connection with the orthopedic surgeries and procedures performed by Residents without the requisite level of attending/teaching physician participation, involvement and supervision, unaware of the falsity of said claims and in reliance on the certifications of compliance by Midwest Orthopaedics.

98.    Had the State of Illinois known that Midwest Orthopaedics submitted claims for surgeries and procedures performed by Residents without the required level of attending/teaching physician participation, supervision and involvement, it would not have paid those claims.

99.    As a condition of payment these Defendants expressly certified to DHFS that they would, on a continuing basis, comply with the current rules and regulations for resident surgery training required by DHHS, Medicare, GME, IME, " Federal requirements," the ACGME, and Illinois regulations, its implementing regulations, and the policies and procedures as set forth in the Illinois Administrative Code, by the Illinois Department of Public Health and DHFS.   *See* Illinois Department of Healthcare and Family Services, "Agreement for Participation in the Illinois Medical Assistance Program,"(Form DPA 1413 (R-6-04) IL478-1930).

100.    Claims submitted by these Defendants for surgeries where attending/teaching physicians were not present or not present and available were not covered services reimbursable by DHFS/Medicaid and were therefore false claims.

101.    As a result of said Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount in the millions of dollars, exclusive of interest.

WHEREFORE, Relators, on behalf of the State of Illinois and themselves, request:

A.    That Defendant Rush University Medical Center be cited to appear and answer and, upon final trial or hearing, judgment be awarded to Plaintiffs for:

      (i)    all actual, incidental and/or consequential damages sustained by the State of Illinois;

      (ii)    treble damages pursuant to 740 ILCS 175/3;

      (iii)    civil penalties pursuant to 740 ILCS 175/3; and

      (iv)    pre-judgment interest.

B.    That Defendant Rush University Medical Center be cited to appear and answer and, upon final trial or hearing, judgment enter that:

      (i)    Relators be awarded reasonable and necessary attorneys' fees, litigation expenses and court costs through the trial and any appeals of this case;

      (ii)    in the event the State of Illinois intervenes in and proceeds with this action, Relators be awarded an amount for originating this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement; and

      (iii)    in the event the State of Illinois does not intervene in and proceed with this action, Relators be awarded an amount for originating and prosecuting

this action and collecting civil penalties and damages of at least 25%, but not more than 30%, of the proceeds of the action or settlement.

C.     That this Court grant such other and further relief, both in law and in equity, to which Plaintiffs are justly entitled.

**COUNT V**
**(False Claims Act – Rush University Medical Center, Midwest Orthopaedics,**
**Rush SurgiCenter, Brian Cole)**

102.   Paragraphs 1 through 101 of the Second Amended and Supplemental Complaint are herein incorporated as fully set forth herein.

103.   Pursuant to 42 CFR Ch. IV (10–1–02 Edition) § 415.172(a)(1)(ii) and § 15016 entitled Supervising Physicians In Teaching Hospitals, Medicare Carriers Manual, revised November 22, 2002, viewing endoscopic procedures through a monitor in another room does not meet the teaching physician presence requirement.

104.   A video monitor to view endoscopic procedures performed by residents in another operating room has been installed and is in use by surgeons at Rush SurgiCenter and by members of Midwest Orthopaedics.

105.   Defendants Rush, Rush SurgiCenter, Midwest Orthopaedics and Brian Cole have knowingly allowed numerous endoscopic surgeries by residents to be "attended" only by means of remote video access, in contravention of clear Medicare regulations.

106.   All of said Defendants benefited directly and indirectly by use of a video monitor to view endoscopic procedures performed by residents in another operating room, by falsely charting such procedures to misrepresent the presence of the attending surgeon in the operating room while the endoscope was activated for viewing, falsely billing the United States for physician services and other charges, and by falsely certifying and conspiring to

certify compliance with Medicare regulations governing GME and related direct and indirect resident training payments to the hospital.

107.    No notation in the charts of such procedures is made by the participating residents, attending physician or other surgical staff at the SurgiCenter to disclose to billing personnel that no attending physician was present during key and critical portions of the surgery or entire surgeries, or while the endoscope was activated.   Consequently, false claims for payment of physician service charges and related charges are routinely submitted to the government related to the endoscopic procedures performed on federal and state insurance beneficiaries.

108.    Upon reasonable information and belief, the memo dated April 20, 2005 from the Operations Committee at Rush to "Rush SurgiCenter Medical Staff," more fully described above, was a response to Relator Dr. Goldberg's inquiries in the SurgiCenter and an admission that defendants' misuse of residents and surgical scheduling practices had been, in fact, non-compliant with applicable Medicare regulations.

109.    By virtue of the acts described above, said Defendants knowingly made or used, or caused to be made or used, false records or statements, including statements regarding proper coding of medical charges, and made certifications of compliance with applicable federal laws and regulations, to get false or fraudulent claims paid or approved by the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a) *et seq.*

110.    The United States paid these false or fraudulent claims because of the acts of the defendants, not knowing the falsity of their claims and certifications.   As a result the federal government has been damaged in an amount to be determined at trial.

111.    As a result Defendants are liable for civil damages and monetary penalties.

WHEREFORE, Relators, on behalf of the United States and themselves, request:

A.     That Defendants Rush, Rush SurgiCenter, Midwest Orthopaedics and Brian Cole be cited to appear and answer and, upon final trial or hearing, judgment be awarded to Plaintiffs for:

        (i)     all actual, incidental and/or consequential damages sustained by the United States;

        (ii)    treble damages pursuant to 31 U.S.C. § 3729(a);

        (iii)   civil penalties pursuant to 31 U.S.C. § 3729(a); and

        (iv)   pre-judgment interest.

B.     That said Defendants be cited to appear and answer and, upon final trial or hearing, judgment enter that:

        (i)     Relators be awarded reasonable and necessary attorneys' fees, litigation expenses and court costs through the trial and any appeals of this case;

        (ii)    in the event the United States intervenes in and proceeds with this action, Relators be awarded an amount for originating this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement; and

        (iii)   in the event the United States does not intervene in and proceed with this action, Relators be awarded an amount for originating and prosecuting this action and collecting civil penalties and damages of at least 25%, but not more than 30%, of the proceeds of the action or settlement.

C.     That this Court grant such other relief and further relief, both in law and in equity, to which Plaintiffs are justly entitled.

## COUNT VI
### (Illinois Whistleblower Act – Rush University Medical Center, Midwest Orthopaedics, Rush SurgiCenter, Brian Cole)

112.    Paragraphs 1 through 111 of the Second Amended and Supplemental Complaint are herein incorporated as fully set forth herein.

113.    The conduct alleged hereinabove and specifically in ¶¶ 101 – 109 violates 740 ILCS 175/3(a), rendering defendants Rush, Midwest Orthopaedics, Rush SurgiCenter and Brian Cole liable to the State of Illinois for the remedies and penalties set forth therein for (1) Knowingly presenting, or causing to be presented, to an officer or employee of the State …a false or fraudulent claim for payment or approval; and (2) knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State.

114.    The State of Illinois, by and through DHFS, paid the claims submitted by or on behalf of said Defendants in connection with the orthopedic surgeries and procedures performed by residents without the necessary and required level of attending/teaching physician participation and supervision, unaware of the falsity of said claims and in reliance on the certifications of compliance by said defendants.

115.    Had the State of Illinois known that said Defendants submitted claims for the surgeries performed by residents without the required level of attending/teaching physician participation and supervision, it would not have paid those claims.

116.    As a condition of payment said Defendants expressly certified to DHFS that they would, on a continuing basis, comply with the current rules and regulations for resident surgery training required specified under federal requirements, ACGME, and Illinois

regulations, and its implementing regulations, and the policies and procedures as set forth in the Illinois Administrative Code, by the Illinois Department of Public Health and DHFS.

117.    Claims submitted by Defendants for surgeries where attending/teaching physicians were not present or not present and available were not covered services reimbursable by DHFS/Medicaid and were therefore false claims.

118.    As a result of said Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount in the millions of dollars, exclusive of interest.

WHEREFORE, Relators, on behalf of the State of Illinois and themselves, request:

A.    That Defendants Rush University Medical Center, Midwest Orthopaedics, Rush SurgiCenter, and Brian Cole be cited to appear and answer and, upon final trial or hearing, judgment be awarded to Plaintiffs for:

      (i)    all actual, incidental and/or consequential damages sustained by the State of Illinois;

      (ii)    treble damages pursuant to 740 ILCS 175/3;

      (iii)    civil penalties pursuant to 740 ILCS 175/3; and

      (iv)    pre-judgment interest.

B.    That Defendant Rush University Medical Center be cited to appear and answer and, upon final trial or hearing, judgment enter that:

      (i)    Relators be awarded reasonable and necessary attorneys' fees, litigation expenses and court costs through the trial and any appeals of this case;

      (ii)    in the event the State of Illinois intervenes in and proceeds with this action, Relators be awarded an amount for originating this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement; and

(iii)    in the event the State of Illinois does not intervene in and proceed with this action, Relators be awarded an amount for originating and prosecuting this action and collecting civil penalties and damages of at least 25%, but not more than 30%, of the proceeds of the action or settlement.

C.    That this Court grant such other and further relief, both in law and in equity, to which Plaintiffs are justly entitled.

## COUNT VII
### (Conspiracy to Commit Violations of the
### False Claims Act and Illinois Whistleblower Act – All Defendants)

119.    Paragraphs 1 through 118 of the Second Amended and Supplemental Complaint are herein incorporated as if fully set forth herein.

120.    Each of the Defendants knowingly conspired and agreed with each other to accomplish an unlawful purpose or a lawful purpose in an unlawful manner, all as previously alleged herein, for the purpose of certifying compliance with Medicare regulations governing GME and related direct and indirect resident training payments to the hospital, Medicaid reimbursements, and to cause payment of additional federal funds for physician services through false billing, and/or to benefit from participation in referral and/or kickback arrangements.

121.    As alleged hereinabove, each of said Defendants:

(a)    was a knowing party to or knowingly acquiesced in the conspiracy;

(b)    actively participated in the conspiracy with a common goal of obtaining money from the government through false claims or certifications of compliance with federal healthcare laws;

(c)    aided, supported and/or encouraged the conspiracy;

(d)     ratified acts of the conspiracy;

(e)     actively concealed the unlawful purpose of the conspiracy;

(f)     and adopted acts done for the benefit of themselves individually and/or jointly.

122.    As alleged hereinabove, each Defendant had knowledge of the conspiracy, the ability to stop the conspiracy and intentionally chose not to do so.

123.    By reason of the conspiratorial acts of Defendants, the United States and the State of Illinois has paid these false or fraudulent claims because of the acts of the Defendants, not knowing the falsity of their claims and certifications.  As a result the federal government and the State of Illinois have been damaged in an amount to be determined at trial.

124.    By reason of the conspiratorial acts of Defendants, they are each liable for civil damages and monetary penalties available under the False Claims Act and the Illinois Whistleblower Act.

WHEREFORE, Relators, on behalf of themselves, the United States and the State of Illinois, request:

A.      That Defendants be cited to appear and answer and, upon final trial or hearing, judgment be awarded to Plaintiffs for:

(i)     all actual, incidental and/or consequential damages sustained by the United States;

(ii)    treble damages pursuant to 31 U.S.C. § 3729(a) and/or 740 ILCS 175/3;

(iii)   civil penalties pursuant to 31 U.S.C. § 3729(a) and/or 740 ILCS 175/3; and

(iv)    pre-judgment interest.

B.    That Defendants be cited to appear and answer and, upon final trial or hearing, judgment that:

(i)    Relators be awarded reasonable and necessary attorneys' fees, litigation expenses and court costs through the trial and any appeals of this case;

(ii)    in the event the United States and/or the State of Illinois intervenes in and proceeds with this action, Relators be awarded an amount for originating this action of at least 15%, but not more than 25%, of the proceeds of the action or settlement; and

(iii)    in the event the United States and/or the State of Illinois does not intervene in and proceed with this action, Relators be awarded an amount for originating and prosecuting this action and collecting civil penalties and damages of at least 25%, but not more than 30%, of the proceeds of the action or settlement.

C.    That this Court grant such other relief and further relief, both in law and in equity, to which Plaintiffs are justly entitled.

## COUNT VIII
### (Retaliation – Rush University Medical Center)

125.    Paragraphs 1 through 124 of the Second Amended and Supplemental Complaint are herein incorporated as fully set forth herein.

126.    Relator Dr. Goldberg is a member of the teaching staff at Rush University Medical College by virtue of his medical privileges at Rush, and subject to the reasonable

control on his practice of Rush and its representatives.   Termination of his medical privileges would constitute termination of his employment relationship with Rush.

127.   In or about November 2004, Relator Dr. Goldberg filed suit in the Circuit Court of Cook County, Illinois, Chancery Division, Case no. 04 L 12403 against Rush, Midwest Orthopaedics, Dr. Gunnar Andersson and Dr. Mark Cohen asserting claims related to interference with Relator Dr. Goldberg's medical practice, including his use of residents.   Among other allegations in the complaint, Relator Dr. Goldberg asserted the Medicare fraud allegations set forth hereinabove as motivations and conduct affecting his claims.

128.   Weeks after the events in the SurgiCenter, as alleged herein above, Relator Dr. Goldberg received a threatening letter dated November 16, 2004 from Thomas Deutsch, M.D., Dean of Rush Medical College, requesting that the Executive Committee of Rush take corrective disciplinary action against him concerning the questions asked and the concerns raised in the SurgiCenter on October 21 and 28, 2004.   This action directly threatened Dr. Goldberg's medical privileges to practice at Rush and could have far reaching adverse consequences to his professional practice.

129.   Attached to the letter from Dr. Deutsch was a memo from Barbara Ramsey. The facsimile legend on that memo indicated it had been forwarded to Dr. Deutsch by Rush Legal Affairs on November 16, 2004. Ms. Ramsey claimed that Relator Dr. Goldberg had accused nurses of "having committed Medicare fraud," though no such accusation was ever, in fact, made. All of the nurses to whom Relator Dr. Goldberg had spoken on October 21 had volunteered their comments without threat or persuasion in any form.   These nurses had expressed that the conduct being discussed, especially that of Dr. Cole, was morally wrong and a risk to patient safety. Each expressed concern about the possibility of personal

legal liability for being in any way involved with the physician behaviors which were creating the risks.

130.    Further, Ms. Ramsey's note mentions Relator Dr. Goldberg's contact with Nurse Nancy Dutton at the SurgiCenter. As set forth above, Ms. Dutton had told him that Dr. Cole's conduct operating remotely on patients at the SurgiCenter and leaving Residents alone to operate on patients during key and critical portions of surgeries had been raised before an Executive Committee of the SurgiCenter and Dr. Cole had been instructed to discontinue this practice.  She had also told him that Dr. Cole did briefly cease these practices, but resumed the same practices shortly thereafter.  Ms. Duttton expressed concern that she personally might be liable for Medicare fraud by acquiescing to these practices.

131.    Most of the information in Ms. Ramsey's report is inaccurate, and after extended delay, appearance at a hearing by Dr. Goldberg and his legal counsel and further investigation, the Ad Hoc Committee recommended to the Executive Committee that no corrective action concerning my inquiries at the SurgiCenter be taken.  After further extended delay, the Executive Committee accepted that recommendation and determined not to act against Relator Dr. Goldberg.

132.    The unwarranted actions of Rush through its Ad Hoc and Executive Committees were taken with explicit or implicit notice that Relator Dr. Goldberg's action could result in a False Claims Act complaint being filed.  The disciplinary actions taken and threatened against Dr. Goldberg by Rush were without good faith basis in fact and were in direct retaliation for the actions of Dr. Goldberg in seeking inquiry into whether the conduct of Defendants is compliant with applicable federal and state law and regulations.

133.    Rush has committed further acts in direct retaliation for Dr. Goldberg's efforts to reveal and properly disclose to responsible authorities at Rush and public officials

conduct of Defendants that appears not to be compliant with applicable federal and state law and regulations.

134.   Dr. Goldberg's actions constitute protected conduct in furtherance of important public policies expressed in the applicable federal and state laws and regulations. Consequently, the retaliatory actions and conduct of Rush violates the anti-retaliation provisions of the False Claims Act, 37 U.S. § 3730(h) and the Illinois Whistleblower Act, 740 ILCS 175/4(g).

135.   Relator Dr. Goldberg has incurred substantial damage as a result of the retaliatory misconduct of Rush in the form of, *inter alia*, attorneys' fees and related expenses, and loss of professional time, all to be specified more fully at trial herein.

WHEREFORE, Plaintiff Robert Goldberg, in his own behalf, requests:

A.   That Defendant Rush University Medical Center be cited to appear and answer and, upon final trial or hearing, judgment be awarded to said Plaintiff for:

      (i)   all actual, incidental and/or consequential or special damages sustained by him in order to make him whole as a result of said Defendant's retaliatory misconduct;

      (ii)   pre-judgment interest;

      (iii)   litigation costs and expenses, including reasonable attorneys' fees; and

B.   That this Court grant such other relief and further relief, both in law and in equity, to which said Plaintiff is justly entitled.

## PLAINTIFFS DEMAND TRIAL TO A JURY OF ALL ISSUES SO TRIABLE

Respectfully submitted,

By: _____

One of Relators' Attorneys

Christopher N. Mammel (6231492)
Childress Duffy Goldblatt, Ltd.
515 N. State Street, Suite 2200
Chicago, Illinois  60610
(312) 494-0200
cmammel@childresslawyers.com



Illinois Department of Public Aid

## AGREEMENT FOR PARTICIPATION
## IN THE ILLINOIS MEDICAL ASSISTANCE PROGRAM

WHEREAS, _____
Full Legal as well as any Assumed (d.b.a.) name,

_____ (IDPA Provider Number, if applicable) hereinafter referred to
as ("the Provider") is enrolled with the Illinois Department of Public Aid hereinafter referred to as ("the
Department") as an eligible provider in the Medical Assistance Program; and

WHEREAS, the Provider wishes to submit claims for services rendered to eligible Public Aid clients;

NOW THEREFORE, the Parties agree as follows:

1.  The Provider agrees, on a continuing basis, to comply with all current and future program policy and
    billing provisions as set forth in the applicable Department of Public Aid Medical Assistance Program rules
    and handbooks.

2.  The Provider agrees, on a continuing basis, to comply with applicable licensing standards as contained in
    State laws or regulations.  Hospitals are further required to be certified for participation in the Medicare
    Program (Title XVIII) or, if not eligible for or subject to Medicare certification, must be accredited by the
    Joint Commission on the Accreditation of Healthcare Organizations.

3.  The Provider agrees, on a continuing basis, to comply with Federal standards specified in Title XIX and
    XXI of the Social Security Act and with all other applicable Federal and State laws and regulations.

4.  The Provider agrees that any rights, benefits and duties existing as a result of participation in the Medical
    Assistance Program shall not be assignable without the written consent of the Department.

5.  The Provider shall receive payment based on the Department's reimbursement rate, which shall constitute
    payment in full.  Any payments received by the Provider from other sources shall be shown as a credit and
    deducted from charges sent to the Department.

6.  The Provider agrees to be fully liable for the truth, accuracy and completeness of all claims submitted
    electronically or on hard copy to the Department for payment.  Provider acknowledges that it understands
    the laws and handbook provisions regarding services and certifies that the services will be provided in
    compliance with such laws and handbook provisions.  Provider further acknowledges that compliance with
    such laws and handbook provisions is a condition of payment for all claims submitted.  Any submittal of
    false or fraudulent claim or claims or any concealment of a material fact may be prosecuted under
    applicable Federal and State laws.

7.  The Provider agrees to furnish to the Department or its designee upon demand all records associated with
    submitted claims necessary to disclose fully the nature and extent of services provided to individuals under
    the Medical Assistance Program and maintain said records for not less than three (3) years from the date
    of service to which it relates or for the time period required by applicable Federal and State laws,
    whichever is longer.  The latest twelve months of records must be maintained on site.  If a Department
    audit is initiated, the Provider shall retain all original records until the audit is completed and every audit
    issue has been resolved, even if the retention period extends beyond the required period.

8.  The Provider, if a medical transportation provider, agrees that vehicle operators(s) shall have an
    appropriate Drivers License and vehicle(s) shall be properly registered.

9.   The Provider, if not a practitioner, agrees to comply with the Federal regulations requiring ownership and control disclosure found at 42 CFR Part 455, Subpart B.

10.   The Provider agrees to exhaust all other sources of reimbursement prior to seeking reimbursement from the Department.

11.   The Provider agrees to be fully liable to the Department for any overpayments, which may result from the Provider's submittal of billings to the Department.  The Provider shall be responsible for promptly notifying the Department of any overpayments of which the Provider becomes aware.  The Department shall recover any overpayments by setoff, crediting against future billings or by requiring direct repayment to the Department.

12.   The Provider (if a hospital, nursing facility, hospice or provider of home health care or personal care services) agrees to comply with Federal requirements, found at 42 CFR Part 489, Subpart I, related to maintaining written policies and providing written information to patients regarding advance directives.

13.   The Provider certifies that there has not been a prohibited transfer of ownership interest to or in the provider by a person who is terminated or barred from participation in the Medical Assistance Program pursuant to 305 ILCS 5/12-4.25.

14.   The Provider certifies the following owners/stock holders own 5% or more of the stock/shares.  If additional space is needed for names, please use separate page.  If there is no information to disclose, write NONE on PRINT NAME line.  This section MUST be completed for enrollment purposes and an entry is required.

| PRINT NAME | SOCIAL SECURITY NUMBER | % OF OWNERSHIP |
|---|---|---|
| PRINT NAME | SOCIAL SECURITY NUMBER | % OF OWNERSHIP |

15.   The Provider agrees and understands that knowingly falsifying or willfully withholding information on the Provider Enrollment Application and/or the Agreement for Participation may be cause for termination of participation in the Illinois Medical Assistance Program and such conduct may be prosecuted under applicable Federal and State laws.

16.   Requested effective date _____/_____/_____.  The Provider certifies that all services rendered on or after such date were rendered in compliance with and subject to the terms and conditions of this agreement.

Under penalties of perjury, the undersigned declares and certifies that the information provided in this Agreement for Participation is true, correct and complete.

DEPARTMENT of PUBLIC AID:

by: _____        by: _____
         (Provider Signature)                                          Division of Medical Programs


_____
    (Print Name of Signature above)

Date: _____        Date: _____

# B

 

GRADUATE
MEDICAL
EDUCATION

**2005 - 06**
**HOUSESTAFF AGREEMENT**


**PREAMBLE**

This Agreement, effective from July 1, 2005 to June 30, 2006, is entered into for the purpose of defining the formal and continuing relationship between the Rush University Medical Center and the House Officer, during the House Officer's participation in the Medical Center's graduate medical education and clinical training program (the "program").

House Officer is defined as either a resident or a fellow. This agreement supersedes all prior Agreements signed for the same purpose and covering the same period of time.

The terms of this Agreement recognize that it is in the best interest of the public and the Medical Center's patients to assure the performance of the respective obligations of the parties – first and foremost, the provision of the highest possible quality of health care along with the supervised graduate medical education.

There is a need for flexibility within the working relationship of the parties, and a fair and frank understanding of the rights and responsibilities of both parties is important at the onset of and throughout their relationship.

This Agreement is also intended to recognize the role of the Housestaff Association and Executive Council in representing the views of its members on the issues of patient care, graduate medical education, graduate clinical training program and the negotiation and administration of House Officer Agreements


**ARTICLE I - POSITION DESCRIPTION OF HOUSE OFFICER**

The Rush House Officer meets the applicable qualifications for resident eligibility outlined in the <u>Essentials of Accredited Residencies in Graduate Medical Education</u> in the AMA Graduate Medical Education Directory, or the standards, Requirements and Guidelines for Approval of Residencies in Podiatric Medicine of the Council of Podiatric Medical Education, or the American Psychological Association's Committee on Accreditation's Guidelines and Principles, or other governing Board/Society for the specific program as appropriate, heretofore referred to as "appropriate governing bodies."

As the position of House Officer involves a combination of supervised, progressively more complex and independent patient evaluation and management functions and formal educational activities, the competence of the House Officer is evaluated on a regular basis. The program shall maintain a confidential record of these evaluations.

The position of House Officer entails provision of care commensurate with the House Officer's level of advancement and competence, under the general supervision of appropriately privileged attending teaching staff. This includes:

1. Participation in safe, effective and compassionate patient care;

2. Developing an understanding of:
   (a) ethical, socioeconomic and medical/legal issues that affect graduate medical education and patient care and
   (b) how to apply appropriate utilization management and cost containment measures in the provision of patient care;

3. Participation in the educational activities of the training program and, as appropriate, assumption of responsibility for teaching and supervising other residents and students, and participation in institutional orientation and education programs and other activities involving the Medical Center staff;

4. Participation in institutional committees and councils to which the House Officer is appointed, elected or invited; and

5. Performance of these duties in accordance with the established practices, procedures and policies of this institution and its governing bodies where they exist, as well as those of its programs, clinical departments

and other institutions to which the House Officer is assigned.

## ARTICLE II - OBLIGATIONS OF THE MEDICAL CENTER

**Section 1.**        **GRADUATE MEDICAL EDUCATION (GME) OR GRADUATE CLINICAL TRAINING**.  The Medical Center agrees to provide an educational program in graduate medical education or graduate clinical training which meets the contemporaneous standards and requirements in effect from the appropriate governing bodies.

**Section 2.**        **HOUSE OFFICER FACILITIES**.   The Medical Center will provide sufficient, comfortable, safe and sanitary facilities in connection with the House Officer's educational and clinical programs.  This includes, but is not limited to clerical space, computers for access to educational and clinically relevant information and the Internet, supporting facilities such as meeting space, dictating equipment for clinical notes, and administrative liaison personnel for individual and group Housestaff affairs. Callroom facilities will be same-sex when available.

**Section 3.**        **SEMI-ANNUAL FORMAL WRITTEN EVALUATION**.   It is the responsibility of the Program Director to provide a system of a semi-annual formal written evaluations of the House Officer's work. The Program Director or designee shall meet personally with each House Officer to review his/her progress at least annually. Evaluations may include objective testing methods.  Only upon the written request of the House Officer, may copies be sent to other institutions or prospective employers by the Medical Center.

**Section 4.**        **APPOINTMENT TO FACULTY AND MEDICAL STAFF**.    Housestaff are appointed as an "Assistant" on the faculty of Rush Medical College of Rush University. Fellows and Housestaff in advanced training may qualify for the rank of Adjunct Member of the Medical Staff of Rush University Medical Center, and/or for the rank of "Instructor" in Rush Medical College. The House Officer shall be bound by all Medical Center rules and shall have all the privileges relating to faculty and, where applicable, Medical Staff members, unless expressly limited by this Agreement.

**Section 5.**        **CONFIDENTIALITY OF RECORDS**.   The Medical Center expressly acknowledges its obligations as an educational institution and as an employer to maintain as confidential the academic and personnel records of the House Officer.  The Medical Center will obtain the written consent of the House Officer before allowing access to such records except where required by law or where required directly and routinely in the administration of the program. The current Review of Employment and Academic files Policy approved by GMEC will specify additional guidelines

**Section 6.**  .    **LIAISON WITH ADMINISTRATION**.   Medical Center Administration shall attempt to inform the Housestaff in advance of Policy and Procedural changes having an impact on their status as a House Officer. The House Officer individually, through the elected representatives of the Housestaff Association or through the Executive Council described below (Article V), shall have at all reasonable times during the term of this Agreement, direct access to the Associate Dean, GME and/or the Dean of Rush Medical College and administrative personnel of Rush University Medical Center for the purpose of discussing and resolving issues of mutual interest.

**Section 7.**        **FULL STAFFING**.  The parties recognize that it is in the best interest of both the House Officer and the Medical Center to maintain a post-graduate medical education program of optimal size which meets the highest possible standards of excellence.  To that end, the Medical Center will determine the number of House Officers participating in the educational and clinical programs based upon an evaluation and consideration of all relevant factors, including, but not limited to, quality of patient care, workload, fiscal constraints, third-party reimbursement, availability of post-graduate medical education facilities and the recommendation and/or regulation of the appropriate governing bodies.

**Section 8.**        **LETTERS OF RECOMMENDATION**.    The House Officer may request letters of recommendation from Rush Medical College faculty.  The individual faculty member at his/her discretion may request that the House Officer sign a letter waiving his/her right to review the letter of recommendation.

**Section 9.**        **CERTIFICATE OF COMPLETION**.   Upon successful completion of the training period as determined by the program, a certificate of satisfactory completion will be issued to the House Officer.

**Section 10.**       **ACCESS TO MEDICAL CENTER POLICIES**.  The Medical Center must provide, upon request of the House Officer, access to all Medical Center Policies to which the House Officer is bound by this agreement.

**Section 11.**       **COMMUNICATION**.  The Medical Center will provide one pager free of charge in good working condition to the House Officer at the beginning of his/her training.

**Section 12.**       **DUTY HOURS AND THE WORK ENVIRONMENT**.  The Medical Center and the House Officer both recognize their mutual obligation to comply with institutional and program policies concerning Resident

2

Duty Hours and the Work Environment as well as with the policies of the ACGME and appropriate governing bodies where they exist.

## ARTICLE III - OBLIGATIONS OF HOUSE OFFICER

**Section 1.**     **EDUCATIONAL AND CLINICAL REQUIREMENTS**.   The House Officer agrees to fulfill the educational and clinical requirements specified by his/her training program.

**Section 2.**     **PATIENT CARE**.   The House Officer agrees to use his/her best efforts to provide safe, effective, ethical and compassionate patient care wherever assigned or assumed.

**Section 3.**     **COMPLIANCE WITH MEDICAL STAFF BY-LAWS AND RULES**.   The House Officer agrees to comply with the Medical Staff By-Laws, the Rules for Governance of Rush University and Rush Medical College, the Rules and Regulations promulgated thereunder, including the Medical Staff Standards of Accreditation of the Joint Commission on Accreditation of Healthcare Organizations (JCAHO), to the extent applicable. The House Officer also agrees to comply with the Medical Center's written policy and procedures concerning Patents, Copyrights and Licenses resulting from discoveries, inventions, writings and other work products relating to the House Officer's work at the Medical Center.

**Section 4.**     **CORPORATE COMPLIANCE**.   The House Officer agrees to complete all necessary current Healthcare Education System requirements as mandated by the Office of Corporate Compliance. Failure to comply may result in removal from service, loss of pay for non-compliant days, suspension and/or ineligibility for promotion until completion.  Warning notifications will be sent to delinquent Housestaff  and their programs.

**Section 5.**     **HEALTH SCREENING**.   The House Officer is required to provide documentation to Rush Employee and Corporate Health Services (ECHS) of immunity to measles, rubella, varicella, hepatitis B, as well as appropriate tuberculosis screening. If the House Officer is unable to provide this documentation, ECHS will assist in meeting these requirements free of charge.  In addition, House Officers must have a TB mask fit testing completed by the Infection Control Department.  Failure to meet the above requirements may result in disciplinary action up to and including termination of this agreement. Only in an exceptional circumstance and on an individual basis can an extension of time be granted by request of the Chairperson or Program Director with approval of the Dean.

**Section 6.**     **DRUG SCREENING**.   All new House Officers are required to submit to a Rush University Medical Center drug screening according to Medical Center's Drug/Alcohol policy.

**Section 7.**     **LICENSURE**.   The House Officer agrees to obtain, at the House Officer's own expense, the appropriate State of Illinois licensure for participation in the educational or clinical programs hereunder and to notify the Medical Center in writing immediately if any such licensure is revoked or otherwise restricted.

The Office of Graduate Medical Education (GME) will notify prospective House Officers and current House Officers of the requirements for submission of applications for temporary licensure, and for licensure examinations when indicated and will make available the necessary application forms.  It is the obligation of the prospective or current House Officer to satisfactorily complete and submit the required information to the office of GME on or before the specified time so that the material can be submitted to the State of Illinois, Department of Professional and Financial Regulations. If the House Officer fails to do this, and if the issuance of the temporary or permanent license is delayed resulting in a period of time during which the House Officer is not covered by either a temporary or a permanent license, then GME will suspend the House Officer without pay on the day that the lapse in licensure begins, and his/her training and pay will not be reinstated until the permanent or temporary license is issued. Any House Officer without a valid Illinois license is not considered a Rush employee and therefore is not afforded the benefits listed herein.

**Section 8.**     **MEDICAL RECORDS**.   Residents are responsible for the timely completion of dictations in accordance with JCAHO mandates, Federal Agencies' requirements, Rush Medical Staff Policies and Procedures, Rules and Regulations, the by-laws of the Rush University Medical Center.

- All operative reports will be dictated the day of the procedure.

- All available discharge summaries will be dictated within 48 hours of the discharge.
- All available dictations will be completed prior to leaving for vacation or away rotations.
- Completion of all available dictations is required at year-end in order to advance or graduate.

The Health Information Management Department will make available to the House Officer, upon request, a daily updated summary of his/her incomplete records. In addition, the House Officer will be notified of incomplete records at least weekly. A weekly summary of all incomplete charts will be sent to the Program Directors, Department Chairpersons, the Housestaff Association President and the Associate Dean for Graduate Medical Education.

The Health Information Management Department and GME will not grant end of academic year clearance to any House Officer who has available incomplete medical records. GME may apply the following sanctions, if applicable:

- Deny the House Officer the necessary registration material for credentialing and licensing
- Deny the House Officer a certificate of completion for his/her training program
- Deny the House Officer reappointment or promotion
- In conjunction with the Housestaff Association adopted polices, impose other sanctions, eg., possible loss of parking privileges

**Section 9.       COMMUNICATION.**   All House Officers are required to keep informed of all messages from GME, Rush Housestaff Association and their programs via their Rush Lotus email account. It is the House Officer's responsibility to review email at least once a week (excluding vacation and holidays). Housestaff may access their Lotus Notes at work or from home or any other computer with Internet capability. Housestaff mailboxes (in the Housestaff Lounge on the 4th floor of the Academic Facility) must be kept clean for incoming mail. The House Officer must maintain his/her pager in working order during the times outlined by his/her program. The House Officer must notify both the program and GME of any/all address changes.

**Section 10.       OFF-DUTY ACTIVITIES/MOONLIGHTING.**   The House Officer is not required to engage in moonlighting. Because graduate medical education is a full-time endeavor, the Program Director must ensure that moonlighting does not interfere with the ability of the House Officer to achieve the goals and objectives of the educational program and does not violate the ACGME rules and regulations for Duty Hours.

House Officers who are engaged in moonlighting must notify and receive permission from his/her Program Director. Moonlighting must comply with the Institutional GMEC Policy for Housestaff Moonlighting and any programmatic policies.

**Section 11.       IMPAIRED HOUSE OFFICER.**   When a House Officer has a physical or mental impairment which has an impact on his/her ability to deliver effective patient care as determined by the Program Director, the House Officer is required to participate in a treatment program which shall be subject to the approval of his/her Program Director. During the course of the House Officer's care and any required after care, the Program Director may require the submission of written documentation attesting that the House Officer is meeting the requirements of his/her treatment program. In the case of a House Officer having an impairment associated with drugs and/or alcohol, the Program Director may require random drug and/or alcohol testing which would be done under the direction of a mutually agreeable treating physician and such physician shall verify that the House Officer is continuing to receive needed treatment. In an appropriate case, the House Officer would be eligible for the disability benefits outlined in Article IV, section 3 (I) of the House Officer's Agreement and the Employee Assistance Program provided for all Rush employees.

**Section 12.       DUTY HOURS AND THE WORK ENVIRONMENT.**   The Medical Center and the House Officer both recognize their mutual obligation to comply with institutional and program policies concerning Resident Duty Hours and the Work Environment as well as with the policies of the ACGME and appropriate governing bodies where they exist..

## ARTICLE IV - HOUSE OFFICER BENEFITS

**Section 1.                SCHEDULE OF HOUSE OFFICER'S STIPENDS**

PGY-1  $ 41,977
PGY-2  $ 43,951
PGY-3  $ 46,017
PGY-4  $ 48,318
PGY-5  $ 50,589
PGY-6  $ 52,610

PGY-7  $ 54,715
PGY-8  $ 56,906
Podiatry  R-1  $ 31,974
Podiatry  R-2  $ 40,714
Podiatry  R-3  $ 43,332
Psychology  Res  $ 22,460

**Section 2.   LEVEL.**  For the purpose of this Contract, a House Officer's "level" shall be determined and defined as the current level of clinical training service as described in the current program's job description. A research year not required for Board eligibility shall not be counted toward determination of pay level advancement. Further explanation of PGY level is found in the GME policy on Post-Graduate Year Level of Pay.

**Section 3.   ADDITIONAL BENEFITS.**  In addition to the specified stipend, the Medical Center agrees to pay for the following benefit options:

(a)   Individual and family health insurance, subject to a premium contribution of:

$10.00 /month with no dependents
$20.00 /month with children
$22.00 /month with spouse/same sex domestic partner
$25.00 /month with spouse/same sex domestic partner & children

(b)   A dental insurance program is provided by the Medical Center for House Officer, spouse/same sex domestic partner and dependents with a co-pay of:

Free            House Officer
$10.00 /month   Spouse/same sex domestic partner
$22.00 /month   Family

(c)   Right of voluntary participation in the Medical Center's Vision Plan.

(d)   Confidential psychological and psychiatric support services are available at no charge through the Housestaff Counseling Program.

(e)   Malpractice Professional Liability and General Liability insurance coverage while performing services within the scope of their training in an amount no less than $5,000,000/$5,000,000. A House Officer is a 'covered person' under the terms of Rush University Medical Center's insurance program for their employment related activities.

(f)   Worker's Compensation coverage under Illinois law for protection against employment-related accidents or illnesses.

(g)   Professional discount on prescription medication from the Medical Center programs for House Officers as described herein.

(1)   All House Officers may utilize the Professional Office Building Pharmacy and receive a discount for medications needed for Acute Needs and for contraception. Beneficiaries are defined as those covered under the House Officer's health insurance policy as in 3 (a) above.

i:   Acute Needs are defined as medical conditions requiring the urgent use of a prescription medication.  Prescription medications for such Acute Needs may be obtained at the Professional Building Pharmacy.  No greater than a 14-day supply may be obtained at the discounted rate and no refills will be honored at the discounted rate.  Generic prescriptions will be at no cost to the House Officer as the Medical Center will cover his/her insurance co-pay. The House Officer will have the option to purchase formulary and non-formulary prescriptions by paying the incremental costs.

ii:   All House Officers may fill prescriptions for contraceptive medications for themselves or beneficiaries as outlined in 3 (a).  Generic prescriptions will be at no cost to the House Officer as the Medical Center will cover his/her insurance co-pay. The House Officer will have the option to purchase formulary and non-formulary prescriptions by paying the incremental costs.

iii:   The House Officer is entitled to the RUMC employee discount of $3.00 for prescriptions filled at the Professional Building or Triangle Office Building

5

Pharmacies, with the exception of fertility medications and medications used solely for cosmetic purposes.

(2)    For prescription medications required for extended periods, the House Officer may receive discounts on medications in accordance with his/her health insurance carrier.

(h)    Life insurance is provided by the Medical Center in the form of $50,000 group term insurance. Additional amounts are available at the House Officer's option and expense.

(i)    Travel accident insurance of $350,000 without charge to House Officer, applicable while on approved travel outside of the Medical Center for Medical Center business (i.e. attending conferences).

(j)    Maternity/Paternity Leave – Two weeks of leave shall be paid with benefits for the care of newly born or adopted child. The House Officer must provide 30 days notice (or as much notice as practicable if the leave is not foreseeable) to the Department of Graduate Medical Education and the Program Director of the request for leave and complete the necessary forms.

> As an example, Maternity/Paternity Leave may be structured as follows:
> 2 weeks paid maternity/paternity leave
> <u>4 weeks paid vacation</u>
> 6 weeks paid leave with benefits

If additional leave is necessary for medical reasons, short-term medical disability is available. The Family Medical Leave Act can provide further leave options (see below).

(k)    Medical Leave /short term disability - Up to three months of leave because of the House Officer's serious health condition, extended illness or disability shall be paid with benefits, where appropriate. The House Officer must provide 30 days notice (or as much notice as practicable if the leave is not foreseeable) to the Department of Graduate Medical Education and the Program Director of the request for leave and complete the necessary forms.

(l)    Long term disability benefits after 90 days of continuous disability in accordance with the eligibility and benefit terms of the long-term Rush Housestaff disability plan. It will be the responsibility of the Program Director to determine if this leave of absence affects the requirements of the individual Specialty Board and/or program and if additional time will be required to advance in or complete the program.

(m)    Family Medical Leave Act (FMLA) - Up to twelve weeks total leave to care for a spouse, parent, or child with a serious health condition, two weeks of which shall be paid, where appropriate. After these two weeks, subsequent leave is unsalaried, however, the House Officer may maintain benefits by paying the Health and Dental insurance premium contribution as described in Article IV, Section 3 (a) and (b). The House Officer must provide 30 days notice (or as much notice as practicable if the leave is not foreseeable) to the Department of Graduate Medical Education and his/her Program Director of the request of leave and complete the necessary forms.

(n)    Leaves of Absence - may be extended at the request of the House Officer and the discretionary approval of his/her Program Director. Extension does not guarantee that the House Officer's position will be held open pending his/her return to work and the unavailability of a position when a House Officer returns to work shall result in termination of the House Officer's Agreement.

(o)    Vacation and Special Education leave – the equivalent of four work weeks with pay, one of which may be taken as an educational leave. Vacation and/or educational leave must be scheduled by mutual agreement with the Program Director or his/her designee.

(p)    Armed Services Reserve Duty Leave - two weeks with pay in addition to other approved leave as specified in Medical Center Policy.

(q)    Bereavement Pay - time off with pay upon the death of a relative as specified in Medical Center Policy.

(r)    Lost Pagers - each House Officer will be responsible for replacing a lost or stolen pager <u>only</u> with a Rush Medical Center pager within one pay period. A replacement pager will be issued at a cost to the House Officer of $50.

(s)    Right of voluntary participation in Medical Center approved tax sheltered annuity programs.

(t)     Right of voluntary participation in the "Flex Spending Account" for medical, dependent care and transportation charges.

(u)     Right of voluntary participation in the Educational and Tuition Assistance Program (L.E.A.P).

(v)     Laundry and Maintenance of white lab coats and scrubs customarily issued to the House Officer at no cost.

(w)     Free Garage Parking at the Medical Center, provided the majority of the House Officer's duty hours are at the Medical Center and he/she is in good standing with medical records as described in Article III, Section 8.

(x)     Customary Medical Center lodging while on in-house call at night at no cost to the House Officer.

(y)     House Officers who are ON CALL will be provided meal reimbursement through a disbursement system in the amount of $18 per ON CALL shift. An ON CALL shift is defined as a scheduled shift that is over 14 consecutive hours and physically at the Medical Center. House Officers who are on HOME CALL will be provided meal reimbursement in the amount of $9 per HOME CALL shift only if he/she is called into the Medical Center 2 or more times during that shift or if he/she is working 70 or more hours/week during a rotation for which he/she is assigned HOME CALL. The scheduled hours must be in compliance with the duty hour requirements. This benefit must be used within the fiscal year disbursed.

(z)     Non-financial assistance, when appropriate and when requested, in licensure and application for USMLE exams and/or individual specialty board requirements as specified by Article III, Section 7.

(aa)    For qualifying rotations, House Officers will receive gasoline and depreciation repayment consistent with the current GME Mileage Reimbursement Policy.  Completed GME Mileage Reimbursement Requests must be received in the GME office within 60 days of the rotation end date.

(bb)    Reimbursement for educational materials (books, PDAs, medical equipment/software) purchased at the Rush University Bookstore. House Officers will have an account set up in the Book Store for the amount of $300 (tax free) for the fiscal year.  Housestaff who are not on a July 1st start date are entitled to one reimbursement benefit per 12-month period.

(cc)    All Rush House Officers will be issued confidential passcodes for the Rush Lotus notes email and the multitude of computer systems accounts.  A CD is available to provide access to non-clinical systems from home.

## ARTICLE V - HOUSESTAFF ASSOCIATION

**Section 1.      ROLE OF THE HOUSESTAFF ASSOCIATION & COUNCIL.**   The Housestaff Association consists of an Executive Board and an Executive Council. The Executive Board is comprised of a President, Vice-President, Treasurer, Secretary, Compliance Chairperson, Social Chairperson, and Meeting Coordinator. Election of the Housestaff Association Executive Board will be held in accordance with the Housestaff Association By-Laws.

The Executive Council should consist of at least one House Officer delegate from each program.  Alternates may be chosen by each program's housestaff to attend meetings in the absence of the primary representative.  All House Officers are eligible to be adhoc members of the Association.  The residents from each program will be responsible for selecting their Executive Council representative and for providing time to attend the monthly meetings.

The parties recognize that the Association and Executive Council have an established role as a representative of its members and assume the responsibility to represent the views of its members on matters concerning the administration of House Officer Agreements and other matters affecting patient care and graduate medical education at the Medical Center. The parties expressly acknowledge, however, that recognition of the Association and Executive Council is not intended as its designation by the Medical Center as the sole bargaining agent for House Officers within the meaning of the National Labor Relations Act.  The Executive Council shall make recommendations for appointment of House Officer membership to the committees of the Faculty of Rush University and to the Housestaff Grievance Committee and Hearing and Appeals Body described below.  The House Officer shall be eligible for all such appointments.

7

Section 2.     **FUNDING.**   The Graduate Medical Education Department will provide adequate funding for Housestaff Association functions.

## ARTICLE VI  - TERMS OF AGREEMENT

Section 1.     **TERMS OF AGREEMENT.**  The House Officer stipend, level of appointment and duration of appointment shall also be specified in an individual Letter of Appointment.

Section 2.     **TERMINATION OF AGREEMENT BY MEDICAL CENTER.**  This agreement may be terminated by the Medical Center only for cause as defined in the Faculty Rules for Governance and/or for material breach of the terms of this agreement by the House Officer.  The Medical Center may not terminate this agreement without thirty (30) days written notice to the House Officer.

Section 3.     **TERMINATION OF AGREEMENT BY HOUSE OFFICER.**  This agreement may be terminated by the House Officer only for a material breach of the agreement by the Medical Center or for the failure of the Medical Center to provide a program in graduate medical education or graduate clinical training that meets the contemporaneous standards in effect from the appropriate governing bodies where they exist.  The House Officer may not terminate this agreement without thirty (30) days written notice submitted to the Medical Center.

Section 4.     **NOTICE OF NON-RENEWAL.**  The Medical Center shall provide written notice of intent not to renew this Agreement no later than 120 days before the expiration of this Agreement.  Prior to giving such notice, the Medical Center shall inform the House Officer in writing of his/her deficiencies and place the House Officer on probation for at least 60 days, during which time s/he shall be given opportunity to correct the deficiencies.  If the deficiencies are not corrected to the satisfaction of the Medical Center during the probationary period, the Medical Center shall give the House Officer notice of intent not to renew.  Failure to give the notice shall preclude the Medical Center from not renewing the Agreement except as provided in Section 2 of this Article.  All notice requirements contained in this section shall govern and supersede any inconsistent notice provisions in the Rush Medical College Policies and Procedures.

## ARTICLE VII - GRIEVANCE PROCEDURE

Section 1.     **PURPOSE.**   The purpose of this section is to establish a procedure for the resolution of disputes occurring between the House Officer and the Medical Center.

Article VII of the House Officer's Agreement shall supersede any grievance and hearing procedures provided for in the Rules for Governance of Rush University, the By-laws of the Medical Staff of Rush University Medical Center, and the Personnel Policies and Procedures of Rush University Medical Center.  However, any grievance with respect to Patents, Copyrights and Licenses resulting from and relating to the House Officer's work at the Medical Center shall be subject to the procedures set forth in the Medical Center's Policy and Procedures Manual for Patents, Copyrights, and Licenses.

     (a)    This grievance procedure shall apply to any and all disputes or controversies about the interpretation of this Agreement and any rule, regulation, policy or practice of the Medical Center affecting the House Officer, including those dealing with the termination of this Agreement and the decision to recommend the House Officer for certification.

     (b)    A grievance is initiated by the filing of a written and signed request with the appropriate Chairperson, a copy is to be filed with the Dean within thirty (30) days after the event or events upon which the grievance is based.

     (c)    Refer to Rush GMEC Grievance Procedure.

## ARTICLE VIII - CONTINUITY OF MEDICAL CARE

Section 1.     **CONTINUITY OF SERVICES.**   The parties to this agreement shall be under an obligation to maintain patient care services and the payment of compensation throughout the duration of this agreement without interruption in operations of the education and clinical programs except in cases of contract termination in accordance with the provisions of this agreement.

## ARTICLE IX - CONTRACTUAL RENEGOTIATIONS AND RENEWAL

Section 1.     **IMPASSE PROCEDURE.**   In the event that the Medical Center and the House Officer are unable to conclude a final agreement with respect to the negotiation of the successor contract to this contract, the Medical Center and the House Officer thereby agree to submit all issues not agreed to and resolved by the parties to a panel of five persons who shall be empowered to review all the facts relevant to the issues unresolved and who shall have the power to determine those issues.  The decision of this panel shall be final

and binding on all parties hereto. The members of this panel shall consist of two members of the Housestaff Association designated by the House Officer and two members of Management designated by the Dean. The fifth member of the panel shall be either a member of the administration, faculty, or staff and shall be determined by a majority vote of the four designees to the panel herein before provided. If the panel fails to reach a majority vote on the fifth member within ten (10) working days, then the panel shall immediately request a list of arbitrators from the American Arbitration Association and shall select the fifth member from that list within five (5) working days after receipt thereof. Selections shall be made by alternately crossing a name from the list until one name remains. The Medical Center and the House Officer agree that the provision of Article IX, Section 1, shall remain in full force and effect during the pendency of renegotiation of contracts and the pendency of panel proceedings.

3/7/05