**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERT S. GOLDBERG, M.D. and JUNE BEECHAM, ) ) ) | |
| Relators, ) ) | |
| BRING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA and the STATE OF ILLINOIS, ) ) ) ) | No. 04 C 4584 Judge Ruben Castillo |
| Plaintiffs, ) ) ) | |
| v. ) ) | |
| RUSH UNIVERSITY MEDICAL CENTER; MIDWEST ORTHOPAEDICS AT RUSH, LLC; RUSH SURGICENTER, LTD. PARTNERSHIP; BRIAN J. COLE, M.D.; MITCHELL B. SHEINKOP, M.D.; RICHARD A. BERGER, M.D.; AARON G. ROSENBERG, M.D.; CRAIG J. DELLA VALLE, M.D.; and WAYNE G. PAPROSKY, M.D., ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Robert S. Goldberg, M.D. ("Dr. Goldberg")[1] and June Beecham ("Beecham")[2]

(collectively, "Relators") bring this *qui tam* action under the provisions of the False Claims Act

("FCA"), 31 U.S.C. § 3729 *et seq.*, and the Illinois Whistleblower Reward and Protection Act

("IWRPA"), 740 Ill. Comp. Stat. 175/1 *et seq.*, in the name of the United States of America and

---

[1] Dr. Goldberg is an orthopedic surgeon who has been on the medical staff of Rush University Medical Center since 1995. (R. 36, Third Am. Compl. ¶ 50.)

[2] Beecham was the Director of Real Estate for Rush from 1999 to 2003. (R. 36, TAC ¶ 51.)

the State of Illinois, against Rush University Medical Center ("Rush"),[3] Midwest Orthopaedics at

Rush, LLC ("MOR"),[4] Rush SurgiCenter at the Professional Building Limited Partnership

("SurgiCenter"),[5] Brian J. Cole, M.D. ("Dr. Cole"), Mitchell B. Sheinkop, M.D. ("Dr.

Sheinkop"), Richard A. Berger, M.D. ("Dr. Berger"), Aaron G. Rosenberg, M.D. ("Dr.

Rosenberg"), Craig J. Della Valle, M.D. ("Dr. Della Valle"), and Wayne G. Paprosky, M.D.

("Dr. Paprosky"),[6] (collectively, "Defendants"). (R. 36, Third Am. Compl.) Relators allege that

Defendants fraudulently billed Medicare and Medicaid for overlapping surgeries that violated

Medicare and Medicaid rules and regulations.[7] (R. 36, TAC ¶ 22.) Presently before the Court is

Defendants' motion to dismiss the Third Amended Complaint ("TAC") for lack of subject matter

---

[3] Rush is a teaching hospital associated with Rush Medical College that provides medical care to Medicare and Medicaid beneficiaries. (R. 36, TAC ¶ 52.) Rush is accredited by the Accreditation Council for Graduate Medical Education, and receives Graduate Medical Expense payments for its resident training programs under the rules and regulations of Medicare Part A. (*Id.*)

[4] MOR is a group of orthopedic surgeons in private practice who have surgical privileges at Rush and are members of the faculty of Rush Medical College. (R. 36, TAC ¶ 69.)

[5] SurgiCenter is a surgery center owned in part by Rush and physicians who are members of MOR that performs high volumes of orthopedic surgeries. (R. 36, TAC ¶ 55.)

[6] Drs. Cole, Sheinkop, Berger, Rosenberg, Della Valle, and Paprosky (collectively, "Individual Doctor Defendants"), are orthopedic surgeons and past and present members of MOR who have performed surgeries at Rush. (R. 36, TAC ¶¶ 55-60.)

[7] In Count VI (mislabeled as Count IV) of the Third Amended Complaint, Relators also allege a retaliation claim by Dr. Goldberg against Rush under 31 U.S.C. § 3730(h). (R. 36, TAC ¶¶ 191-202.) Relators have conceded the retaliation claim should be dismissed because the version of the FCA in effect at the time the suit was filed did not cover Dr. Goldberg, as he was not an "employee" of any Defendant as required by the FCA. (R. 84, Relators' Mem. in Opp'n to Defs.' Mot. to Dismiss ("Relators' Mem.") at 26.) The Court accordingly dismisses Count VI of the Third Amended Complaint.

jurisdiction under Federal Rule of Civil Procedure ("Rule") 12(b)(1).[8] For the reasons stated below, the motion is granted.

**RELEVANT FACTS[9]**

## I.  Background

Rush is a teaching hospital and a provider of medical care to Medicare and Medicaid beneficiaries. (R. 36, TAC ¶ 52.) All doctors who treat patients at Rush are required to be members of the faculty at Rush Medical College and serve as attending physicians,[10] including the individual doctor defendants in this case. (*See id.* ¶ 13.) As a teaching hospital, Rush receives compensation from the United States government for the use of its facilities for teaching and for expenses associated with the training of residents.[11] (*Id.* ¶ 62.) These teaching and training costs are paid by the government to Rush pursuant to Medicare Part A Graduate Medical Expense payments. (*Id.*) Payments under Medicare Part A include residents' salaries and the teaching activities of attending physicians where the direct patient care is provided by residents,

---

[8] Defendants also brought motions to dismiss under Rules 12(b)(6), 9(b), and 12(c). Because the Court is granting the motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it will not reach the arguments under Rules 12(b)(6), 9(b), or 12(c).

[9] These facts are taken from Relators' Third Amended Complaint and the exhibits attached to the memoranda of law pertaining to this motion. In making the jurisdictional determination under Rule 12(b)(1), the Court is not limited to the pleadings and may consider other submitted evidence. *Johnson v. Apna Ghar, Inc.*, 330 F.3d 999, 1001 (7th Cir. 2001).

[10] An attending physician, also known as a teaching physician, is a physician who involves residents in the care of his or her patients. *See* 42 C.F.R. § 415.152. In this opinion, any doctor or surgeon referenced is also an "attending physician."

[11] A resident is an individual who participates in an approved graduate medical education program. 42 C.F.R. § 415.152. A resident is a doctor or surgeon "in training." (R. 36, TAC ¶ 2.)

fellows, nurses, or physician assistants, and the attending physicians act in an indirect supervisory role. (*Id.* ¶¶ 62-63, 66.) Attending physicians who involve residents in patient care, but directly provide the patient care, are reimbursed under Medicare Part B. (*Id.* ¶ 63.) An attending physician is prohibited from billing under Medicare Part B for services for which he or she is already compensated under Part A, such as when the attending physician has not directly supervised the resident during key portions of the medical care. (*Id.*)

In the context of surgeries that involve attending physicians and residents, reimbursement under Medicare Part B requires that the teaching physician is physically present during all "key and critical" portions of the surgical procedure and is otherwise "immediately available" for the entire surgical procedure. (*Id.* ¶ 64.) Thus, with overlapping surgeries, Medicare regulations require that "(1) the second overlapping surgery not begin until after the critical or key portions of the first surgery are completed; (2) the teaching physician is present for the critical or key portions of the surgery; (3) the teaching physician personally document that he/she was present for the critical or key portions of the surgery; and (4) when teaching physicians are not present during non-critical or non-key portions of a surgery, another qualified surgeon is immediately available to assist, if needed." (*Id.* ¶¶ 68, 72-73, 76.) During an endoscopic procedure, Medicare regulations require the presence of the teaching physician for the entirety of the procedure. (*Id.* ¶¶ 78, 82.) Relators rely upon three sets of rules and regulations pertaining to overlapping surgeries: (1) Medicare regulation "Physician fee schedule payment for services of teaching physicians" ("Teaching Physician Regulations"), 42 C.F.R. § 415.172; (2) applicable billing rules in the May 30, 1996, Health Care Financing Administration Carrier Manual Instructions, "Final Rule for Teaching Physicians" ("1996 Medicare Rules"), (R. 36, TAC, Ex. A); and (3) the

4

November 2002 Part 3 Department of Health and Human Services Medicare Carriers Manual, "Supervising Physicians in Teaching Settings" ("2002 Medicare Rules"), (R. 36, TAC, Ex. B), (collectively, with the Teaching Physician Regulations and the 1996 Medicare Rules, the "Medicare Rules and Regulations").

## II.    Relators' Allegations

Relators allege that the Defendants submitted claims in violation of the Medicare Rules and Regulations between 1996 and 2004 by failing to follow the required procedures for overlapping surgeries. (R. 36, TAC ¶ 83.) In support of this claim, Relators describe several procedures for which Medicare was allegedly billed that appear to violate the relevant rules and regulations. These include a surgery in which the billing doctor never entered the operating room; six complex surgeries scheduled to be performed by the same surgeon in two separate operating rooms over the course of a day; a surgery in which the resident performed the procedure in its entirety; five surgeries scheduled in three different operating rooms, in different buildings, in a three-hour time span; and the viewing of an arthroscopic procedure by the attending physician through a monitor in another operating room. (*Id.* ¶¶ 84-91, 101, 106-08.) Relators also allege that one of the MOR surgeons, Dr. Cole, had been instructed by the Executive Committee of SurgiCenter to discontinue his practice of directing residents to conduct surgeries unsupervised. (*Id.* ¶¶ 112-14.) Despite these instructions, Relators allege that he continued this practice. (*Id.*) In support of these allegations, Relators provide Dr. Cole's schedule for one day of surgeries to show the "physical impossibility" of Dr. Cole being present for the critical portions of all of the surgeries or otherwise immediately available. (*Id.* ¶¶ 108-09.)

According to Relators, it was the practice of the orthopedic residents to lie in the medical records and state that MOR doctors were present for all key and critical portions of the surgery, and that the surgeon scheduling the surgery was the surgeon "immediately available." (R. 36, TAC ¶¶ 93-94.) Relators also allege that the MOR doctors were motivated to increase the number of surgeries they performed to justify millions of dollars in kickbacks from Zimmer, a manufacturer and developer of hip and knee surgical implants.[12] (R. 36, TAC ¶¶ 138-42.)

Dr. Goldberg repeatedly communicated with senior Rush officials between 1999 and 2004 about the lack of surgeon supervision over residents and that such conduct violated Medicare regulations.[13] (R. 36, TAC ¶ 32.) Relators claim that Rush and SurgiCenter knew the surgeries being billed by MOR doctors were not being properly supervised, but they allowed the scheduling of concurrent surgeries to continue, and obtained reimbursement from the government for surgeries that they knew did not comply with the Medicare Rules and Regulations. (*Id.* ¶¶ 169-70.) Relators also allege that Defendants conspired to fraudulently bill Medicaid and Medicare in order to receive additional federal funds, as well as to benefit from participation in referral and kickback programs. (*Id.* ¶ 186.)

## PROCEDURAL HISTORY

Relators filed suit in this case under seal on July 12, 2004, alleging violations of both the FCA and the IWRPA by Rush and MOR. (R. 1, Compl.) While the case was still under seal,

_____

[12] In 2007, Zimmer entered into a monetary settlement with the federal government in order to avoid prosecution for paying kickbacks to orthopedic surgeons. (R. 36, TAC ¶ 140.)

[13] The TAC also contains allegations regarding Dr. Goldberg's retaliation claim against Rush. As Relators have conceded that the retaliation claim should be dismissed, the Court has omitted the facts related to that claim.

Relators filed their Second Amended Complaint ("SAC") on June 13, 2006, and added

SurgiCenter and Dr. Cole as defendants. (R. 8, Second Am. Compl.) Relators' allegations

focused on three areas: (1) leasing arrangements that allegedly violated the Stark Law, 42 U.S.C.

§ 1395nn (the "Stark Claims"); (2) violations related to Defendants' activities in providing

graduate medical instruction to residents (the "Teaching Hospital Claims"); and (3) claims for

retaliation against Rush by Dr. Goldberg (the "Retaliation Claims"). (R. 17, Joint Status Report

at 1-2.) On March 5, 2010, the United States and the State of Illinois intervened in the Stark

Claims and declined to intervene in the Teaching Hospital Claims. (R. 9, Notice of Intervention

in part and Declination in part by the United States; R. 10, Notice of Intervention in part and

Declination in part by the State of Illinois.) The parties settled the Stark Claims and, on March 5,

2010, Chief Judge Holderman dismissed the Stark Claims with prejudice and unsealed the SAC

and other documents in this matter. (R. 17, Joint Status Report at 2.)

The case was subsequently reassigned and, on June 21, 2010, Relators filed their Third

Amended Complaint, adding Dr. Sheinkop, Dr. Berger, Dr. Rosenberg, Dr. Della Valle, and Dr.

Paprosky as defendants. (R. 36, TAC.) The TAC contains six counts: Count I alleges violations

of the FCA by MOR and the Individual Doctor Defendants for knowingly submitting false claims

to the U.S. government that did comply with Medicare rules and regulations pertaining to

required attending physician presence for key and critical portions of a surgery; Count II alleges

violations of IWRPA by MOR and the Individual Doctor Defendants for knowingly submitting

false claims to the State of Illinois; Count III alleges violations of the FCA by Rush and

SurgiCenter for knowingly submitting false claims to the U.S. government and permitting the

MOR doctors to schedule multiple concurrent surgeries that were not properly supervised; Count

IV alleges violations of IWRPA by Rush and SurgiCenter for knowingly submitting false claims

to the State of Illinois; Count V alleges a conspiracy to violate the FCA and IWRPA by all

Defendants; and Count VI alleges retaliation by Rush against Dr. Goldberg in violation of

Section 3730(h) of the FCA and Section 175/4(g) of IWRPA. (R. 36, TAC ¶¶ 146-202.)

On July 20, 2010, MOR and the Individual Doctor Defendants filed a motion to dismiss

the TAC under Rule 12(b)(1), and alternatively, Rules 12(b)(6) and 9(b). (R. 68, MOR and

Individual Doctors' Mot. to Dismiss.) On July 27, 2010, Rush and SurgiCenter filed a motion to

dismiss under Rule 12(b)(1) and, alternatively, Rule 12(c). (R. 75, Rush and SurgiCenter's Mot.

to Dismiss.) Regarding the Rule 12(b)(1) motions, Defendants argue that this Court does not

have subject matter jurisdiction over Relators' FCA claims under 31 U.S.C. § 3730(e)(4) because

Relators' allegations are based on public disclosures of government investigations of similar

conduct in teaching hospitals across the country. (R. 75, Rush and SurgiCenter's Mot. to

Dismiss ¶ 4; R. 68, MOR and Individual Doctors' Mot. to Dismiss ¶ 3.) Additionally,

Defendants argue that Relators have failed to plead facts showing that they qualify as "original

sources." (*Id.*) In opposing Defendants' motion, Relators concede that they do not meet the

original source requirement, but argue that their claims are not based on public disclosure and

thus are permitted under Section 3730(e)(4). (R. 84, Relators' Mem. in Opp'n to Defs.' Mot. to

Dismiss ("Relators' Mem.") at 2.)

### LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(1) asks the court to dismiss an action over

which it allegedly lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). In a motion to

dismiss under Rule 12(b)(1), the party asserting jurisdiction bears the burden of proof. *See*

8

*Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009). All reasonable inferences are drawn in favor of the plaintiff, and all well-pleaded allegations are accepted as true. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). The jurisdictional inquiry focuses on the plaintiff's most recent amended complaint. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."). In making the jurisdictional determination under Rule 12(b)(1), a court may look beyond the allegations of the complaint and consider other submitted evidence. *Johnson*, 330 F.3d at 1001.

## ANALYSIS

Relators bring this suit under the FCA, which prohibits false or fraudulent claims for payment to the United States. 31 U.S.C. § 3729(a). To remedy such fraud, the FCA authorizes civil actions to be brought by the Attorney General, or as *qui tam* actions by private individuals in the government's name. *Id.* § 3720(a)-(b). If a private individual, called a relator, brings a *qui tam* suit, he or she must deliver a copy of the complaint to the government, which then has 60 days to intervene in the action. *Id.* § 3730(b)(2). Whether or not the government chooses to intervene, the relator receives a share of any proceeds from the action, ranging from 15 to 30 percent, in addition to attorney's fees and costs. *Id.* § 3730(d)(1)-(2). The purpose of the *qui tam* provision of the FCA is "to reward private individuals who take significant personal risks to bring wrongdoing to light . . . and to encourage whistleblowing and the disclosure of fraud." *United States v. Bank of Farmington*, 166 F.3d 853, 858 (7th Cir. 1999), *overruled on other grounds by Glaser*, 570 F.3d at 910. At the same time, however, "Congress intended that the

9

courts not be troubled by persons who wish to capitalize on others' discovery of frauds to the exposure of which they themselves have in no way contributed." *Id.* Thus, the FCA contains several jurisdictional bars intended to "strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cnty.*, 130 S. Ct. at 1407.

At issue in this motion to dismiss is the "public disclosure" bar. *See* 31 U.S.C. § 3730(e)(4).[14] Under Section 3730(e)(4), "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."[15] Once the information has been publicly disclosed, "only the Attorney General and a relator who is an 'original source' of the information may represent the United States." *Glaser*, 570 F.3d at 913 (internal quotation omitted). An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B).

---

[14] The Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119, signed into law on March 23, 2010, replaced the prior version of 31 U.S.C. § 3730(e)(4) with new language. Because the legislation makes no mention of retroactivity, the Court uses the previous version of Section 3730(e)(4). *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1400 n.1 (2010) (citing *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 948 (1997)).

[15] In *Rockwell International Corp. v. United States*, the Supreme Court held that the "jurisdiction" in Section 3730(e)(4) refers to the subject matter jurisdiction of the court. 549 U.S. 457, 467-68 (2007).

The Court must conduct a three-step inquiry to determine whether it has jurisdiction under Section 3730(e)(4). *Glaser*, 570 F.3d at 913. First, the Court must examine whether the Relators' allegations have been publicly disclosed. *Id.* Second, if there has been public disclosure, the Court must determine whether the lawsuit is "based upon" the publicly disclosed information. *Id.* Finally, if the allegations are based upon publicly disclosed information, the Court determines whether the Relators are an "original source" of the information upon which the allegations are based. *Id.* (citation omitted).

## I. Have Relators' Allegations Been Publicly Disclosed?

Under Section 3730(e)(4), "public disclosure of allegations or transactions" may occur in "a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media . . ." Invoking this provision in their motion to dismiss, Defendants assert that the allegations underlying Plaintiffs' complaint were publicly disclosed in government reports as well as through the news media. In support of this assertion, Defendants offer a 1998 General Accounting Office ("GAO") Report, "Concerns with Physicians at Teaching Hospitals (PATH) Audits," (R. 69, MOR and Individual Doctors' Mot. to Dismiss Mem., Ex. A); a 2001 Office of Inspector General ("OIG") Semiannual Report discussing the Physicians at Teaching Hospitals ("PATH") audits initiative, (*id.*, Ex. B at 10-11); and several news reports pertaining to the PATH audits, (*id.*, Exs. E, F, G, H, I, J), and the Zimmer prosecution, (*id.*, Exs. L, M, N, O, P).[16] Relators, on the other

---

[16] There is no question that the government reports and the news articles offered by Defendants fall within the category of sources–"administrative, or Government [General] Accounting Office report . . .or from the news media"–enumerated in Section 3730(e)(4)(A).

hand, argue that their claims were not part of the PATH audits, and that the PATH audits would not have led to the discovery of the false claims in this case. (R. 84, Relators' Mem. at 2.)

In the Seventh Circuit, "public disclosure" occurs when "the critical elements exposing the transaction as fraudulent are placed in the public domain." *United States ex rel. Feingold v. Adminastar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003) (citations omitted). A public disclosure "brings to the attention of the relevant authority that there has been a false claim against the government." *Glaser*, 570 F.3d at 913 (internal quotation marks omitted). Under the "critical elements" standard, the specific defendants need not be named in the public disclosure. *See United States ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 729 (7th Cir. 2006). Instead, if there have been "[i]ndustry-wide public disclosures," *qui tam* actions against "any defendant who is directly identifiable from the public disclosures" are barred. *Id.*; *see also United States, ex rel. Baltazar v. Warden*, No. 07 C 4107, 2009 WL 935805, at *6 (N.D. Ill. Apr. 2, 2009) (internal citations omitted) (It is not required that "the specific defendants be named or identified in the public disclosures . . . It is sufficient that the public disclosures contain information regarding industry-wide abuses that mimic closely the plaintiff['s] [allegations of] fraud."); *Schultz v. Devry Inc.*, No. 07 C 5425, 2009 WL 562286, at *3 (N.D. Ill. Mar. 4, 2009) ("The specific defendants in the lawsuit do not need to be identified in public disclosures . . . The disclosures were of industry-wide abuses; thus [defendants] were identifiable, and the public disclosure bar applied.").

The purpose of *qui tam* litigation is to encourage private citizens to come forward with information regarding fraudulent activity. *Feingold*, 324 F.3d at 495. However, when there has already been a public disclosure, the government "is already in a position to vindicate society's

interests, and a *qui tam* action would serve no purpose." *Id.* Thus, under the first portion of the three-step inquiry, the Court must focus on whether the GAO and OIG reports and related news articles exposed the "critical elements" of Relators' allegations of fraud.

## A. The PATH Initiative

The PATH initiative grew out of OIG hospital audits that identified irregularities in Medicare billing practices at teaching hospitals. (R. 69, MOR and Individual Doctors' Mot. to Dismiss Mem., Ex. A at 3.) In 1995, the Department of Justice ("DOJ") entered into a $30 million settlement with the University of Pennsylvania to resolve allegations of improper billing of Medicare. (*Id.*) Specifically, an OIG audit had concluded that "some of the university's teaching physicians had inappropriately billed Medicare because medical records did not adequately document their involvement in services provided by residents." (*Id.*) The audit also found that some teaching physicians had "upcoded" their claims, meaning that they had billed for more expensive procedures than may have been provided. (*Id.*) Concerned that these problems might be widespread among teaching hospitals, the OIG, in cooperation with the DOJ, instituted "a nationwide initiative" now known as the PATH audits. (*Id.*) When the PATH initiative began, the OIG's intention was to audit all major teaching hospitals or faculty practice plans associated with each of the nation's 125 medical schools, one of which is Rush.[17] (*Id.* at 6; R. 36., TAC ¶ 52.) The audits focused on two main areas of concern: (1) "whether teaching physicians who billed [Medicare] part B for services furnished by residents provided sufficient

---

[17] The OIG subsequently reduced the number of institutions to be audited due to competing demands and other factors. (R. 69, MOR and Individual Doctors' Mot. to Dismiss Mem., Ex. A at 6, 12.)

'personal direction' in the delivery of the service"; and (2) "whether teaching physicians have inflated their part B claims by 'upcoding,' that is billing using a code that is one or more levels higher than the level of service that was actually performed." (R. 69, MOR and Individual Doctors' Mem., Ex. A at 8.)

Regarding the first area of concern–the personal direction of residents by teaching physicians–the GAO report admitted that the requirements under Medicare Part B had not always been clearly communicated or consistently enforced. (*Id.* at 13.) However, the report also emphasized that "the need for a teaching physician to be physically present to bill for services performed by residents is a longstanding requirement of the Medicare program. The fact that a physical presence requirement has not always been consistently communicated or enforced does not obviate the need for teaching physicians to document their personal involvement in services to legitimately bill Medicare." (*Id.* at 5.) According to the Inspector General, these "physical presence problems . . . pertained to teaching institutions across the country." (*Id.* at 26.)

As of 2001, the PATH initiative had resulted in settlements with eight teaching hospitals and the recovery of over $98.7 million. (R. 69, MOR and Individual Doctors' Mot. to Dismiss Mem., Ex. B at 11.) Eight other investigations outside of the PATH initiative, but which included billings for teaching physicians, resulted in FCA settlements totaling over $41.1 million. (*Id.*) During this time, the PATH initiative and the related litigation also received press coverage in numerous medical news sources. (*Id.*, Exs. E, F, G, H, I, J.) In the OIG semiannual report issued six years after the audits initially began, the objective of the audits remained unchanged–"[t]he fundamental tenet of the PATH initiative is that in order to receive a separate payment from Medicare Part B for a service rendered to a patient, the teaching physician must

have personally provided that service or have been present when the resident furnished the care." (*Id.* at 10.)

In *United States ex rel. Gear v. Emergency Medical Associates of Illinois*, the Seventh Circuit was squarely presented with the issue of whether the PATH initiative constituted a public disclosure for the purposes of a *qui tam* suit alleging fraudulent billing of Medicare for services performed by residents. 436 F.3d at 729. The Seventh Circuit concluded that the PATH initiative was an "industry-wide public disclosure" that barred *qui tam* actions against any defendant "directly identifiable from the public disclosures." 436 F.3d at 729. The court looked at the development of the PATH initiative and observed that there had been public allegations since the mid-1990s that Medicare was being billed for services provided by residents as if attending physicians had actually performed the service. *Id.* at 728. The PATH initiative thus sought to determine whether "hospitals and other entities were improperly billing Medicare for services provided by unsupervised residents." *Id.* Noting the OIG and GAO reports pertaining to the audits, the settlements and litigation that occurred, and that "medical news sources [took] notice, with some alarm," the Seventh Circuit held that the PATH initiative disclosed "industry-wide abuses and investigations," barring suit against any implicated defendant.[18] *Id.* at 728-29.

_____

[18] Relators cite *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 564-66 (11th Cir. 1995), in support of the proposition that a public disclosure that does not identify the particular fraud does not constitute a public disclosure for the purposes of Section 3730(e)(4). *Cooper*, however, emphasized that the important issue for public disclosure purposes is whether the government will have "difficulty identifying all of the individual actors engaged in fraudulent activity." *Id.* at 566. Here, the PATH audits implicated only the teaching hospitals and faculty practice plans associated with each of the nation's 125 medical schools, (R. 69, MOR and Individual Doctors' Mot. to Dismiss Mem., Ex. A at 12), which is very different than the reports of widespread fraud among Medicare health plan administrators in *Cooper*. *See Cooper*, 19 F.3d at 566.

**B.    The "Critical Elements" of Relators' Allegations**

While it is clear under Seventh Circuit precedent that the PATH initiative is an "industry-wide public disclosure," whether the initiative exposed "the critical elements" of Relators' allegations requires further analysis of the overlap between the audits and Relators' claims.  As a preliminary inquiry, the Defendants must be "directly identifiable from the public disclosures." *Id.* at 729.  In this case, the Defendants, like the defendants in *Gear*, were not named specifically in the PATH initiative.  *Id.*  However, the Seventh Circuit noted that under the PATH audits, "[t]eaching hospitals associated with the nation's 125 medical schools were informed that they were subject to an audit of the billing for resident services."  *Id.* at 728.  Thus, the defendants in *Gear*, corporations that provided physicians to hospital emergency rooms, including residents participating in a medical school residency program, were implicated and "directly identifiable" from the PATH audits.  *Id.* at 728-29.  Similarly, the Defendants in this case, a teaching hospital and attending physicians associated with Rush Medical College, (R. 36, TAC ¶¶ 52-69), are "directly identifiable" from the PATH audits.

Next, the Court must decide whether the PATH initiative, an "industry-wide public disclosure" that implicated Defendants, actually exposed the "critical elements" of Relators' claims.  As discussed above, Relators' TAC  alleges that Defendants fraudulently billed the government by failing to follow Medicare Rules and Regulations regarding attending physician supervision and documentation requirements for overlapping surgeries.  (R. 36, TAC ¶ 2.)  In opposing Defendants' motion to dismiss, Relators attempt to frame the "critical elements" of their allegations narrowly–and thus allegedly outside the scope of the PATH audits–as solely "focus[ing] on what [MOR] doctors were doing during [the time they were entitled to leave the

operating room during non-key and critical parts of the surgery], and specifically, whether they were immediately available, as required under the Medicare conditions of payment." (R. 84, Relators' Mem. at 6.) At either level of abstraction, however, the Court finds that the critical elements of Relators' allegations are encompassed by the scope of the PATH audits and related news coverage.

Once again, the Seventh Circuit's reasoning in *Gear* is particularly instructive in this case. In *Gear*, the relator alleged that certain teaching hospitals had violated Medicare rules and regulations which prohibit residents from "moonlighting" as attending physicians during residency hours. 436 F.3d at 727 (citing 42 C.F.R. § 415.208(b)(1)). The court rejected the relator's argument that the information in the complaint was not in the public domain because the PATH initiative did "not expose any transactions from which the government (or anyone else) could infer that the particular entities [the relator] named were fraudulently billing Medicare." *Id.* at 729 (citations omitted); *see also United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 687 (D.C. Cir. 1997) (concluding that the relators' claims were precluded by the FCA's jurisdictional bar because the relators' complaint merely "repeat[ed] what the public already knows and add[ed] only the identity of particular [defendants] engaged in the questionable and previously documented generic practice"). Instead, viewing the relator's allegations as pertaining to both the specific "moonlighting resident" regulations allegedly violated, as well as the broader issue of Medicare being billed for services provided by residents as if attending physicians had actually performed the services, the Seventh Circuit held that "the information on which the complaint [was] based was already publicly disclosed" by the PATH

17

audits.[19] *Id.* at 728.

Similarly, Relators' arguments that their "claims are based solely on the overlapping surgery issue which was never the subject of the PATH investigation" and that the "PATH audits did not and could not have revealed the false claims at issue here" are unpersuasive. (R. 84, Relators' Mem. at 11.) Admittedly, the specific "overlapping surgeries" provisions of the Teaching Physician Regulations upon which Relators rely were promulgated after the initiation of the PATH audits. However, these regulations–like the "moonlighting resident" regulations allegedly violated in *Gear*–were drafted in response to the same concerns that led to the audits. (R. 69, MOR and Individual Doctors' Mot. to Dismiss Mem., Ex. A at 10), and are merely a subset in the larger system of Medicare rules and regulations regarding attending physician supervision of residents that were revised in 1995. *See* 60 Fed. Reg. 63124, Dec. 8, 1995. While focusing on the specific rules regarding overlapping surgeries, the crux of Relators' claims still mirrors the allegations of fraud exposed in the PATH audits–that attending physicians are failing

---

[19] Relators acknowledge that "the nature of their Complaint may have invited [the] mischaracterization" that the nature of their claims sounds "similar, if not identical" to the claims in *Gear*, and "welcom[ed] the opportunity presented by the Motion to Dismiss, to explain to the Court and the Defendants what this case is, and is not, about." (R. 84, Relators' Mem. at 2-3.) They attempt to distinguish *Gear* by focusing on the brevity of the complaint in *Gear*, and what the relator in *Gear* did–or did not do–prior to filing the lawsuit. (*Id.* at 9.) ("Gear, a medical resident, provided no evidence that he had done anything about the conduct he alleged to be false prior to filing his lawsuit.") This distinction, however, is unpersuasive in the preliminary inquiry of whether the allegations were publicly disclosed, and is more appropriate in the subsequent steps of the inquiry under Section 3730(e)(4).

to provide the required direct supervision of residents to bill Medicare under Part B.[20]

Importantly, the PATH initiative demonstrates that the government is on notice of the possibility for fraudulent billing by Defendants. *See United States ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp. 2d 633, 641 (E.D. Va. Mar. 18, 2010) (quoting *United States ex rel. Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 389 (6th Cir. 2005)) ("To constitute a 'public disclosure' sufficient to negate FCA jurisdiction, a disclosure need not specifically show fraud, but must merely be 'sufficient to put the government on notice of the likelihood of related fraudulent activity.'"). Here, because of the PATH initiative and the notice it provided, "the government is already in a position to vindicate society's interests, and a *qui tam* action would serve no purpose." *Glaser*, 436 F.3d at 729.

Relators' concern that the PATH audits cannot "serve to forever immunize all teaching medical institutions from all whistleblower lawsuits premised on Medicare fraud" is unfounded in this case. (R. 84, Relators' Mem. at 15.) The PATH initiative was ongoing through at least 2001, (R. 69, MOR and Individual Doctors' Mot. to Dismiss Mem., Ex. B), and Relators' claims

---

[20] Relators' own characterization of the case emphasizes this point:

This case concerns the illegal practices of the Defendants to dramatically increase the amount of orthopedic surgeries being performed by surgeons associated with MO at Rush and the SurgiCenter . . . well beyond the safe capacity of the orthopedic surgeons involved to manage their caseloads. These practices included MO[R] orthopedic surgeons' complete abrogation of their duties and responsibilities to supervise and manage the work of orthopedic residents (surgeons in training) and the dramatic and false over-billing of Medicare and Medicaid by those same surgeons for surgeries at which they were not present for most, and in some cases all, of the time that a patient was lying unconscious on the operating table, undergoing surgery.

(R. 36, TAC ¶ 2.)

19

are based on allegedly fraudulent activity that occurred between 1996 and 2004. Holding that the allegations in this case were previously publicly disclosed by the PATH audits is far from "forever immun[izing]" the Defendants from suit based on Medicare fraud. *See Findley*, 105 F.3d at 679 (affirming the district court's determination that three public sources, from 1952, 1974, and 1986 constituted public disclosure in a suit brought in 1994). Moreover, Section 3703(e)(4)(A) provides two additional safeguards to prevent the "immunization" of defendants in a case like this: suits based on allegations that have been publicly disclosed are not barred if the suits are brought by the government or an "original source." 31 U.S.C. § 3730(e)(4)(A).

Thus, under the first portion of the three-step "public disclosure" bar inquiry, the Court concludes that the PATH initiative, an "industry-wide public disclosure," implicated the Defendants in this case and exposed the critical elements of Relators' allegations.

## II.    Is the Lawsuit "Based Upon" the Public Disclosures?

Because Relators' allegations against Defendants were disclosed in the PATH audits and the related news coverage, the Court must next decide if Relators' suit is "based upon" the "public disclosure." 31 U.S.C. § 3730(e)(4)(A). In *Glaser v. Wound Care Consultants, Inc.*, the Seventh Circuit recently overruled its prior interpretation of the phrase "based upon" found in Section 3730(e)(4)(A). 570 F.3d at 910. The Seventh Circuit had previously held that an FCA lawsuit is "based upon" a public disclosure when the lawsuit "depends essentially upon publicly disclosed information and is actually derived from such information." *Bank of Farmington*, 166 F.3d at 864. Though this interpretation was reaffirmed in *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 738 (7th Cir. 2007), it was the minority position among the

20

circuit courts, and ultimately rejected in *Glaser*. 570 F.3d at 910. In *Glaser*, the Seventh Circuit

reasoned that under the minority interpretation of "based upon," the "entire original-source

inquiry-asking whether the relator had 'direct and independent knowledge' of the information

and 'voluntarily provided' it to the government is superfluous." *Id.* Instead, the Seventh Circuit

adopted the majority interpretation, holding that "an FCA relator's complaint is 'based upon'

publicly disclosed allegations or transactions when the allegations in the relator's complaint are

*substantially similar* to the allegations already in the public domain." *Id.* (emphasis added).

Under the "substantially similar" interpretation of "based upon" adopted by the Seventh

Circuit in *Glaser*, the addition of particular allegations not specifically covered by the public

disclosure is "not enough to take [the] case outside the jurisdictional bar." *Id.* at 920. In *Glaser*,

the relator argued that her complaint contained particular allegations of fraud not mentioned in

the government investigation of the defendant, and thus was not "based upon" the investigation.

*Id.* In rejecting her argument, the Seventh Circuit noted that "based upon" does not mean "solely

based upon," and "[a]n FCA *qui tam* action even partly based upon publicly disclosed allegations

or transactions is nonetheless 'based upon' such allegations or transactions." *Id.* at 920-21

(quoting *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir.

1992) ("To insert the term 'solely' into § 3730(e)(4)(A) would impermissibly expand federal

jurisdiction by allowing *qui tam* plaintiffs to avoid the more exacting 'original source'

requirement simply by asserting an additional count.")). Instead, the Seventh Circuit held that

relator's allegations of wrongdoing were "virtually identical" to those in the investigation

because they pertained to the same entity and described the same fraudulent conduct. *Id.* at 920.

In this case, Relators' allegations of wrongdoing also pertain to the same entities

21

implicated in the PATH initiative and describe the same fraudulent conduct as the initiative. The

PATH audits implicated teaching hospitals and practice plans associated with the nation's

medical schools, (R. 69, MOR and Individual Doctors' Mot. to Dismiss Mem., Ex. A at 6);

Defendants in this case are a teaching hospital and attending physicians associated with a medical

school. (R. 36, TAC ¶ 52.) The PATH audits disclosed allegations of fraud pertaining to the

lack of proper supervision of residents by attending physicians and the resulting over billing of

Medicare, (R. 69, MOR and Individual Doctors' Mot. to Dismiss Mem., Ex. A at 8); Relators

allege that residents were not properly supervised and Medicare was improperly billed because

Defendants failed to follow the Medicare Rules and Regulations pertaining to overlapping

surgeries. (R. 36, TAC ¶ 2.)[21] Thus, the allegations in the TAC are "based upon" the PATH

audits because the allegations in the TAC are "substantially similar to the allegations already in

the public domain." *Glaser*, 570 F.3d at 910.

Relators, however, argue that their complaint "could not have simply mimicked or copied

in any way the public disclosures [regarding the PATH audits] because those disclosures say

nothing about the impact or consequences of performing overlapping surgeries." (R. 84,

Relators' Mem. at 10.) Again, focusing the claims only on the overlapping surgery rules and

---

[21] The attempt by Relators to draw a distinction between the PATH audits and their
allegations is again belied by the TAC:
> Drafters of the Medicare laws were well aware of the fact that financial
> incentives could lead a surgeon to conduct a surgery with limited, or even no
> supervision, in order to maximize the number of surgeries and billing. Therefore the
> Medicare Legislators created laws prohibiting improper supervision of surgical
> residents while billing Medicare. Medicare laws included specific standards detailing
> the ability of a surgeon to bill Medicare for overlapping surgeries in the context of
> teaching hospitals. MO[R] surgeons violated those laws.
>
> (R. 36, TAC ¶ 15.)

regulations does not save Relators' allegations from being "substantially similar" to the allegations disclosed in the audits and related news coverage. Merely inserting the identity of specific parties and focusing on a minute area of a well-documented fraudulent practice may "add[] a few allegations not covered by the [PATH initiative]," but that is insufficient to overcome the requirements of Section 3730(e)(4)(A). *Glaser*, 570 F.3d at 920.

Relators attempt to distinguish *Glaser* by pointing out that the relator in *Glaser* was a patient who knew nothing about the false claims she alleged and admitted that her entire case was the creation of the lawyers who filed it, whereas in this case, Dr. Goldberg witnessed the allegedly fraudulent conduct "with his own eyes and ears" and tried to stop the conduct. (R. 84, Relators' Mem. at 9-10.) While this distinction may have proven persuasive under the Seventh Circuit's prior interpretation of "based upon," it is less relevant under the governing "substantially similar" interpretation; the question now is whether the claims are "substantially similar" to the public disclosures, not whether they "depend essentially" or are "actually derived from" the disclosures.[22] Thus, because the allegations in Relators' complaint are substantially similar to publicly disclosed allegations, Relators' complaint is based upon those public disclosures and therefore falls within the threshold jurisdictional bar of § 3730(e)(4)(A).

## III. Were Relators an "Original Source"?

The final step in the three part "public disclosure" bar inquiry is determining whether

---

[22] Notably, though, even under the prior interpretation of "based upon," the Seventh Circuit in *Gear* still found the relator's claims to be "based upon" the public disclosures despite the relator's affidavit claiming that he based his complaint on his own personal observations and experience. *Gear*, 436 F.3d at 729. The court found this affidavit "insufficient to counter the weighty public record" regarding the PATH audits. *Id.*

Relators qualify as "original sources" under Section 3730(e)(4)(B). Because Relators' "allegations are substantially similar to information about an alleged fraud that is already publicly disclosed, the statute permits [Relators] to avoid the jurisdictional bar only if [they have] 'direct and independent knowledge of the information on which the allegations are based' and 'voluntarily provided the information to the Government before filing' a qui tam action." *Glaser*, 570 F.3d at 910 (quoting 31 U.S.C. § 3730(e)(4)(B)). The Court need not pursue this inquiry further, however, as Relators concede that Dr. Goldberg did not properly notify the Government prior to filing the suit, and Beecham does not have any independent knowledge of the allegations in the TAC. (R. 84, Relators' Mem. at 32-33.) Thus, Relators do not qualify as an "original source" and their claims under the FCA are barred by Section 3730(e)(4).[23]

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss for lack of subject matter jurisdiction, (R. 68; R. 75), are GRANTED with regard to Counts I, III, V (as it relates to the FCA), and VI. Given the Court's dismissal of Relators' federal claims, the Court relinquishes jurisdiction over Relators' state-law claim for violation of IWRPA, brought in Counts II, IV, and V (as it pertains to IWRPA). *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the

---

[23] Although Relators claim that they "do not seek recovery for any claim that . . . was tainted by a kickback from Zimmer," (R. 84, Relators' Mem. at 9), the Court notes that the analysis above applies with equal force to any allegations related to Zimmer. Relators made no mention of Zimmer until the TAC, which was filed nearly three years after Zimmer entered into the publicly disclosed deferred prosecution agreement Relators rely upon. (R. 36, TAC ¶¶ 140-42; Ex. D.)

merits.") (citation omitted). The state-law claims brought in Counts II, IV, and V are therefore dismissed without prejudice to their potential refiling in state court. Judgment in favor of Defendants is entered on all of the federal claims, Counts I, III, and V, for lack of subject matter jurisdiction.

Entered:

Judge Ruben Castillo
United States District Court

**Dated:** November 2, 2010