IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT S. GOLDBERG, M.D. and JUNE BEECHAM, | ) ) ) | |
| Relators, | ) ) | Case No. 04 C 4584 |
| BRING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA and the STATE OF ILLINOIS, | ) ) ) ) | Judge Ruben Castillo |
| | ) | Magistrate Judge Young Kim |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| RUSH UNIVERSITY MEDICAL CENTER; MIDWEST ORTHOPEDICS AT RUSH, LLC; RUSH SURGICENTER, LTD. PARTNERSHIP; BRIAN J. COLE, M.D.; MITCHELL B. SHEINKOP, M.D.; RICHARD A. BERGER, M.D.; AARON G. ROSENBERG, M.D.; CRAIG J. DELLA VALLE, M.D.; and WAYNE G. PAPROSKY, M.D., | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**RUMC'S MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEYS' FEES**

**I.      Introduction.**

RUMC brings this Motion for Fees and Expenses against Dr. Goldberg because his conduct in this litigation has been clearly frivolous, vexatious and intended primarily for purposes of harassment.  31 U.S.C. §3730(d)(4).  Any of these conditions is sufficient to support a fee award under the False Claims Act ("FCA").  *Mikes v. Straus,* 274 F.3d 687, 704-05 (2d Cir. 2001).  As we will detail below, all three of these conditions exist here.

In authorizing private litigants to pursue claims under the FCA where the government has declined to do so, Congress recognized that there had to be some measure of control over a private plaintiff who behaved inappropriately and used the FCA's qui tam provisions to inflict

loss and damage, not as the result of a sincere and meritorious position, but simply because he was at odds with the defendant. That is the case here.

As we will demonstrate, Dr. Goldberg's conduct in this litigation is informed and contextualized by a detailed understanding of Dr. Goldberg's fifteen-year history of vexatious and harassing conduct against RUMC. His conduct in this litigation is entirely consistent with this history, and is, in fact, an extension of it. In the instant case, Dr. Goldberg's claims against RUMC failed and the facts make clear that Dr. Goldberg knew, or should have known, that they would. Further, Dr. Goldberg continued on with his lawsuit after any reasonable person would have stopped, or at least sought to mitigate the costs of proceeding. Dr. Goldberg, instead, chose to accelerate the costs and burden imposed by his litigation.

Taken together, Dr. Goldberg's conduct in this case and his history with RUMC make abundantly clear that Dr. Goldberg should be held accountable for the fees incurred by RUMC to defend this litigation.

## II.     Dr. Goldberg's History Of Vexatious And Harassing Conduct.

### A.      Dr. Goldberg's Demands on RUMC: 1995 to 1996.

Dr. Goldberg joined the medical staff at RUMC in September 1995. About three months later, on December 3, 1995, Dr. Goldberg wrote to the head of orthopedic surgery at RUMC, Dr. Gunnar Andersson, asking that Dr. Goldberg be included on the emergency room on-call schedule for hand surgeons. A copy of the December 3, 1995 letter is attached hereto as part of Group Exhibit A, which is a collection of documents relating to Dr. Goldberg's 1995 to 1996 demands on RUMC. Hand surgery is Dr. Goldberg's specialty. Dr. Goldberg was advised, orally, that there was not enough work available to justify adding him to the call schedule and that he was not bringing in enough cases to warrant this change.

2

In furtherance of his cause, and as what now seems clearly to be Dr. Goldberg's opening shot in what would become a campaign by him that would expand and last more than ten years, Dr. Goldberg sent Dr. Andersson a threatening letter on June 3, 1996, which began:

> I am writing this letter because, having exhausted all other avenues of communication with you, I have failed to receive due process for my written and verbal requests.

(6/3/1996 Letter, attached in Group Ex. A.) By this time, Dr. Goldberg was also seeking greater opportunities to teach residents; to participate in the Rush Arthritis and Orthopedic Institute; and to conduct research. Dr. Goldberg closed his letter of June 3, 1996 by stating that "there exists an unsettling pattern of activity which serves to exclude [Dr. Goldberg]". When Dr. Goldberg wrote this letter, he had been at RUMC for all of nine months.

In what seems to have been a genuine effort to accommodate, Dr. Andersson responded to Dr. Goldberg's letter by overruling his initial decision and making room for Dr. Goldberg where possible. (6/18/1996 Letter, attached in Group Ex. A.) Although the teaching program was scheduled and booked far in advance, Dr. Goldberg was given a spot on the ER on-call list for hand surgeons and Dr. Andersson stated that he would reach out to the appropriate people regarding the Arthritis Institute, as well as research opportunities for Dr. Goldberg.

On October 3, 1996, having been at RUMC for one year, Dr. Goldberg wrote again, stating that the on-call allocation he had received was inadequate and that his exclusion from resident teaching was driven by "politics," not preexisting schedules:

> Any policy which serves to suppress resident education for a political or economic imperative should be challenged with disapprobation. So, again, I am respectfully urging you to investigate and consider options for this worsening problem.

(10/3/1996 Letter, attached in Group Ex. A.) Dr. Goldberg's letter makes no mention of the accommodations that Dr. Andersson had made as the result of Dr. Goldberg's earlier demands.

3

In response, Dr. Andersson sent Dr. Goldberg a letter on October 8, 1996, which was conciliatory but firm. Dr. Andersson explained that there was no political agenda working against Dr. Goldberg, but there is a "seniority principle" regarding the on-call schedule, and a long-established schedule already in place regarding teaching assignments. Dr. Andersson declined to disrupt those schedules, and the operation of the orthopedics department, simply because Dr. Goldberg was dissatisfied. (10/8/1996 Letter, attached in Group Ex. A.)

### B. Dr. Goldberg's 1999 to 2004 Grievance Against RUMC and Related Litigation.

In June 1999, Dr. Goldberg, personally and through lawyers, notified RUMC that he intended to commence a grievance procedure to address the same issues that had been the subject of the 1995 to 1996 correspondence with Dr. Andersson, as well as additional issues. Dr. Goldberg was now asserting that:

- He was not getting his fair share of the call schedule;
- He was not given sufficient and appropriate teaching duties;
- He was not invited to participate in developing orthopedic department rules;
- He had not been promoted to Assistant Professor at RUMC;
- He was not given sufficient access to orthopedic residents;
- He was subject to improper economic credentialing;
- He was subject to the unreasonable facilitation of Midwest Orthopaedics' practices of monopolization of the RUMC department of orthopedics; and
- He was subject to Dr. Andersson's conflict of interest and abuse of his position as Chairman of the Department of Orthopedics.

Copies of May 12, 1999 and June 16, 1999 letters setting forth these complaints are attached hereto as part of Group Exhibit B, which is a collection of documents relating to Dr. Goldberg's 1999 to 2004 invocation of RUMC's grievance process.

4

Dr. Goldberg's grievance process continued, off and on, for years, until 2004. Dr. Goldberg then terminated the grievance process, mid-stream and after RUMC had spent substantial resources on it over a period of years, stating that he had concluded that the process was unfair. We now know the real reason: on July 12, 2004, Dr. Goldberg filed his first federal qui tam action against RUMC and Midwest Orthopedics at Rush, LLC ("MOR") under seal and unbeknownst to RUMC. (Doc. 1.)

On October 7, 2004, Dr. Goldberg wrote to a senior officer of RUMC, and now its CEO, Dr. Larry Goodman, stating that Dr. Goldberg would not complete the grievance procedure unless the Grievance Committee allowed him to include certain economic issues that the Committee had found to not be grievable. Dr. Goldberg states near the end of his e-mail:

> I hope the Committee has not been influenced to obstruct the grievance in order to obstruct corporate compliance.

Dr. Goodman responded fully, and stated that he "would urge you to follow through the established grievance procedure . . . ." (10/11/2004 Email chain, attached in Group Ex. B.)

Shortly after Dr. Goldberg terminated the grievance process in November 2004, he filed another suit, this time in the Circuit Court of Cook County against, inter alia, RUMC, MOR, and Dr. Andersson, alleging essentially the same claims that had been in his grievance. A copy of Dr. Goldberg's state court complaint is attached hereto as part of Group Exhibit C, which is a collection of documents relating to Dr. Goldberg's 2004 state court lawsuit. Dr. Goldberg amended his complaint twice.[1]

---

[1] In addition, in 1997, Dr. Goldberg had sued MOR, as well as one of its doctors, Dr. Rosenberg. RUMC was also named as a respondent in discovery. The suit alleged that Dr. Goldberg had developed an implant for use in surgery to correct carpal tunnel damage and that the defendants had engaged in "actual or threatened misappropriation of Dr. Goldberg's trade secrets." A copy of Dr. Goldberg's second amended complaint is attached hereto as part of Group Exhibit D, which is a collection of documents relating to Dr. Goldberg's 1997 state court litigation.

On April 18, 2005, Dr. Goldberg's second amended complaint was dismissed for failure to exhaust his administrative remedies. (4/18/2005 Order, attached in Group Ex. C.)

On March 10, 2005, Dr. Goldberg's Motion to Reconsider was denied, as was his Motion for Leave to File a Third Amended Complaint. (3/10/2005 Orders, attached in Group Ex. C.)

On February 20, 2007, the Illinois Appellate Court affirmed the trial court's order of dismissal. (2/20/2007 Order, attached in Group Ex. C.)

Although Dr. Goldberg was suing in state court to have more access to, and teaching responsibilities for, the orthopedic residents, during this same period of time, on August 22, 2005, the orthopedic residents at RUMC signed a petition to "request cessation of the clinical coverage of Dr. Robert Goldberg by the Orthopedic Residency Program at Rush University Medical Center. We are strongly against continuing the relationship between Dr. Goldberg and the residency program." A copy of the petition is attached as Exhibit E.

The orthopedic residents, all of whom signed the petition, listed three reasons for their request:

> First, he does not participate in the educational process. This is evident by the fact that he does not attend intake, lecture at the Monday night didactic series, or participate in Grand Rounds. He does not have regularly scheduled operating room time nor does he engage in any pre-operative planning or teaching with the residents.
>
> Second, Dr. Goldberg created a difficult learning environment as he is argumentative and accusatory to the residents and operating room staff. He often complains about treatment in the operating room and his treatment by the residency. These politically and personally motivated derisive comments are inappropriate and detrimental to the educational process.
>
> Finally he has shown consistently suspect clinical judgment and often skirts responsibility for care. In the operating room and while seeing consults, he often

---

RUMC was dismissed as a respondent in discovery in the trade secrets litigation in September 1998. In April 1999, Dr. Goldberg moved to voluntarily dismiss the case. The Illinois state court granted that motion on April 16, 1999 and Dr. Goldberg tendered costs to defense counsel in open court. (*See* Group Ex. D.)

formulates treatment plans which are contrary to the standards of care for hand surgery. Per previous resident experience, he is indecisive and inconsistent in the operating room.

(Ex. E.)

### C. Dr. Goldberg's October 28, 2004 Conduct.

As additional evidence of Dr. Goldberg's vexatious, intentionally disruptive behavior during the course of these grievance processes, Dr. Goldberg took matters in to his own hands in a reckless and destructive fashion. Having filed his qui tam action under seal a few months earlier and apparently seeking to stir the pot at RUMC, on October 28, 2004, Dr. Goldberg cornered several members of the SurgiCenter nursing and administrative staff. He told them that RUMC and SurgiCenter were engaged in Medicare fraud; that each staff member he was speaking to could go to jail; that each staff member could lose their nursing license; and that they should each get a lawyer.

Dr. Thomas Deutsch, the Dean of Rush Medical College, learned of the October 28, 2004 events and requested that the Medical Staff Executive Committee issue a letter of admonition against Dr. Goldberg. A copy of Dr. Deutsch's request is attached hereto as part of Group Exhibit F, a collection of documents relating to the SurgiCenter incident. The executive committee investigated the facts, including interviewing all participants, including Dr. Goldberg, and issued a report. (2/22/2005 Report, attached in Group Ex. F.)

According to the Committee's report, Dr. Goldberg denied certain parts of these conversations with staff and admitted others, but the Committee "did not credit" Dr. Goldberg's denials. The Committee found that Dr. Goldberg's conduct was "unwelcome, unwanted and self serving" and that he had wrongly tried to "frighten or intimidate non-management staff for the purpose of obtaining support for his claims." (2/22/2005 Report at 6.)

Dr. Goldberg's response was not to be chastened or to apologize. His response was to send a three page, single-spaced letter to RUMC, with his "comments and specific clarifications" regarding the Committee's findings. (3/23/2005 Letter, attached in Group Ex. F.)

### D. Dr. Goldberg's Compliance Complaints.

In addition to the grievance proceedings and the multiple lawsuits, Dr. Goldberg had also insisted on the initiation of two corporate compliance investigations, one in 2003 and another in 2004. Both investigations were costly, time consuming and disruptive and neither resulted in findings of any wrongdoing.

There were seemingly endless communications from Dr. Goldberg to RUMC on these various investigations and grievances, many of them in writing. A selection of the correspondence is attached as Group Exhibit G. To provide some sense of the level of attention that Dr. Goldberg demanded throughout, and the level of disruption that he deliberately caused, one can review any number of these communications specifically. (*See* Group Ex. G.)

As one example, on October 5, 2004, the Director of Corporate Compliance at RUMC, Janis Anfossi, wrote to Dr. Goldberg:

> My experience over the past ten months with answering your pages and phone calls while I am in the process of an investigation based on your charges has been that I am continuously harassed and accused by you while trying to do my job.

(10/5/2004 Email, attached in Group Ex. G.)

Of course, although RUMC did not know it until last spring, beginning in 2004, and through today, Dr. Goldberg has been working on this litigation against RUMC. Recall that before the Court is his Third Amended Complaint (Doc. 36, "TAC"). For the last six years, in this matter alone, as in all his other litigation, he has been making allegations, hiring and firing

lawyers, making new claims, abandoning most of them, and ultimately failing on the facts and the law; all at the considerable expense of RUMC, a not-for-profit teaching hospital.[2]

### III. Why It Is Appropriate To Award Attorneys' Fees Here.

Dr. Goldberg's TAC contained two theories of liability. The first was that MOR surgeons at RUMC booked so many surgeries that they could not be present for the "key" or "critical" parts of a procedure, as required under Medicare rules. Dr. Goldberg claimed that the MOR surgeons were overscheduled and, therefore, had to be in too many places at the same time. The other theory of liability, which was a very distant second in all practical respects, was that MOR orthopedic surgeons failed to provide for back-up surgeons who would be "immediately available" during a surgery in the case of an emergency, as required by Medicare rules.

In July 2010, the Defendants filed their Motions to Dismiss the TAC (Docs. 68, 69, 75) and on August 23, 2010, Dr. Goldberg filed his Response (Doc. 84).[3] Dr. Goldberg therein explicitly abandoned his "key" or "critical" allegations as a basis for liability – the most significant portion of his case – because the Defendants had advised the Court in their Motions to Dismiss that the "public disclosure" doctrine barred Dr. Goldberg's complaint. (Doc. 84 at 6-9.)

---

[2] RUMC focuses this motion against Dr. Goldberg only, although both he and Ms. Beecham remain listed as Relators. RUMC does so because this qui tam action was the combination of two separate and distinct causes of action, as the government recognized when it agreed to intervene in one aspect of the case and to decline to intervene in the other. Ms. Beecham's part of the case, as Relators' counsel acknowledge by their admission that she knows nothing about the teaching issues (Doc. 84 at 28 n.9), related to leasing issues. That is the part of the case that both the Government and RUMC understood to have some merit, and which was settled. On March 5, 2010, the leasing claims were dismissed with prejudice. (Doc. 116 at 7.) Dr. Goldberg had little or no involvement in that part of the case. Relator June Beecham, in turn, had no personal knowledge of the teaching allegations, which were Dr. Goldberg's part of the case and Ms. Beecham should not have pursued them as a purported Relator after her portion of the case was settled. For obvious reasons, RUMC has focused on Dr. Goldberg and his lengthy history of meritless allegations against RUMC and others.

[3] Dr. Goldberg also included in his TAC counts for Medicaid fraud and retaliation against RUMC. (Doc. 36, Counts IV and VI.) Nowhere in his pleading did Dr. Goldberg provide any support for his Medicaid claim. His retaliation claim was also unsupportable and eventually, he affirmatively abandoned it (Doc. 84 at 13, 26-27), but only after RUMC was forced to spend the time and money to file motions and briefs highlighting the obvious inadequacies of these specious claims (Doc. 75 ¶¶ 7, 12-21).

9

Dr. Goldberg did not argue for an extension of existing law or contend that there was any room at all for the Court to conclude that the public disclosure doctrine did not apply to his "key" or "critical" claims. Instead, he used the briefing on the Motions to Dismiss to amend the TAC on the fly, promoting his "immediately available" claims to a leading role as the sole justification for this ongoing litigation.

In fact, it seems clear now that Dr. Goldberg knew when he filed his TAC that the public disclosure doctrine would bar his claims, but he apparently had determined that the "original source" exception to the public disclosure doctrine would be available to save the day. This must have been true because he certainly knew of the public disclosure doctrine and, at least with respect to the "key" or "critical" claims, he had no response to offer when presented with it other than abandoning those claims.

At some point, however, before he filed his Response to the Motion to Dismiss, he learned that the original source exception would not work for him in this case. Indeed, in his Response to the Motions to Dismiss, Dr. Goldberg explains that his present counsel had only recently learned that Dr. Goldberg's prior counsel had "failed to notify the government of the allegations prior to filing suit", thereby making the original source exception unavailable. Dr. Goldberg also states that, therefore, he was withdrawing the allegation in the TAC (Doc. 36 ¶ 46) that proper notice had been given to the government. (Doc. 84 at 27.)

At this point, Dr. Goldberg chose to press on with his suit, now based only on the allegation that RUMC had violated the "immediately available" Medicare rule. As explained in bold type by Dr. Goldberg:

> But in this case, **Relators do not seek recovery for any claim that may be false simply because the doctor was not present for the key and critical portions, or because it was tainted by a kickback from Zimmer.** Relators claims are not "based on" these allegations.

> Rather, Relators' claims [are based on] whether they were immediately available, as required under . . . Medicare . . . .

(Doc. 84 at 5-6, emphasis in original.)

In fact, once Dr. Goldberg knew that the original source exemption from the public disclosure doctrine had been lost, he should have admitted his error and ended this case. Indeed, the frivolous and vexatious nature of the TAC was effectively admitted by Dr. Goldberg because Dr. Goldberg knew that the public disclosure doctrine barred much, if not all of his claims, and he knew that the original source exception was not available. These facts alone warrant a fee award under the FCA. *United States ex rel. Bain v. Georgia Gulf Corp.,* 208 Fed. App'x 280, 283 (5th Cir. 2006) (unpublished opinion) (FCA fee award upheld where Relator was subject to the public disclosure doctrine and he knew that he was not an "original source"); *Martel v. Maxxam, Inc.,* 211 F.3d 594 (5th Cir. 2000) (FCA fee award upheld where there was a public disclosure bar: "[Relator] should have known that an FCA qui tam action is barred even when it is partly based upon publicly disclosed allegations . . . ."). A copy of *Bain* is attached as Exhibit H.

Moreover, for all of the reasons explained in the Motions to Dismiss (Docs. 68, 69, 75), the public disclosure doctrine barred the entire complaint. Indeed, on November 2, 2010 this Court dismissed the remaining portion of Dr. Goldberg's claims – the "immediately available" allegations – pursuant to the public disclosure doctrine. (Doc. 116.)

In fact, a person of reasonable judgment who was not so heavily invested in causing inconvenience, expense and harm to RUMC at every opportunity, would, or should have made different decisions once it was determined that there would be no barrier to the application of the public disclosure bar. At the very least, an agreed stay of discovery would have been appropriate at that point to avoid the enormous costs of discovery that were upcoming. But Dr. Goldberg

would hear nothing of a discovery stay, and, in fact, moved to compel in order to speed up discovery compliance by the defendants.

To appreciate how much this case changed, and how little of it was left once the "key" or "critical" elements were dropped, one need only read the TAC. It seems impossible, or entirely improbable, for example, that Dr. Goldberg would have made the spectacular, public filing with the following allegations, as were included in the TAC, if the sole basis of his complaint was an allegation that surgeons had simply not arranged for a back up surgeon to be "immediately available." Only because of the "key" or "critical" claims was Dr. Goldberg bold enough to allege all of the following in the TAC. All of these inflammatory allegations stood, unamended and intended, presumably, to garner unflattering and damaging publicity for RUMC, which he indeed succeeded in doing:[4]

- That surgeons were engaged in the "complete abrogation of their duties and responsibilities to supervise and manage the work of orthopedic residents (surgeons in training) and the dramatic and false overbilling of Medicare and Medicaid by those same surgeons for surgeries at which they were not present for most, and in some cases all, of the time that a patient was lying unconscious on the operating table, undergoing surgery." (Doc. 36, TAC ¶ 2.)

- "This is a case that exposes the orthopedic practice at Rush as one focused only on quantity and monetary gain at the expense of patient health. The Defendants' reckless behavior placed patients' health at great risk, while at the same time earning Rush and the doctors practicing at MO enormous monetary rewards and celebrity status." (*Id.* ¶ 6.)

- "In addition, MO surgeons leveraged their status . . . into millions, if not tens of millions of dollars annually in kickbacks from Zimmer, Inc." (*Id.* ¶ 7.)

- "This case raises important red flags about what can happen when . . . doctors . . . encouraged by the hospital . . . are tempted by easy money, focus exclusively on maximizing profits, instead of serving patients." (*Id.* ¶ 8.)

- "Patients of MO doctors have suffered severe injuries, including death, in the course of orthopedic surgeries." (TAC ¶ 38.)

---

[4] A selection of press reports describing Dr. Goldberg's allegations is attached hereto as Group Exhibit I.

- "Patient safety was put at risk, and MO doctors and Rush consciously chose to ignore that risk to obtain financial rewards from Medicare and other sources arising out of unacceptably high surgery volume." (*Id.* ¶ 39.)

Even after Dr. Goldberg knew or should have known that the "key" or "critical" portion of the case was, or would be, gone, which he should have known before filing the TAC, Dr. Goldberg behaved in a manner that can only be understood to be malicious. He left scurrilous allegations standing in the public record and took steps to accelerate the discovery burden on the Defendants. Between August 23, 2010, when Dr. Goldberg filed his Response to the Motion to Dismiss, and October 31, 2010, when the Defendants were obliged to complete their discovery responses, many hundreds of hours, and hundreds of thousands of dollars, were spent complying with Dr. Goldberg's discovery requests that really were applicable only to the "key" or "critical" part of Dr. Goldberg's case.

Dr. Goldberg knew or should have known before it was filed that the allegation in his TAC that proper notice had been given to the government was simply not true. He should have known then, and acted upon the fact, that original source status would not be available to him and that the public disclosure doctrine would bar his claims, rather than only admitting those facts in his Response to a Motion to Dismiss, months after the TAC was filed and discovery had been served. And certainly once these fatal defects in his position were known and after he had abandoned the heart of his claims, Dr. Goldberg should have recognized that it was abusive – vexatious and harassing – to insist that his suit move forward, with the enormous costs that he was deliberately imposing on the Defendants.

In fact, Dr. Goldberg has a long history of vexatious and harassing conduct against RUMC. His behavior in this litigation is entirely consistent with his past practice of deliberately inflicting expense on and causing disruption at RUMC at every opportunity that he found or could manufacture. This sort of aggravated behavior by a plaintiff in an FCA suit is directly

relevant to a determination of whether that Relator's conduct in the litigation should be deemed to be frivolous, vexatious, or harassing. *Millner v. ITT Aerospace/Comm'ns Div. of ITT Corp.*, No. 95-3545, 1997 WL 415238, at *6 (7th Cir. July 21, 1997) (unpublished opinion) (upholding FCA fee award based, in part, upon relator's history of vexatious and harassing conduct toward defendant, including previously filing baseless charges against defendants in various forums).  A copy of *Millner* is attached as Exhibit J.

## CONCLUSION

     Dr. Goldberg has gone out of his way for fifteen years to create expense, disruption and highly public embarrassment for RUMC.  It is appropriate to have Dr. Goldberg bear the cost of his latest effort in this regard.

Date:  December 3, 2010                Respectfully Submitted,

                                           RUSH UNIVERSITY MEDICAL CENTER

                                           By: /s/ Daniel P. Shapiro
                                                 One of Its Attorneys

Sheldon T. Zenner
Daniel P. Shapiro
BeLinda I. Mathie
Patrick C. Harrigan
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60603-5298
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

## **CERTIFICATE OF SERVICE**

      I hereby certify that on December 3, 2010, I electronically filed the foregoing **RUMC's Memorandum in Support of Motion for Attorneys' Fees** with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record registered with ECF accounts. I also served the above pleading via U.S. Mail, postage pre-paid, upon the following:

      Patricia L. Hanower
      Alan E. Kleinburd
      Joyce R Branda
      Civil Division
      Commercial Litigation Branch
      P.O. Box 261
      Ben Franklin Station
      Washington, DC 20044

      /s/ Daniel P. Shapiro
      Sheldon T. Zenner
      Daniel P. Shapiro
      BeLinda I. Mathie
      Patrick C. Harrigan
      KATTEN MUCHIN ROSENMAN LLP
      525 W. Monroe Street
      Chicago, IL 60661-3693
      T: (312) 902-5200
      F: (312) 902-1061