UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT S. GOLDBERG, M.D. and JUNE BEECHAM, ) ) ) | |
| Relators, ) ) | |
| on behalf of the UNITED STATES OF AMERICA and the STATE OF ILLINOIS, ) ) ) | |
| Plaintiffs, ) ) | |
| ) | No. 04 C 4584 |
| v. ) ) | Judge Ruben Castillo |
| RUSH UNIVERSITY MEDICAL CENTER; MIDWEST ORTHOPAEDICS AT RUSH, LLC; RUSH SURGICENTER, LTD. PARTNERSHIP; BRIAN J. COLE, M.D.; MITCHELL B. SHEINKOP, M.D.; RICHARD A. BERGER, M.D.; AARON G. ROSENBERG, M.D.; CRAIG J. DELLA VALLE, M.D.; and WAYNE G. PAPROSKY, M.D., ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Robert S. Goldberg, M.D.[1] and June Beecham[2] (collectively, "Relators") bring this *qui*

*tam* action under the provisions of the False Claims Act ("FCA" or "the Act"), 31 U.S.C. § 3729

---

[1] Dr. Goldberg is an orthopedic surgeon who has been on the medical staff of Rush University Medical Center since 1995. (R. 168, Fourth Am. Compl. ¶ 12.)

[2] Beecham was the Director of Real Estate for Rush from 1999 to 2003. (R. 168, Fourth Am. Compl. ¶ 13.)

*et seq.*, and the Illinois Whistleblower Reward and Protection Act ("IWRPA")[3], 740 Ill. Comp.

Stat. 175/1 *et seq.*, in the name of the United States of America and the State of Illinois against

Rush University Medical Center ("RUMC")[4], Rush SurgiCenter, Limited Partnership

("SurgiCenter")[5] (collectively, "Rush"), and Midwest Orthopaedics at Rush, LLC ("MOR")[6].

(R. 168, Fourth Am. Compl. ¶¶ 14-16.) Relators also name the following individual defendants:

Brian J. Cole, M.D., Mitchell B. Sheinkop, M.D., Richard A. Berger, M.D., Aaron G.

Rosenberg, M.D., Craig J. Della Valle, M.D., and Wayne G. Paprosky, M.D. (collectively,

"Doctor Defendants,"[7] and with MOR, RUMC, and SurgiCenter, "Defendants"). (R. 168, Fourth

Am. Compl. ¶¶ 17-22.) Relators allege that Defendants fraudulently billed Medicare and

Medicaid for simultaneous and overlapping surgeries that violated Medicare and Medicaid rules

and regulations.

In earlier proceedings in this case, this Court dismissed Relators' complaint for lack of

subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *Goldberg v.*

*Rush Univ. Med. Ctr.* (*Goldberg I*), 748 F. Supp. 2d 917 (N.D. Ill. 2010). Relators appealed, and

---

[3] The complaint refers to the IWRPA, despite the fact that the IWRPA was renamed the Illinois False Claims Act in July 2010. *See* Ill. Pub. Act 96–1304, § 10 (2010). Because both parties refer to the IWRPA, the Court will as well.

[4] RUMC is a teaching hospital that provides medical care to Medicare and Medicaid beneficiaries. (R. 168, Fourth Am. Compl. ¶ 14.) RUMC is accredited by the Accreditation Council for Graduate Medical Education, and it receives Graduate Medical Expense payments for its resident training programs under the rules and regulations of Medicare Part A. (*Id.*)

[5] SurgiCenter is a surgery center, owned in part by RUMC and physicians who are members of MOR, that performs a high volume of orthopedic surgeries. (R. 168, Fourth Am. Compl. ¶ 16.)

[6] MOR is an LLC that provides medical care to Medicare and Medicaid beneficiaries. (R. 168, Fourth Am. Compl. ¶ 15.)

[7] Drs. Cole, Sheinkop, Berger, Rosenberg, Della Valle, and Paprosky are orthopedic surgeons and past and present members of MOR who have performed surgeries at Rush. (R. 168, Fourth Am. Compl. ¶¶ 17-22.)

the Seventh Circuit vacated and remanded the dismissal. *United States ex rel. Goldberg v. Rush Univ. Med. Ctr. (Goldberg II)*, 680 F.3d 933 (7th Cir. 2012). The Seventh Circuit held that Relators' allegations that Defendants misrepresented the "immediate availability" of teaching physicians during overlapping surgeries were not subject to the public disclosure bar to *qui tam* suits. *Id.* at 935-36. Specifically, the Seventh Circuit held that Relators' allegations were not "substantially similar" to the disclosures made public by a Government Accountability Office report and the Physicians at Teaching Hospitals ("PATH") audits. *Id.* (citing *United States ex rel. Baltazar v. Warden*, 635 F.3d 866 (7th Cir. 2011)). Upon remand, Relators filed a Fourth Amended Complaint. Presently before the Court are Defendants' motions to dismiss. For the reasons discussed below, MOR's and Doctor Defendants' motion is granted in part and denied in part, and Rush's motion is granted.

## RELEVANT FACTS

## I. Background

Relators rely upon three sets of rules and regulations pertaining to overlapping surgeries: (1) the Medicare regulation entitled "Physician fee schedule payment for services of teaching physicians" ("Teaching Physician Regulations"), 42 C.F.R. § 415.172; (2) applicable billing rules in the May 30, 1996, Health Care Financing Administration Carrier Manual Instructions ("1996 Medicare Rules"), (R. 168, Fourth Am. Compl., Ex. A); and (3) the November 2002 Part 3 Department of Health and Human Services Medicare Carriers Manual, "Supervising Physicians in Teaching Settings" ("2002 Medicare Rules"), (R. 168, Fourth Am. Compl., Ex. B), (collectively, with the Teaching Physician Regulations and the 1996 Medicare Rules, the "Medicare Rules and Regulations").

3

RUMC is a teaching hospital that provides medical care to Medicare and Medicaid beneficiaries. (R. 168, Fourth Am. Compl. ¶ 14.) As a teaching hospital, Rush[8] receives compensation from the United States government for the use of its facilities for teaching and for expenses associated with the training of residents.[9] (*Id.* ¶ 27.) These teaching and training costs are paid by the government to Rush pursuant to Medicare Part A Graduate Medical Expense payments, 42 U.S.C. § 1395ww(h). (*Id.*) Payments to Rush under Medicare Part A cover residents' salaries and reimbursement for the teaching activities of attending physicians when the attending physicians act in an indirect supervisory role. (*Id.* ¶¶ 27-28.) Teaching physicians who themselves directly provide patient care while involving residents in patient care are reimbursed under Medicare Part B. (*Id.* ¶ 29.)

In the context of surgeries, reimbursement under Medicare Part B requires that the teaching physician is physically present during all "key and critical" portions of the surgical procedure and is otherwise "immediately available" for the entire surgical procedure—not involved in another procedure from which he or she cannot return. 42 C.F.R. § 415.172; 1996 Medicare Rules. The Medicare Rules and Regulations instruct that when surgeries overlap, the teaching physician, in addition to being physically present during the key or critical portions of both operations, must "personally document in the medical record that he/she was physically present during the critical or key portion(s) of both procedures," and, if she will not be

---

[8] Because Relators use "Rush" to refer to Rush University Medical Center both individually and collectively with Rush SurgiCenter, it is not entirely clear whether certain allegations refer to them both or just to RUMC. The Court has done its best to determine when Relators mean to include both entities and uses the inclusive "Rush" when it cannot determine. Here, Rush has clarified that SurgiCenter is an ambulatory surgery center located at RUMC, and both Rush and SurgiCenter receive reimbursement from the federal government for Medicare services. (R. 172, Rush's Mem. at 3.)

[9] A resident is an individual who participates in an approved graduate medical education program, a doctor or surgeon "in training." *See* 42 C.F.R. § 415.152.

4

immediately available, she "must arrange for another qualified surgeon to immediately assist the resident in the other case should the need arise." 2002 Medicare Rules § 15016(C)(4)(a)(2).

## II.   Relators' Allegations

Relators allege that between 1996 and 2004, Defendants submitted claims to Medicare that violated the Medicare Rules and Regulations by failing to follow the required procedures for overlapping surgeries. (R. 168, Fourth Am. Compl. ¶ 67.) In support of their claims, Relators describe several surgeries for which Medicare was allegedly billed that appear to violate the relevant Rules and Regulations. These include a surgery in which the billing doctor never entered the operating room; six complex surgeries scheduled to be performed by the same surgeon in two separate operating rooms over the course of a day; a surgery in which the resident performed the procedure in its entirety; five surgeries to be performed by the same surgeon scheduled in three different operating rooms, in different buildings, in a three-hour time span; and the viewing of an arthroscopic procedure by the teaching physician through a monitor in another operating room. (*Id.* ¶¶ 84-91, 105-06, 110-13, 120.) Relators also allege that one of the MOR surgeons, Dr. Cole, had been instructed by the Executive Committee of SurgiCenter to discontinue his practice of directing residents to conduct surgeries unsupervised. (*Id.* ¶¶ 117-18.) Despite these instructions, Dr. Cole continued this practice in violation of the Medicare Rules and Regulations. (*Id.* ¶ 119.) Relators provide Dr. Cole's schedule for one day of surgeries to demonstrate the "physical impossibility" of Dr. Cole being present or immediately available for the critical portions of all of the surgeries. (*Id.* ¶¶ 112-13.)

Relators allege that Doctor Defendants' regular practice was to conduct simultaneous surgeries in two or more operating rooms on each day they were operating without arranging for a back-up physician to be immediately available when they were involved in overlapping

surgeries. (*Id.* ¶¶ 69-74, 81-82.) According to Relators, it was the practice of the orthopedic residents to lie in the medical records and state that MOR doctors were present for all key and critical portions of the surgery and that the scheduled surgeon was "immediately available" at all times. (*Id.* ¶ 80.) Additionally, the Rush orthopedic nurses facilitated and covered up the simultaneous surgeries by failing and refusing to note the times at which Doctor Defendants entered and exited their surgeries, even after they were instructed by their supervisors to do so. (*Id.* ¶¶ 75-79.) Relators also allege that the MOR doctors were motivated to increase the number of surgeries they performed to justify millions of dollars in kickbacks from Zimmer, a manufacturer and developer of surgical hip and knee implants. (*Id.* ¶¶ 60-63.)

Dr. Goldberg repeatedly communicated with senior Rush officials between 1999 and 2004 about the lack of surgeon supervision over residents, and he informed Rush that such conduct violated Medicare regulations. (*Id.* ¶ 55.) Relators claim that Rush knew the surgeries being billed by MOR doctors were not being properly supervised, but they allowed and assisted the scheduling of concurrent surgeries and obtained reimbursement from the government for surgeries that they knew did not comply with the Medicare Rules and Regulations. (*Id.* ¶¶ 31-34, 57.) Relators also allege that Defendants conspired to fraudulently bill Medicaid and Medicare in order to receive additional federal funds, benefit from kickback programs, and reap the financial and reputational benefits accrued by such a high volume of surgeries. (*Id.* ¶¶ 52-54, 58-60.)

## PROCEDURAL HISTORY

Relators filed suit in this case under seal on July 12, 2004, alleging violations of both the FCA and the IWRPA by RUMC and MOR. (R. 1, Compl.) Relators subsequently filed an Amended Complaint on November 1, 2005, adding SurgiCenter and Dr. Cole as defendants, (R.

6

7, Am. Compl.), a Second Amended Complaint on June 13, 2006, (R. 8, Second Am. Compl.), and a Third Amended Complaint on June 21, 2010, adding Dr. Sheinkop, Dr. Berger, Dr. Rosenberg, Dr. Della Valle, and Dr. Paprosky as defendants. (R. 36, Third Am. Compl.) The case was unsealed on March 5, 2010. (R. 17, Jt. Status Report at 2.)

On July 20, 2010, MOR and Doctor Defendants filed a motion to dismiss under Rule 12(b)(1) and, alternatively, Rules 12(b)(6) and 9(b). (R. 68, MOR's & Drs.' First Mot. Dismiss.) On July 27, 2010, Rush filed a motion to dismiss under Rule 12(b)(1) and, alternatively, Rule 12(c). (R. 75, Rush's First Mot. Dismiss.) On November 2, 2010, this Court dismissed Relators' federal claims on Rule 12(b)(1) grounds and relinquished jurisdiction over Relators' state law claims. *Goldberg I*, 748 F. Supp. 2d at 931. Relators appealed, and on May 21, 2012, the Seventh Circuit vacated the dismissal and remanded the case. *Goldberg II*, 680 F.3d at 936.

On August 31, 2012, Relators filed their Fourth Amended Complaint ("Complaint"). (R. 168.) Counts I and II respectively allege violations of the FCA, 31 U.S.C. §§ 3729-32, and the IWRPA, 740 Ill. Comp. Stat. 175/3(a)(1), (2), by MOR and Doctor Defendants for knowingly making and submitting to the United States and the State of Illinois false claims and claims that did not comply with Medicare Rules and Regulations. (*Id.* ¶¶ 165-86.) Counts III and IV respectively allege violations of the FCA and the IWRPA by Rush for permitting MOR doctors to schedule improperly supervised concurrent surgeries, knowingly submitting false claims to the United States and the State of Illinois, and perpetuating the fraudulent billing scheme. (*Id.* ¶¶ 187-204.) Count V alleges a conspiracy to violate the FCA and IWRPA by all Defendants. (*Id.* ¶¶ 206-08.)

On September 21, 2012, Doctor Defendants and MOR moved to dismiss the Complaint pursuant to Rules 12(b)(6) and 9(b), (R. 169, MOR's & Drs.' Mot. Dismiss), as did Rush, (R.

7

171, Rush's Mot. Dismiss). Defendants argue that the Complaint fails to meet the heightened pleading standard of Rule 9(b) and fails to state a claim against them under the Act. (R. 169, MOR's & Drs.' Mot. ¶¶ 4-6; R. 171, Rush's Mot. at 1-2.) Additionally, Drs. Berger, Rosenberg, and Sheinkop argue that the claims against them are time-barred. (R. 169, MOR's & Drs.' Mot. ¶ 3.)

## LEGAL STANDARD

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Reger Dev. LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010). Pursuant to Rule 8(a)(2), a complaint must contain "a 'short and plain statement of the claim showing that the pleader is entitled to relief,' sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rule 8(a)(2) requires more than mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 545. "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true . . . state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570) (internal quotation marks omitted). A claim has facial plausibility when its factual content allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

While the federal rules generally provide for liberal notice pleading, Rule 9(b) requires that plaintiffs averring fraud state "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Specifically, Rule 9(b) requires plaintiffs to plead the "who, what, when, where, and how: the first paragraph of any newspaper story," of the "circumstances constituting fraud." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). "Rule 9(b) requires heightened pleading of fraud claims in all civil cases brought in the federal courts, whether or not the applicable state or federal law requires a higher standard of proving fraud." *Ackerman v. Nw. Mut. Life. Ins. Co.*, 172 F.3d 467, 470 (7th Cir. 1999) (citing *Herman & McLean v. Huddleston*, 459 U.S. 375, 387-89 (1983)). This heightened pleading requirement is a response to the "great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal citation omitted). Thus, "[a] plaintiff claiming fraud or mistake must do more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate." *Id.*

While the circumstances constituting fraud must be pleaded with particularity, a defendant's "[m]alice, intent, knowledge [or] other condition of mind . . . may be averred generally." Fed. R. Civ. P. 9(b); *see also DiLeo*, 901 F.2d at 627. In the Seventh Circuit, a plaintiff who provides a "general outline of the fraud scheme" sufficient to "reasonably notify the defendants of their purported role" in the fraud satisfies Rule 9(b). *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992). "[F]air notice is '[p]erhaps the most basic consideration' underlying Rule 9(b)." *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777-78 (7th Cir. 1994) (quoting 5 Wright & Miller, Federal Practice and Procedure § 1298, at 648 (1969)). Further, when details of the fraud itself "are within the defendant's exclusive knowledge," specificity requirements are less stringent. *Jepson, Inc. v. Makita Corp.*, 34 F.3d

1321, 1328 (7th Cir. 1994). Under those circumstances, the complaint must plead the grounds for the plaintiff's suspicions of fraud. *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 684 (7th Cir. 1992).

The heightened pleading standard in fraud cases established by Rule 9(b) serves "three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party." *Vicom*, 20 F.3d at 777; *see also Ackerman*, 172 F.3d at 469 (The purpose of Rule 9(b) is to "force the plaintiff to do more than the usual investigation before filing his complaint" in order to "assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate."); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (Rule 9(b)'s heightened pleading standard derives from "the potential stigmatic injury that comes with alleging fraud" and the desire to discourage a "sue first, ask questions later" approach to fraud litigation.). The Seventh Circuit has shied away from a rigid, formulaic approach to Rule 9(b) and noted that "[t]he twin demands of detail and flexibility, though in tension with one another, make sense in light of the competing purposes of the federal rules." *Pirelli*, 631 F.3d at 442.

A statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c)(1). Dismissing a claim as untimely at the pleading state is an "unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). "[A] federal complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense." *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006). A claim may be dismissed as untimely, however, if "the allegations of the complaint itself set forth everything

necessary to satisfy the affirmative defense." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005).

## ANALYSIS

The False Claims Act and the IWRPA, in relevant parts, makes it unlawful to knowingly (1) present or cause to be presented to the United States government a false or fraudulent claim for payment, 31 U.S.C. § 3729(a)(1) (1994); 740 Ill. Comp. Stat. 175/3(a)(1)(A), or (2) make or use or cause to be made or used a false record or statement material to a false or fraudulent claim paid or approved by the United States government, 31 U.S.C. § 3729(a)(1)(B); 740 Ill. Comp. Stat. 175/3(a)(1)(B).[10] Under the FCA, private individuals, "referred to as 'relators,' may file civil actions known as *qui tam* actions on behalf of the United States." *Yannacopoulos*, 652 F.3d at 822. "To establish civil liability under the False Claims Act, a relator generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Id.* (citing *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005)). Analysis of FCA claims applies equally to claims under the IWRPA. *United States ex rel.*

---

[10] The Complaint fails to specify the subsections of the Act upon which Relators' claims are based. Defendants' review of the statute and the Complaint led them to infer that Relators intend to assert claims under 31 U.S.C. §§ 3729(a)(1) and (a)(2). (R. 170, MOR's & Drs.' Mem. at 11 n.6.) The Court concurs with Defendants' conclusion and therefore interprets Relators' claims as claims brought pursuant to 31 U.S.C. §§ 3729(a)(1) and (a)(2). The Court notes, however, that 31 U.S.C. § 3729(a)(2) is now 31 U.S.C. § 3729(a)(1)(B). In 2009, Congress altered the language of the Act. Pub. L. No. 111–21, § 4(a)(1) (2009). The amendments to the Act were not retroactive except for the new 31 U.S.C. § 3729(a)(1)(B), which replaces the previous 31 U.S.C. § 3729(a)(2) and applies to all FCA suits that were pending on June 7, 2008. Pub. L. No. 111–21, § 4(f) (2009); *see also United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 n.2 (7th Cir. 2011); *Sanders v. Allison Engine Co.*, 703 F.3d 930, 936-42 (6th Cir. 2012) (thoroughly exploring the retroactivity of 31 U.S.C. § 3729(a)(1)(B)). This suit was filed in 2004, and Relators' FCA claims were pending before this Court on June 7, 2008. Accordingly, the Court relies on the pre-2009 amendment language of the Act to instruct its decision on all aspects of Relators' claims except for those pertaining to 31 U.S.C. § 3729(a)(1)(B), for which it relies upon the post-2009 amendment language.

11

*Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1163 n.2 (N.D. Ill. 2007) (citing *Scachitti v. UBS Fin. Servs.*, 831 N.E.2d 544, 557 (Ill. 2005)). The FCA is an anti-fraud statute, and claims brought pursuant to the FCA are subject to the heightened pleading requirements of Rule 9(b). *Gross*, 415 F.3d at 604.

## I.     Sufficiency of the Complaint under Rule 9(b)

Defendants argue that Relators have failed to plead their fraud claims with the particularity required by Rule 9(b). (R. 170, MOR's & Drs.' Mem. at 10.)[11] Defendants argue that Relators' "conclusory allegations" fail to provide the essential details necessary to satisfy Rule 9(b), such as the specific Medicare procedures that were performed and the specific fraudulent claims that were submitted. (*Id.* at 12.) As discussed below, Relators allege specific details about MOR and Doctor Defendants, but only conclusory and generic allegations that Rush conspired to commit fraud and that Rush nurses cooperated with the offending doctors. Relators do not identify any specific Rush nurses or officials that committed fraud or ordered their employees to commit fraud, nor do they provide any details alleging how such fraud was committed. While the Court concludes that the Complaint satisfies Rule 9(b), it only does so with respect to the claims Relators allege against MOR and Doctor Defendants, not Rush.

### A.     Allegations based on information and belief

Defendants allege that Relators improperly pleaded that Defendants submitted false Medicare claims upon information and belief. (R. 170, MOR's & Drs.' Mem. at 13, 18.) A plaintiff that pleads based on information and belief "is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are based on

---

[11] Rush states in its memorandum that it "adopts in full the arguments made by MOR and the Doctor Defendants." (R. 172, Rush's Mem. at 1.) Accordingly, the Court will cite to the memorandum submitted by MOR and Doctor Defendants in support of the motion to dismiss for all arguments that are not unique to Rush.

secondhand information that he believes to be true." *Pirelli*, 631 F.3d at 442 (quoting Black's Law Dictionary 783 (7th ed. 1999)) (internal quotation marks omitted). Defendants contend that although Relators allege on information and belief that claims for overlapping surgeries were submitted to Medicare, they fail to specifically identify any such surgeries or claims. (R. 170, MOR's & Drs.' Mem. at 15.) A plaintiff may plead fraud based on information and belief if "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Pirelli*, 631 F.3d at 443 (internal quotation marks omitted). "The grounds for the plaintiff's suspicions must make the allegations plausible, even as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail." *Id.* Rule 9(b)'s requirements can be fulfilled by pleading facts on information and belief if they are "facts inaccessible to the plaintiff, in which event he ha[s] to plead the grounds for his suspicions." *Bankers Trust*, 959 F.2d at 684.

In the Complaint, Plaintiffs plead several paragraphs "on information and belief." (*See, e.g.*, R. 168, Fourth Am. Compl. ¶¶ 91, 103, 109.) Each one of these paragraphs, however, alleges that specific claims were submitted to Medicare. Plaintiffs do not plead other allegations on information and belief. Whether claims were actually submitted to Medicare is information that is inaccessible to Relators. *See Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998) ("[T]he particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim."). Relators state the "grounds for [their] suspicions" in pleading that fraudulent claims were submitted to Medicare consistent with the pattern and practices of the Doctor Defendants and of Rush. *Bankers Trust*, 959 F.2d at 684; *see Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). Relators' inferences that such claims were submitted to Medicare, consistent with the pattern and practice for surgeries on

13

Medicare-eligible patients by MOR doctors at Rush, are reasonable. *See Aventis Pharm.*, 512 F. Supp. 2d at 1167 ("Given the significant proportion of medical care in this country that is financed by Medicare and Medicaid, relators have drawn a reasonable inference that claims for reimbursement . . . were submitted to the federal government or the State of Illinois for payment.").

Although the inferences are reasonable, Relators' allegations must meet Rule 9(b)'s heightened pleading requirement. The Seventh Circuit interprets Rule 9(b) with flexibility. In the context of the Act, the Seventh Circuit recognizes that "much knowledge is inferential." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009) (holding that the complaint alleging "the promise, the intent not to keep that promise, and the details of non-conformity" was sufficient "to narrate, with particularity, the circumstances that violate[d the FCA]" and that the relator was not required to produce the invoices for payment at the pleading stage); *see also United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010) ("claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme"); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (an FCA complaint that "cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted"); *United States ex rel. Upton v. Family Health Network, Inc.*, 09 C 6022, 2012 WL 4577553 (N.D. Ill. Oct. 1, 2012) (Relators' "inability to provide the certifications' dates, identification numbers, or verbatim content does not preclude them from adequately pleading a false claim.").

Accordingly, Rule 9(b) does not act as a rigid bar to filing a charge of fraud for individuals with

less than perfect knowledge. *See, e.g., Pirelli*, 631 F.3d at 446 ("[T]he district court was incorrect when it suggested that [plaintiff] need[ed] to point to specific misrepresentations made by particular [employees of defendant].").

Here, Relators allege specific details about all but the submission of the claims, and they provide reasonable inferences that MOR and Doctor Defendants submitted false Medicare claims. They have pleaded on information and belief only facts about the submissions of the claim that are inaccessible to them, and they have stated reasonable grounds for their suspicions. *See Aventis Pharm.*, 512 F. Supp. 2d at 1167 (holding that relators had alleged the facts they could with particularity and had drawn reasonable inferences that the claims were actually submitted to the government. "For these reasons, dismissal at this stage under Rule 9(b) would be inappropriate."). The Court declines to dismiss the Complaint on the grounds that some paragraphs were pleaded on information and belief.

**B.    The Newspaper Questions**

Defendants next argue that Relators' allegations fall short of the Rule 9(b) pleading standard because they fail to answer the "who, what, where, when, and how" "newspaper questions" set out in *DiLeo*. (R. 170, MOR's & Drs.' Mem. at 13-14.) Defendants argue that Relators' Complaint "include[s] only conclusory and unsupported allegations that there was any actual overlap in the surgeries and fail[s] to provide any details of the actual times at which the surgeries and their component parts took place." (*Id.* at 13.) Specifically, Defendants contend that Relators fail to specify the surgeries, and the dates and locations of the surgeries, for which fraudulent Medicare claims were submitted. (*Id.* at 13-15.) Additionally, Defendants argue that Relators' allegations do not identify any wrongful conduct. (*Id.* at 13.) Defendants claim that because the Medicare Rules and Regulations specifically contemplate overlapping surgeries,

15

allegations that MOR and Doctor Defendants conducted overlapping surgeries are not sufficient to state a claim. (*Id.* at 13-17.)

Generally, a complaint for fraud must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Wade v. Hopper*, 993 F.2d 1246, 1250 (7th Cir. 1993) (internal citations and quotation marks omitted). It would be impossible, however, for Relators to provide all the details of the fraudulent scheme they allege went on for nine years. "A plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but he must at least provide representative examples." *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 735 (N.D. Ill. 2010). In *United States ex rel. Lusby v. Rolls-Royce Corp.*, the Seventh Circuit held that an FCA claim was sufficient even though it did not provide details or specific documents showing that the defendant had actually made a claim. 570 F.3d at 854. In the complaint, the relator had alleged the requirements to make a payment request under defendant's government contract, that the defendant knowingly failed to meet the requirements, and inferences that the defendant submitted at least one claim, otherwise the government wouldn't have paid the defendant. *Id.* Similarly, the court in *Mason* found the allegations in the complaint satisfied Rule 9(b) because the plaintiff outlined the fraud scheme and additionally provided "concrete examples, identifying the individuals and businesses involved, the relevant time frames, and the manner in which the bribes or kickbacks were paid." 731 F. Supp. 2d at 735; *see also Bankers Trust*, 959 F.2d at 684 (plaintiff's theory of fraud did not need to be pleaded in detail). *Cf. Gross*, 415 F.3d at 605 (the complaint was insufficient because it "shed no light on the nature or content of the individual [claim] forms or why any particular false statement would have caused

16

the government to keep the funding spigot open"); *Uni\*Quality*, 974 F.2d at 923 (finding

plaintiff's complaint insufficient to state a claim of fraud under Rule 9(b) where it did "not even

mention any misrepresentations, much less any specifics about those representations"); *United*

*States v. Ortho-McNeil Pharm., Inc.*, No. 03 C 8239, 2007 WL 2091185, at \*5 (N.D. Ill. July 20,

2007) (holding that the complaint was insufficient because it lacked any "concrete examples of

false statements and false claims"). Here, the Court examines the representative examples in the

Complaint to determine whether Relators have sufficiently pleaded the alleged fraudulent

scheme.

### 1. Who

The Complaint clearly sets out the Doctor Defendants and MOR as the entities and

individuals who submitted the false claims. (*See, e.g.*, R. 168, Fourth Am. Compl. ¶¶ 67-69, 86,

99, 103, 108, 116.) Relators contend that to the extent Defendants seek identification of the

patients, the Complaint omitted the specific patient names to protect confidentiality, and that

"numerous patients" are identified in the Complaint who are Medicare-eligible and had surgeries

that overlapped with other patients. (R. 173, Relators' Resp. at 9) (citing R. 168, Fourth Am.

Compl. at ¶¶ 87, 97, 105, 112, 129, 137, and 145). Defendants' argument that because all

Medicare-eligible patients do not rely on Medicare, and therefore Medicare-eligibility is not an

accurate proxy for specific patients, misses the mark: the purpose of the "who" question is to

make sure the defendants know what claims are being brought against them. *See, e.g., United*

*States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003) (the complaint

needed to "state who made the [false] statement to whom and when"); *Vicom*, 20 F.3d at 778 (the

complaint should inform each defendant of their alleged role in the fraud). The Complaint

17

alleges sufficient facts with respect to the "who" inquiry because it identifies MOR and Doctor Defendants as the individuals and entities that allegedly made and submitted false statements.

### 2.   What

Defendants argue that Relators do not plead the requisite details of Defendants' acts of fraud. (R. 170, MOR's & Drs.' Mem. at 13.) For example, Defendants contend that "[r]ather than identifying specific Medicare surgeries or claims, Relators focus their allegations on the respective surgery schedules of the defendant physicians, without specifically identifying the Medicare procedures that were performed or the claims that were allegedly submitted to Medicare." (*Id.* at 12). Defendants' arguments are inaccurate. As an example, paragraph 84 of the Complaint alleges that "on September 13, 1996, MO surgeon Dr. George Holmes, Jr. was scheduled to perform an orthopedic operation on Mr. H.'s leg amputation stump," and paragraph 85 alleges that "Mr. H[.]'s procedures were covered under Medicare." The former paragraph appears to specifically identify the Medicare procedure that was performed (as well as who performed it when), and the latter paragraph identifies the accompanying Medicare claim.

Defendants contend that "the Medicare Rules specifically contemplate the performance of overlapping surgeries." (*Id.* at 13.) They argue that, without alleging the durations of the surgeries, Relators fail to provide sufficient information to infer that the surgeries even overlapped, let alone that claims for overlapping surgeries constitute fraud. (R. 175, MOR's & Drs.' Reply at 12.) The specific wrongdoing the Complaint alleges consists of more than just overlapping surgeries, which alone is not a Medicare violation. *See* 2002 Rules § 15016(C)(4)(a)(2). Rather, the Complaint alleges that MOR and Doctor Defendants:

routinely and knowingly violated the Medicare Rules and Regulations by scheduling and billing simultaneous surgeries during which: (1) a second, overlapping surgery was begun prior to the conclusion of the first-scheduled surgery; (2) no one in the surgery documented the time of the surgeon's presence during any of the procedures; and (3) the surgeon was absent during non-critical or non-key portions of a surgery, without arranging for another qualified surgeon to be immediately available to assist, if needed

(R. 168, Fourth Am. Compl. ¶ 44.) Assuming the truth of these allegations, which the Court must on a motion to dismiss, these practices appear to violate the Medicare Rules and Regulations. Although the Medicare Rules and Regulations contemplate the performance of overlapping surgeries, the teaching physician must ensure that another surgeon is immediately available. 2002 Rules § 15016(C)(4)(a)(2). The Teaching Physician Regulations specify that a payment for teaching physicians is made *only if* the teaching surgeon is present or immediately available during the entire procedure. 42 C.F.R. § 415.172(a)(1). The fraud Relators allege consists of submitting Medicare claims for overlapping surgeries in which the teaching physician was *not* immediately available and did *not* arrange for another surgeon to be immediately available to assist. Such allegations satisfy the "what" inquiry.

### 3. Where

Defendants argue that Relators fail to allege the locations at which the surgeries that were billed to Medicare were performed and "the places from which or to which such misrepresentations were submitted or made." (R. 170, MOR's & Drs.' Mem. at 14.) The Complaint specifies that the overlapping surgeries that were billed to Medicare occurred at RUMC and the SurgiCenter, and it identifies the operating rooms of the overlapping surgeries in the specific examples pleaded. (R. 173, Relators' Resp. at 10.) Again, Relators have provided enough detail to infer that the misrepresentations were submitted from RUMC and SurgiCenter.

### 4.    When

Defendants argue that Relators fail to provide any dates relevant to their fraud with sufficient specificity. (R. 170, MOR's & Drs.' Mem. at 14.) The Complaint provides specific examples of the alleged fraud that occurred on specific dates in 1996, 2004, and 2005, (e.g., R. 168, Fourth Am. Compl. ¶¶ 84, 87, 137), and alleges that Dr. Goldberg voiced his concerns about the fraud to senior Rush officers repeatedly between 1999 and 2004, (id. ¶ 55). Relators have therefore alleged when the fraud occurred with sufficient specificity to satisfy Rule 9(b). See Upton, 2012 WL 4577553, at *6.

### 5.    How

With respect to how Defendants allegedly implemented the fraudulent scheme, Relators allege that Doctor Defendants conducted overlapping surgeries without designating a back-up surgeon, (R. 168, Fourth Am. Compl. ¶ 44); that Rush failed to document Doctor Defendants' entry and exit times, (id. ¶ 76); and that Defendants submitted claims to Medicare for the overlapping surgeries that they knew did not comply with Medicare Rules, (id. ¶ 51). Defendants argue that Relators' allegations "fail to specifically identify any surgeries that actually overlap." (R. 170, MOR's & Drs.' Mem. at 15.) At this stage, concrete evidence that the surgeries actually overlapped is inaccessible to Relators, but the surgery schedules and Relators' allegations about the distance between operating rooms allow the Court to easily infer that surgeries did overlap.

Defendants would have the Court believe that it will be alone in relaxing Rule 9(b) if it allows Relators' Complaint to proceed. (R. 175, MOR's & Drs.' Reply at 16.) The Court is not venturing into unknown territory, however, by applying Seventh Circuit precedent instructing that a complaint satisfies Rule 9(b) by providing the general outline of a fraudulent scheme and

20

detailed representative examples. *See, e.g., Upton*, 2012 WL 4577553, at *6-*7 (holding that the complaint, taken as a whole, plausibly alleged a fraudulent scheme by way of alleging several instances of the fraud); *Mason*, 731 F. Supp. 2d at 735 (holding that an outline of the fraudulent scheme identifying the persons involved, relevant timeframes, and manner of fraud, in addition to concrete examples, satisfied "the substance and purpose of Rule 9(b)"); *United States ex rel. Gear v. Emergency Med. Assocs. of Ill.*, No. 00 C 1046, 2004 WL 1433601 (N.D. Ill. June 25, 2004) (holding that the complaint, which identified the particular persons and locations involved and "the specific regulations which were allegedly violated," provided "adequate notice of the specific activities constituting the alleged fraud, thereby placing [defendant] in position to file an effective responsive pleading. This is all Rule 9(b) requires."); *United States v. Cancer Treatment Centers of Am.*, No. 99 C 8287, 2003 WL 21504998, at *1-*2 (N.D. Ill. June 30, 2003) (holding that although the complaint frequently did "not give specific names or dates," it outlined a general fraudulent scheme and there was "enough information in the complaint to allow defendants to respond and prepare a defense"); *United States ex rel. Bidani v. Lewis*, No. 97 C 6502, 1998 WL 1820753, at*10 (N.D. Ill. Dec. 29, 1998) (holding that the complaint lacked some details but that it satisfied Rule 9(b) by generally alleging the fraudulent scheme, identifying the defendants' roles in the scheme, and providing defendants sufficient notice to be able to adequately respond).

Although Relators do not fully detail all the circumstances of the alleged misrepresentations in their Complaint, the Court finds that they sufficiently allege fraud for the purposes of Rule 9(b), thereby giving MOR and Doctor Defendants sufficient notice to prepare a defense against the claim. Relators' allegations do not vaguely refer to unidentifiable transactions and misrepresentations. Rather, Relators allege that MOR and Doctor Defendants

made a consistent practice of filing claims for Medicare reimbursement that did not satisfy Medicare's standards. The Complaint pleads specific details, including surgery schedules, that detail noncompliance with Medicare Rules and Regulations. Defendants argue that some of Relators' allegations are untrue and unsupported by specific details. (R. 170, MOR's & Drs.' Mem. at 15 n.9.) At this stage in the litigation, however, all of Relators' allegations are presumed true and all reasonable inferences must be drawn in their favor. *Reger Dev.*, 592 F.3d at 763. Although Relators do not identify the particular individual who submitted the Medicare claims, or the precise time, place, and method of each submission, the Court accepts Relators' assertions that these details are in Defendants' sole possession and are inaccessible to them. *See Luckey v. Baxter Healthcare Corp.*, 95 C 509, 1996 WL 242977, at *9 (N.D. Ill. May 9, 1996) (holding that the complaint satisfied Rule 9(b) when it alleged that defendant made repeated representations, the content of those representations, and the grounds for alleging that the representations were fraudulent, even though it did not identify "the particular individual who communicated the guarantees, and the precise time, place, and method of each communication"). The Court concludes that the Complaint complies with Rule 9(b) by pleading a general fraudulent scheme, identifying the individual defendants and their roles within the scheme, pleading specific representative examples that answer all five of the "newspaper questions," and providing reasonable grounds for suspicion of the facts that are inaccessible to Relators. *See DiLeo*, 901 F.2d at 627; *Bankers Trust*, 959 F.2d at 684.

## II.    Whether Relators' Complaint Sufficiently States a Claim under the FCA and the IWRPA Against MOR and Doctor Defendants (Counts I and II)

MOR and Doctor Defendants argue that Relators' Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim under the FCA and the IWRPA because Relators do not allege any specific fraudulent claim that was submitted to either the United

22

States or the State of Illinois. (R. 170, MOR's & Drs.' Mem. at 18, 20.) MOR and Doctor Defendants argue that Relators have failed to provide any link between specific allegations of deceit and claims that were submitted to the government. (*Id.* at 18.) Although MOR and Doctor Defendants label this a Rule 12(b)(6) argument, it is in substance an argument about the sufficiency of Relators' Complaint, which was thoroughly addressed above.

MOR and Doctor Defendants argue that they never violated the FCA and claim that Relators "attempted to manufacture a non-existent inference of wrongful conduct," which is "belied by the fact that the Medicare Rules and Regulations expressly permit the performance of overlapping surgeries." (*Id.* at 16.) MOR and Doctor Defendants argue that the Medicare Rules and Regulations do not require documentation of a teaching physician's entry and exit times for overlapping surgeries. (*Id.* at 16-17.)

The Medicare Rules and Regulations specifically provide that "the medical records must document the teaching physician was present at the time the service is furnished. The presence of the teaching physician during procedures may be demonstrated by the notes in the medical records made by a physician, resident, or nurse." 42 C.F.R. § 415.172(b). The 1996 Rules specifically instruct that in the case of two overlapping surgeries, the teaching surgeon "must personally document the key portion of both procedures in his or her notes in order that a reviewer may clearly infer that the teaching physician was immediately available to return to either procedure in the event of complications." 1996 Rules § 15016(C)(3)(a)(2). The 2002 Rules further clarify that the "documentation must identify, at a minimum, the service furnished, the participation of the teaching physician in providing the service, and whether the teaching physician was physically present." 2002 Rules § 15016(A)(8).

Finally, MOR and Doctor Defendants argue that the Medicare Rules and Regulations allow a teaching physician to be involved in another surgery as long as it is one from which she may return and that the Medicare Rules and Regulations require teaching physicians to arrange for an immediately available replacement only when the need arises, not every time surgeries overlap. (R. 170, MOR's & Drs.' Mem. at 17.) Relators argue that a teaching physician must always arrange for an immediately available replacement if they will not be available during part of the procedure. (R. 173, Relators' Resp. at 3.)

The Medicare Rules and Regulations instruct that "[i]f the teaching physician leaves the operating room . . . to become involved in another surgical procedure, he or she must arrange for another physician to be immediately available to intervene in the original case should the need arise in order to bill for the original procedure." 1996 Rules § 15016(C)(3)(a). This language does not, as MOR and Doctor Defendants suggest, mean that teaching physicians must find a replacement only when the need arises. If the Medicare Rules and Regulations were given the meaning MOR and Doctor Defendants suggest, residents left alone in an operating room and faced with an emergency would be aided by a teaching physician only after someone had run into the second operating room, having taken the requisite time to become properly sterilized; the runner had informed the teaching physician of the situation; the teaching physician had considered what other qualified physicians were available at the time and selected one; and the replacement doctor had been informed that her presence was requested in the first operating room. Such an interpretation contradicts the purpose of having arranged for a back-up in advance. As Relators explain "'should the need arise' is an explanation of why you need to arrange for a back-up – not when you should arrange for it." (R. 173, Relators' Reply at 8.) The 1996 Rules support this reading: "If the teaching physician leaves the operating room after the

key portion(s) of the surgical procedure or during the closing of the surgical field to become involved in another surgical procedure, he or she must arrange for another physician to be immediately available to intervene in the original case should the need arise in order to bill for the original procedure." 1996 Rules § 15016 C)(3)(a).

Accordingly, Relators' allegations that MOR and Doctor Defendants scheduled concurrent surgeries without arranging for another surgeon to be immediately available, failed to adequately and accurately document their presence and absence in the surgeries, and submitted the claims to Medicare for reimbursement under the teaching physician schedule sufficiently state a cause of action under the FCA.

## III. Whether Relators' Complaint Sufficiently States a Claim under the FCA and the IWRPA Against Rush (Counts III and IV)

Like MOR and Doctor Defendants, Rush argues that Relators fail to state a claim for violation of the FCA or the IWRPA and moves to dismiss the Complaint pursuant to Rule 12(b)(6). (R. 172, Rush's Mem. at 14.) Rush argues that Relators improperly attempt to bootstrap their claims against Rush by standard of care allegations. (*Id.* at 18-19.) Rush contends that its claims to the government are for reimbursement for the use of its facilities and the cost of educating residents. (*Id.* at 14.) The Teaching Physician Rule, which undergirds Relators' claims, has no application to facility fee payments to hospitals. *See* 31 U.S.C. § 415.172. Nor, Rush contends, is there any regulation that requires Rush to certify compliance with the Teaching Physician Rule. (R. 172, Rush's Mem. at 14.) Rush argues that Relators' claims against them amount to nothing more than standard of care claims, which the FCA is not intended to address. (*Id.* at 16-17.)

Relators agree that the Teaching Physician Rule is "directed in the first instance towards doctor billing," but argues that Rush is still liable for "seek[ing] reimbursement for "surgeries

25

that it *knows* do not comply with Medicare rules." (R. 173, Relators' Resp. at 18.) Relators allege that Rush was not a passive beneficiary of MOR's and the Doctor Defendants' fraud, but rather a willing participant. (R. 168, Fourth Am. Compl. ¶ 58.)

The closest Relators come to stating a claim against Rush under the FCA is their allegation that "[i]t was the job of Rush orthopedic nurses to facilitate the Doctor Defendants' practice of conducting surgeries simultaneously in two operating rooms." (*Id.* ¶ 75.) Even if this allegation imported any vicarious liability to Rush, however, Relators go on to negate Rush's control by alleging that "[e]ven when the Rush nurses who worked with the Doctor Defendants were instructed by their supervisors to record teaching physician times in and out of their surgeries, they refused to do so." (*Id.* ¶ 79.) Additionally, Relators do not allege that Rush submitted any false claims to the government. Relators' allegations are based upon the Medicare Part B requirements for the reimbursement of teaching physicians, (*id.* ¶ 36), while RUMC and SurgiCenter, as hospitals, are reimbursed for the use of their facilities under Medicare Part A, (*id.* ¶ 14).

The Complaint adequately alleges that MOR and Doctor Defendants knowingly violated the Medicare Rules and Regulations requiring teaching physicians to be immediately available during surgeries and that they submitted claims for reimbursement as though they had complied with the Medicare Rules. The Complaint fails to allege any fraudulent claims submitted by Rush or under Medicare Part A, or any requirements for reimbursement under Medicare Part A that Rush knowingly failed to meet. Permitting Doctors to schedule concurrent surgeries is not grounds for a cause of action under the Act. Accordingly, the Court finds that Relators have failed to state a claim under the Act against Rush. Counts III and IV of the Complaint are therefore dismissed pursuant to Rule 12(b)(6).

## III.    Relators' Conspiracy Claim (Count V)

In Count V, Relators allege that each Defendant conspired to commit the fraud charged in Counts I-IV. (*Id.* ¶¶ 206-07.) The FCA confers liability on persons who "conspire[ ] to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3) (1994). Whether Rule 9(b) applies depends upon the nature of a plaintiff's factual allegations: a claim that is premised upon a course of fraudulent conduct implicates Rule 9(b)'s heightened pleading requirements, regardless of whether the claim is by definition a fraud claim. *Borsellino*, 477 F.3d at 507. Thus, Relators must plead their conspiracy claim, which is premised upon Defendants' alleged fraudulent conduct, with particularity and allege the "who, what, when, where, and how" of the conspiracy to defraud the government. *See DiLeo*, 901 F.2d at 627. Under § 3729(a)(3), "it must be established that [the conspirators] agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 673 (2008).

The allegations of conspiracy within the Complaint lack the requisite particularity to satisfy Rule 9(b). Relators argue that they "have alleged concrete facts from which, at minimum, a reasonable inference can be drawn that Rush and the Doctor Defendants entered into an unlawful conspiracy" to submit fraudulent Medicare claims. (R. 173, Relators' Resp. at 15.) However, Relators make only conclusory allegations about any agreement or conspiracy among Defendants. (*See, e.g.*, R. 168, Fourth Am. Compl ¶¶ 52, 58, 67, 78.) Unlike the fraudulent scheme alleged in Counts I and II, for which Relators provide detailed representative examples, Relators fail to describe a single instance of discussion, agreement, or conspiracy among Defendants. The Complaint may allege who conspired, but it fails to allege with any specificity

what they conspired to do, when, where, or how. *See Garst*, 158 F. Supp. 2d at 824 (holding that general allegations that left the court "to speculate at who was involved in this supposed conspiracy" did not survive a motion to dismiss). Accordingly, Count V is dismissed.

## IV. Statutes of Limitations

Finally, Drs. Berger, Rosenberg, and Sheinkop allege that any claims against them are barred as a matter of law based upon the applicable statutes of limitations. (R. 170, MOR's & Drs.' Mem. at 6.) A civil action under the FCA may not be brought:

> (1) more than 6 years after the date on which the violation of section 3729 is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

31 U.S.C. § 3731(b). The IWRPA contains a nearly identical statute of limitations. 740 Ill. Comp. Stat. 175/5(b). Defendants argue that the tolling provision in 31 U.S.C. § 3731(b)(2) only applies when the government intervenes and that only the six-year limitations period in 31 U.S.C. § 3731(b)(1) is applicable to *qui tam* actions in which the government has not intervened. (R. 170, MOR's & Drs.' Mem. at 7-8.) Accordingly, Defendants contend that claims against Drs. Berger, Rosenberg, and Sheinkop should be dismissed because all three were first named as defendants in the third amended complaint, filed on June 21, 2010, and all of the claims against them occurred prior to June 21, 2004. (*Id.* at 9.)

The Seventh Circuit has not ruled on whether the tolling provision applies only when the government intervenes, and other circuits are split on the matter. Some courts agree with Defendants' view. *See, e.g., United States ex rel. Sanders v. N. Am. Bus Indus., Inc.*, 546 F.3d 288, 293 (4th Cir. 2008) ("Congress intended Section 3731(b)(2) to extend the FCA's default six-year period only in cases in which the government is a party, rather than to produce the

bizarre scenario in which the limitations period in a relator's action depends on the knowledge of a nonparty to the action."); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 725 (10th Cir. 2006) (same, with a thorough analysis of statutory language and legislative history); *Foster v. Savannah Commc'n*, 140 F. App'x 905, 907 (11th Cir. 2005) (applying only the six-year statute of limitations to the relator's claim); *United States ex rel Erskine v. Baker*, 213 F.3d 638 (5th Cir. 2000) (unpublished) (per curiam) ("[Section] 3731(b)(2) is only available to relators if they are in direct identity with the government. . . . [Relators] are thus bound by § 3731(b)(1), which governs relator actions."). Other courts allow a *qui tam* plaintiff to take advantage of 31 U.S.C. § 3731(b)(2), but hold that the three-year extension begins when the *plaintiff*, not the government, learns of the alleged wrong. *See, e.g., United States ex rel. Malloy v. Telephonics Corp.*, 68 F. App'x 270, 273 (3d Cir. 2003) (holding that *qui tam* plaintiffs may take advantage of 31 U.S.C. § 3731(b)(2), but that the three-year extension begins when they learn of the alleged wrong); *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1218 (9th Cir. 1996) (same); *see also United States ex rel. King v. F.E. Moran, Inc.*, No. 00 C 3877, 2002 WL 2003219, at *13 (N.D. Ill. Aug. 29, 2002) (same); *United States ex rel. Bidani v. Lewis*, No. 97 C 6502, 1999 WL 163053, at *4-*9 (N.D. Ill. Mar. 12, 1999) (thoroughly examining the legislative history of the statute of limitations period and concluding that 31 U.S.C. § 3731(b)(2) applies to cases in which the government does not intervene but that "[i]n such cases, the three-year knowledge rule is measured by the knowledge of the qui tam plaintiff").

Relators argue that the tolling provision applies to their claims but concede that their claims against the individual doctors who were named for the first time in the third amended complaint are subject to a six-year limitation because 31 U.S.C. § 3731(b)(1) provides the longer

period of time. (R. 173, Relators' Resp. at 25) (invoking the "whichever occurs last" language of the statute). Relators argue that the six-year limit does not bar their claims against Drs. Berger, Rosenberg, and Sheinkop, however, because the specific dated incidents in the Complaint are only representative examples of misconduct, and all Defendants continued to participate in the fraudulent scheme after June 21, 2004. (*Id.* at 21.) Relators further argue that the Complaint is "not required to plead around a statute of limitations affirmative defense," and thus the fact that the Complaint does not happen to include allegations of specific incidents of fraud that Drs. Berger, Rosenberg, and Sheinkop committed after June 21, 2004 does not subject the claims against them to dismissal. (*Id.*) (citing *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)). "[A] plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). The Court agrees with Relators that "[t]he inclusion of the specific examples set forth in ¶¶ 84-152 in no way limit[s] Relators' claims only to those instances." (R. 173, Relators' Resp. at 21); *see also Upton*, 2012 WL 4577553, at *9. Here, Relators allege an ongoing fraudulent scheme that Defendants allegedly continued to execute after June 21, 2004. (*See* R. 168, Fourth Am. Compl., ¶¶ 110, 137, 145.) Accordingly, dismissal based on the statute of limitations is premature. *See Upton*, 2012 WL 4577553, at *9.

## CONCLUSION

For the foregoing reasons, the Court DENIES in part and GRANTS in part Defendants' Motions to Dismiss (R. 169, R. 171). Counts III, IV, and V of the Fourth Amended Complaint are dismissed, and defendants Rush University Medical Center and Rush SurgiCenter Limited Partnership are dismissed from the case. Counts I and II asserted against Midwest Orthopaedics at Rush, LLC and the individual Doctor Defendants remain. The remaining parties are directed

to exhaust all settlement possibilities prior to this Court's next status hearing on April 2, 2013, at which time this Court will set an expedited litigation schedule for this delayed lawsuit.

ENTERED:

Judge Ruben Castillo
United States District Court

**Dated: March 6, 2013**